UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Administratively Consolidated |
| | : | |
| SageCrest II, LLC, | : | Case No. 08-50754 (Lead) |
| SageCrest Finance, LLC, | : | Case No. 08-50755 |
| SageCrest Holdings, Limited, | : | Case No. 08-50763 |
| SageCrest Dixon, Inc., | : | Case No. 08-50844 |
| | : | |
| Debtors. | : | |

*Appearances*:

| | | |
|---|---|---|
| James Berman, Esq. | : | Attorney for On-Shore Debtors,[1] |
| ZEISLER & ZEISLER, P.C. | : | Movants |
| 558 Clinton Avenue | : | |
| Bridgeport, CT | : | |
| | | |
| Patrick J. Neligan, Esq. | : | Attorney for On-Shore Debtors, |
| NELIGAN FOLEY LLP | : | Movants |
| 325 North St. Paul, Suite 3600 | : | |
| Dallas, TX 75201 | : | |
| | | |
| Laurence May, Esq. | : | Attorney for Off-Shore Debtor,[2] |
| COLE, SCHOTZ, MEISEL, | : | Movants |
|   FORMAN & LEONARD, P.A. | : | |
| 900 Third Ave., 16th Floor | : | |
| New York, NY 10022 | : | |
| | | |
| Carol A. Felicetta, Esq. | : | Attorney for the |
| REID & REIGE. P.C. | : | Official Committee of |
| One Financial Plaza | : | Equity Investors |
| Hartford, CT 06103 | : | |

---

[1] The "On-Shore Debtors" consist of SageCrest II, LLC ("SC II"), SageCrest Finance, LLC ("Finance"), and SageCrest Dixon, Inc. ("Dixon").

[2] The "Off-Shore Debtor" is SageCrest Holdings Limited ("Holdings"). For convenience, the court may collectively refer to the On-Shore Debtors and the Off-Shore Debtor as the "Debtors".

| | | |
|---|---|---|
| Denis Meier, Esq. | : | Attorney for the |
| KILPATRICK STOCKTON LLP | : | Official Committee of |
| 1100 Peachtree Street, Suite 2800 | : | Equity Investors |
| Atlanta, GA 30309-4530 | | |
| | | |
| Alexander D. Widell, Esq. | : | Attorney for Windmill |
| BICKEL & BREWER | : | and the Milton Brothers |
| 767 Fifth Avenue, 50th Floor | : | |
| New York, NY 10153 | : | |
| | | |
| Mark R. Jacobs, Esq. | : | Attorney for Topwater[3] |
| PRYOR CASHMAN LLP | : | |
| 7 Times Square | : | |
| New York, NY 10036-6569 | : | |
| | | |
| Jessica Grossarth, Esq. | : | Attorney for Art Capital[4] |
| PULLMAN & COMLEY, LLC | : | |
| 850 Main Street | : | |
| Bridgeport, CT | : | |
| | | |
| Christopher Donoho, III, Esq. | : | Attorney for Art Capital |
| LOVELLS, LLP | : | |
| 850 Main Street | : | |
| Bridgeport, CT | : | |
| | | |
| Jonathan B. Alter, Esq. | : | Attorney for Deutsche Bank[5] |
| BINGHAM McCUTCHEN, LLP | : | |
| One State Street | : | |
| Hartford, CT | : | |

---

[3]  For convenience, the court will refer to Topwater Exclusive Fund III, Wood Creek Multi-Asset Fund, LP, Freestone Low Volatility Partners, LP, and Freestone Low Volatility Qualified Partners, LP collectively as "Topwater".

[4]  For convenience, the court will refer to ACG Credit Company II, LLC, ACG Credit Company, LLC, ACG Finance Company, LLC, Art Capital Group, LLC, Fine Art Finance Company, LLC, and Ian Peck collectively as "Art Capital".

[5]  For convenience, the court will refer to Deutsche Bank National Trust Company, Deutsche Bank, AG, New York Branch, and DB Structured Products, Inc., collectively as "Deutsche Bank".

| | | |
|---|---|---|
| Brian E. Greer, Esq. | : | Attorney for |
| DECHERT, LLP | : | the Russell Funds[6] |
| 1095 Avenue of the Americas | : | |
| New York, NY 10036 | : | |

Alan H. W. Shiff, United States Bankruptcy Judge:

### MEMORANDUM AND ORDER ON MOTION TO APPROVE A SETTLEMENT AGREEMENT

In March 2010 the Debtors, Windmill Management, LLC ("Windmill"), the managing member of SC II, and its principals, Alan and Philip Milton (the "Milton Brothers"), Deutsche Bank, and the Official Committee of Equity Investors ("Equity Committee") entered into a "Settlement Agreement". On March 25, 2010, the Debtors filed this motion under Rule 9019(a), Fed. R. Bankr. P., for its approval (hereinafter, the "9019 Motion"). The Russell Funds, a major investor, supports the motion. The Settlement Agreement is opposed by Topwater and Art Capital, whose status as holders of allowed unsecured claims is disputed. The narrow issue addressed in this decision is whether the agreement satisfies this Circuit's standard of reasonableness.

There is a general consensus that if unresolved the matters addressed in the Settlement Agreement will be an insurmountable barrier to the construction and confirmation of plans in these cases and that resolution by litigation will necessarily add a level of expense and delay that will likely be fatal to that objective. For the reasons that follow, the 9019 Motion to approve the Settlement Agreement is granted.

### *BACKGROUND*

Because multiple parties and interrelated issues form the context in which the Settlement Agreement evolved, a detailed introductory statement is warranted.

---

[6] For convenience, the court will refer to Russell Alternative Investment Funds plc–The Alternative Strategies Fund, Russell Alternative Strategies Fund II plc, Russell Diversified Alternatives Fund–U.S. Benefit Plans Ltd., and Russell Alternative Strategies Fund N1, collectively as the "Russell Funds".

SC II is a Delaware limited liability company ("LLC") governed by an "Amended and Restated Operating Agreement of SageCrest II, LLC," dated December 18, 2002 ("Operating Agreement").  It is part of a group of hedge funds that was formed to address the financial needs of companies, which, due to the consolidation of the banking and specialty finance sectors, had been excluded from traditional sources of capital.[7]  It is managed by Windmill.  The principals of Windmill are brothers Alan and Phillip Milton.

On August 17, 2008, SC II and Finance filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Holdings filed for Chapter 11 bankruptcy on August 20, 2008, with Dixon doing likewise on September 11, 2008.  By orders dated August 27, 2008, and October 30, 2008, the court approved the joint administration of SC II's case, with those of Finance, Dixon, and Holdings.  On October 7, 2008, the United States Trustee ("UST") appointed the Equity Committee.

### *The Mediation*

Although the Debtors were initially represented by the same counsel, in the Fall of 2008 Holdings retained separate counsel, arguing its interests were not aligned with those of the On-Shore Debtors.  Thus, with the Debtors no longer unanimously united, it was apparent that separate plans would be proposed by the On-Shore Debtors and Holdings.  On March 31, 2009, the On-Shore Debtors filed a joint disclosure statement and liquidating plan.  (*See* docs. ## 530, 531.)  On May 15, 2009, after an initial

---

[7] Generally, the Debtors operate through two lines of business: structured finance and real estate investment and development.  In their structured finance business, the Debtors have made loans to borrowers in the following five areas: specialty finance; life insurance-related products; corporate; mortgage/real estate products; and specialty auto finance.  In their real estate investment and development business, they made loans in the hospitality, mixed use, multi-family, and commercial sectors.  They have also provided senior secured, asset-based loans and related products to small-sized and medium-sized businesses that have a significant asset base and are overlooked by many lenders in the mainstream capital markets.  In addition, the Debtors have provided junior or subordinated secured financing.

extension of its exclusivity period, Holdings filed its disclosure statement and liquidating plan. (*See* docs. ## 616, 617.) Both disclosure statements were scheduled for a hearing on June 18, 2009. Prior to that date, the On-Shore Debtors filed a motion requesting a second extension of their exclusivity period. *See* § 1121(b) and (d). At the June 10, 2009 hearing on that motion, it was determined that the On-Shore Debtors and the Off-Shore Debtor should be given an opportunity to propose a joint consensual plan for the liquidation of all assets, particularly in light of their illiquid nature and the complicated manner in which title and interests were held. To facilitate that objective and with the consent of the parties, the court appointed Melanie Cyganowski, the former Chief Bankruptcy Judge for the Easter District of New York. (*See* Order dated June 10, 2009 (doc. #664).) The parties were directed to report on the result of their efforts on September 16, 2009. That date was extended to October 28, 2009 at the request of the parties who reported they were actively engaged in mediation efforts. The exclusivity periods for both Holdings and the On-Shore Debtors were also extended to that date.

### *The Windmill Claims*

On September 8, 2009, SC II filed a "Motion for Allowance and Payment of Administrative Expense Claim" (doc. #727), seeking permission to pay Windmill a management fee as an administrative expense.[8] SC II claimed that since filing its bankruptcy petition, Windmill continued in its management role but had not been paid. Thus, through September 30, 2009, SC II claimed it owed Windmill in excess of $1,000,000. At the October 6, 2009 hearing on the motion and corresponding objections from several interested parties, the court scheduled a trial with a December 1, 2009 hearing on all pretrial discovery disputes. At the December 1st hearing, upon

---

[8] According to SC II's Operating Agreement, its manager, Windmill is generally "vested with the full, exclusive and complete right, power and discretion to operate, manage and control the affairs" of SC II. Operating Agreement at § 5.1. The agreement further provided that Windmill is entitled to a quarterly management fee, payable in advance on the first day of each quarter. *Id.* at § 5.6(b). That management fee is based on the net value of SC II's assets.

the representation of the parties that the Windmill fee dispute was within the scope of the mediation in progress before Judge Cyganowski, the court agreed to postpone the trial so that the Windmill controversy could be added to the mediation.

### *The Topwater Dispute*

Another of the outstanding disputes is the classification of Topwater's claim. And like the Windmill controversy, the Topwater dispute stands as a significant barrier to the efficient and effective liquidation of assets *alleged* to be the objective of all entities, including Topwater.

Since the inception of these cases, Topwater has claimed it is a general unsecured creditor of SC II because it properly "redeemed"' part or all of its interests. SC II and the Equity Committee have challenged that position, arguing that since there were no payments on its redeemed interests, Topwater continues to be an equity holder in SC II. At the commencement of a trial on September 10, 2009, scheduled to determine that and other issues, the court expressed a concern that a decision on Topwater's status would not be binding on any other so-called "redeemed" investors. The trial was continued *sine die* to allow the parties to explore the possibility of settling their disputes through an extension of the mediation.

On October 13, 2009, Topwater filed a motion for the appointment of an official committee of redeemed investors repeating its position that its interests were not adequately represented by members of the Equity Committee. (*See* doc. #770.) The Debtors and the Equity Committee objected. At the October 27, 2009 hearing, the Equity Committee expressed its willingness to add the Topwater dispute to the mediation. Thus, the court deferred ruling on the motion to allow Topwater to explore the Equity Committee's offer of mediation. On December 15, 2009, Topwater reported that it attempted to mediate its debt/equity dispute, but that effort was unsuccessful. It then renewed its motion for appointment of a committee of redeemed investors, which the court again deferring ruling upon until after there was a report on the mediation efforts to present a consensual joint plan.

### *The Equity Committee's Retention of a Financial Consultant*

In October 2009, the Equity Committee filed, with a supporting affidavit, an application to employ Ralph Harrison ("Harrison") *nunc pro tunc* to September 15, 2009. (*See* doc. #795.)  Harrison had been the managing director and general counsel of SSR Capital Partners, LP ("SSR"), a registered investment advisor and a member of SC II.  SSR is a member of the Equity Committee, and Harrison was SSR's representative on the committee.

The application stated that Harrison's services "are unique and complementary to those currently being provided" and his "retention will provide critical experience and expertise relating to the Debtors' funds and their assets and the liquidation process." Equity Committee's Application (doc. #795) at 5, ¶ 15.  Harrison had resigned from SSR effective August 15, 2009, and the Equity Committee sought his retention effective September 15, 2009.  The UST filed a "Statement of No Objection".  Topwater was the sole objector.  On November 18, 2009, the court overruled Topwater's objection and approved the application to retain Harrison.

### *The Art Capital Dispute*

Another issue to be resolved in these cases is whether Art Capital holds a valid proof of claim against SC II or, conversely, whether it owes SC II substantial sums of money.  Art Capital and SC II are currently involved in state court litigation over monies allegedly due to SC II from Art Capital.  The current litigation is an extension of litigation begun in state court over five years ago.  Components of that litigation are relevant in these cases.[9]  That issue has also been continued *sine die* while the Debtors and the

---

[9] *See, e.g.*, Art Capital's "Motion to Show Cause as to Why Scope of Special Counsel Kelly Drye & Warren's Employment Should Not Be Clarified upon Temporary Stay of New York State Court Litigation and Why This Case Should Not Be Subject to a Scheduling Order" (doc. #479), with motion denied on March 17, 2009; "Motion for Order Authorizing Rule 2004 Examination of Alan Milton" (doc. #517), with motion denied on April 28, 2009; "Motion for Order Authorizing Rule 2004 Examination of Phillip Milton" (doc. #518), with motion denied on April 28, 2009; "Objection to Debtor's Application for Order Authorizing the Retention of Sheppard Mullin Richter & Hampton

(continued...)

Equity Committee work on formulating a consensual plan.

## *DISCUSSION*

As noted, the Settlement Agreement is between the Debtors, Windmill, the Milton Brothers, Deutsche Bank, the Debtors' largest secured creditor, and the Equity Committee.  The Debtors' 9019 Motion also seeks approval of a transition agreement (the "Transition Agreement") among the Debtors, the Equity Committee, Holdings' Provisional Liquidator, and Windmill, which is intended to facilitate a transition of management from Windmill to an interim manager and interim asset servicer who will take over responsibility for managing and servicing the Debtors' assets.  Article IV of the Settlement Agreement, entitled "Transition", addresses the resignation of Windmill and its replacement with Harrison as "Replacement Manager".  Harrison will also "contract with[,] and seek Bankruptcy Court approval of[,] an Interim Asset Servicer mutually acceptable to" the Debtors, the Equity Committee, the Provisional Liquidator and Deutsche Bank.  Settlement Agreement, Art. IV, § 4.2(b), Debtors' Ex. 1 (attached to 9019 Motion as Ex. A).

Art Capital objects to the proposed Settlement Agreement principally arguing that it is really a *sub rosa* plan.  It also challenges interim manager Harrison's qualifications and disinterestedness under Code § 327(a).  Topwater echos Art Capital's concerns about Harrison, arguing that, without further disclosure, no determination can be made as to whether he is disinterested as required by § 327(a).  Topwater also expresses a concern about proposed releases, *i.e.*, the need to clarify that any releases do not bar investors from bringing claims against Windmill and/or the Milton Brothers.  Topwater further contends that replacement of Windmill must be done in accordance with SC II's Operating Agreement.

The analysis begins with the relevant text of Rule 9019(a): "On motion by the [Debtor] . . . the court may approve a compromise or settlement."  Recognizing the

---

[9](...continued)
LLP as Special Counsel *Nunc Pro Tunc* to November 4, 2009" (doc. #853), with objection overruled on December 10, 2009 (doc. #866).

uniqueness of Rule 9019 in that it "does not have a parallel section in the Code," the Second Circuit has held that the rule "has a 'clear purpose . . . to prevent the making of concealed agreements which are unknown to creditors and un-evaluated by the court.'" *Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iredium Operating, LLC)*, 478 F.3d 452, 461 (2d Cir. 2007) (quoting *In re Masters, Inc.*, 141 B.R. 13, 16 (Bankr. E.D.N.Y. 1992)).

> Courts have developed standards to evaluate if a settlement is fair and equitable, and, to that end, courts in this Circuit have set forth factors for approval of settlements based on the original framework announced in [the Supreme Court's opinion in] *TMT Trailer Ferry*. Those interrelated factors are: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Id.* at 462 (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006), and citing *Protective Comm. of Indep. Stockholders of TMT Trailer Ferry, Inc., v. Anderson*, 390 U.S. 414, 424 (1968); *In re Drexel Burnham Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992)).  Through the consideration of these factors, bankruptcy courts are to make an "'informed and independent judgment as to whether [the] proposed compromise is fair and equitable' . . . ." *In re NW Investors II, LLC*, 06-CV-5078 (ADS), 2007 WL 2228151, *4 (E.D.N.Y. 2007) (quoting *TMT Trailer Ferry*, 390 U.S. at 424). "However, '[i]t is not necessary for the bankruptcy court to conduct a 'mini trial' on the issue.'"  *Id.* (quoting *In re WorldCom*, 347 B.R. at 137) (further citation omitted).  Rather,

the Circuit Court has repeatedly instructed that a bankruptcy court "is not to decide the numerous questions of law and fact raised by [objectors] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range to reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.689, 693 (2d Cir. 1972)); *see also Kayo v. Fitzgerald*, 91 Fed. App'x 714, 715 (2d Cir. 2004); *Hitzig, Handler, & Schwinning, P.C. v. Pereira*, 29 Fed. App'x 39, 42 (2d Cir. 2002); *In re Liu*, 166 F.3d 1200, 1200 (2d Cir. 1998); *In re Infotechnology, Inc.*, 89 F.3d 825, 825 (2d Cir. 1995); *In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985).

In that vein and of note, one district court in this circuit held that a bankruptcy court is not required to take evidence when deciding whether to approve a settlement. Rather, the court is required to make an informed and independent judgment regarding the appropriateness of the settlement after independently examining the identified *Iridium* factors. *See In re NW Investors II, LLC*, 06-CV-5078 (ADS), 2007 WL 2228151, *6 (E.D.N.Y. 2007); *see also In re WorldCom, Inc.*, 347 B.R. at 137. And, while a court "may consider a creditor's objection to the proposed compromise, the objection is not controlling, and will not bar approval when a review of the settlement shows it does not 'fall below the lowest point in the range of reasonableness.'" *In re Drexel Burnham*, 134 B.R. at 506 (quoting *In re W.T. Grant Co.*, 699 F.2d at 608) (further internal citations omitted). Finally, "[a] decision to either accept or reject a compromise and settlement is within the sound discretion of the Court . . . ." *Id.* (citation omitted).

I

The Settlement Agreement proponents and objectors appear to agree that given the complexity of these cases, the illiquidity of the assets, and the difficult current financial markets, it is undisputed that it will be years before any allowed claims will be paid in these cases absent resolution of the issues addressed in the Settlement Agreement. There is also no dispute that in the absence of compromise those issues will be bogged down by complex and, assuredly, protracted litigation, with attendant expense, inconvenience, and delay. During an opening statement at the April 7, 2010

hearing on the Settlement Agreement, counsel for SC II argued that Judge Cyganowski had succeeded in achieving a result that none of the participants had initially believed could be accomplished, *i.e.*, an agreement to settle the Windmill claims, so that the prospect for achieving a consensual plan was realistic.

It is noteworthy that the only opposition to approval of the Settlement Agreement is from Art Capital and Topwater (collectively, "Objectors"). That factor supports overruling the Objectors especially when the court considers that Art Capital's claim is relatively small and disputed[10] and Topwater's recurring objections might ultimately be fatal to the vitality of these cases in Chapter 11 to the detriment of *all parties*, except secured creditor Deutsche Bank.[11]

Art Capital's objection that the Settlement Agreement is a *sub rosa* plan is unavailing. Parenthetically, it is noted that a *sub rosa* argument is usually made in the context of a sale of all or substantially all of a debtor's property under § 363(b), because such a sale might arguably be done to by-pass the safeguards of the confirmation process prescribed under §1129. *See Official Comm. of Unsecured Creditors of Tower Automotive v. Debtors (In re Tower Automotive, Inc.)*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006) (affirming and quoting the bankruptcy court's decision to approve a settlement over *sub rosa* objections, *In re Tower Automotive, Inc.*, 342 B.R. 158, 164 (Bankr. S.D.N.Y. 2006) (the Settlement Agreement does not "dispose of all of the debtors'

---

[10] Art Capital filed a proof of claim for $142,000; it also filed an addendum to its proof of claim alleging a claim for damages which could exceed $10 million. SC II vigorously contests the damages claim and, instead, asserts that Art Capital owes it millions of dollars. The parties are currently litigating that issue in state court.

[11] At several junctures in these cases, including at the April 7, 2010 hearing on the 9019 Motion, counsel for SC II stated that the Debtors hoped to present a consensual plan, which would pay all unsecured creditors 100% of their allowed claims. *See, e.g.*, 9019 Motion Hr'g Tr. 33-35, 55-56, 79-80, April 7, 2010 (doc. #991). No such plan has yet been proposed, so it is unknown whether that result will be achieved. However, it is beyond peradventure that there is a direct corollary between delay and the failure of that prospect. In that context, it is not unreasonable to speculate that Topwater's opposition is intended to better its bargaining posture in its dispute with the Debtors and the Equity Committee over its claim to be a holder of debt rather than equity.

assets, restrict creditors' rights to vote as they deem[] fit on a plan of reorganization, or dictate the terms of a plan of reorganization.")).  That is not the function of this Settlement Agreement, which is intended to compromise and settle a disputed post-petition administrative claim.

Moreover, the fact that within the Settlement Agreement the parties have incorporated the resignation of Windmill and the transition of management to Harrison, at least on an interim basis, does not morph that agreement into a liquidating plan. Indeed, the court recognizes the pragmatic integration of those two components. Hence, there is no basis to find the proposed settlement of the Windmill/Milton claims is a *sub rosa* plan, and objections on that basis are overruled.

Having examined the evidence and considered the arguments of counsel,[12] the court is persuaded that the Settlement Agreement provides the indisputable benefit of lifting a significant barrier to the proposal of a consensual joint liquidating plan. Moreover, there is a substantial risk that if not approved, the parties to the Settlement Agreement will not agree to "start over" ,as suggested by Topwater's counsel, the progress achieved through mediation with Judge Cyganowski will be halted, and these cases will be back in litigation mode.  It is apparent to the court that Judge Cyganowski's efforts produced the best result that can be achieved given the adversarial culture of these cases.

## II

The Debtors and the Equity Committee propose the replacement of Windmill with Harrison (*i.e.*, the transition) as an integral part of the Settlement Agreement. Topwater argues that any consideration of that issue should be treated separately.  It is apparent that the transition was crafted as part of a global agreement, which involved

---

[12] The court reiterates that on a Rule 9019 motion, a bankruptcy court is not required to take evidence.  *See supra* p. 10.  Yet, the On-shore Debtors did offer evidence in support of their 9019 Motion: Ex. 1, Settlement Agreement; Ex. 2, Outline of Terms of Transition Agreement; Ex. 3, Harrison's resume; and Ex. 4, SC II's Operating Agreement.  No evidence was offered by Art Capital or Topwater and neither party requested an evidentiary hearing on the 9019 Motion.

overlapping and time-sensitive considerations that might unravel if it is considered separately as urged by Topwater.  Moreover, the court is persuaded that time is of the essence.[13]  Any *de facto* management vacuum must be expeditiously filled as delay will be at the expense of *all* parties – including the Objectors.

Topwater's substantive opposition to the transition fares no better.  Topwater argues that the retention of Harrison, as the interim member of SCII, is subject to § 327(a), and the Debtors cannot satisfy the "disinterested" prong of that provision.  However, the consideration of Harrison must be within the context of Rule 9019.  As discussed, that requires this court "to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range to reasonableness'".  *In re W.T. Grant Co.*, 699 F.2d 599, 608 (internal quotation omitted).  It is not to "decide the numerous questions of law and fact raised by [objectors]".  *Id.*  If, however, an assessment is appropriate under § 327, it would be within the context of § 327(b).

---

[13]  At the April 7, 2009 hearing, Holdings' counsel stated:

> The fact of the matter is . . . that we cannot wait till confirmation of a plan to get someone in to take a look at these assets and to provide the senior leadership needed to move these assets forward and to make decisions with respect to how we deal with some of the assets that are in the debtor's portfolio.  Some of these assets are severely distressed.
> They need . . . an experienced eye to look at them, and they need decisions to be made as to how we proceed.  These assets, some of them are deteriorating on a daily basis, and they have to be . . . coddled, they have to be evaluated, and decisions have to be made.
> And it's important, in my judgment, critical, Your Honor, that we not wait, and that that we have someone go in to do that on an immediate basis.
> And Sage Cest II, the owner – title owner of those assets, has suggested that Mr. Harrison, at least in the first instance, undertake that role, and we are completely comfortable with him doing that.  But it has to be done, It can't wait.

9019 Motion Hr'g Tr. 33:18-34:14, Apr. 7, 2010 (Attorney Laurence May) (doc. #991).

Subsections 327(a) and (b) provide in relevant part:

> (a) Except as otherwise provided in this section, the [Debtors], with the court's approval, may employ. . . *other professional persons*, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtors] in carrying out [their] duties under this title.
>
> (b) If the trustee is authorized to operate the business of the debtor under section . . . 1108 of this title, and if the debtor has regularly employed attorneys, accountants or other professional persons on salary, the trustee may retain or replace such professional persons if necessary in the operation of such business.

11 U.S.C. § 327(a) & (b).

Although § 327(a) references "other professional persons" and a hedge fund manager, *i.e.*, the position to which Harrison would transit, might be considered an "other professional person", reliance of subsection (a) is misplaced. To follow Topwater's logic would nullify subsection (b) as an independent basis for the employment of professional persons, notwithstanding that the caption for § 327 denotes that all of the subsections relate to "professional persons". Moreover, "the phrase 'professional persons,' as used in § 327(a), is a term of art reserved for those persons who play *an intimate role* in the reorganization of a debtor's estate." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Mansville Corp. (In re Johns-Mansville Corp.)*, 60 B.R. 612, 619 (Bankr. S.D.N.Y. 1986); *see also In re Fretheim*, 102 B.R. 298, 299 (Bankr. D. Conn. 1989) ("For § 327(a) to be applicable, an employee's function must be related to the administration of the debtor's estate.").

There is a sharp "distinction between those persons who [are] merely involved in the mechanics of the debtor's business operations . . . and those persons whose employment actually effect[s] the administration of the debtor's reorganization." *In re Johns-Mansville*, 60 B.R. at 620. To that end, in determining whether persons sought to be retained by the debtor were professionals under § 327(a), the *Johns-Mansville* court focused on whether the retention was to represent or assist the debtor in carrying out its bankruptcy duties, to wit: whether those sought to be retained played a part in

negotiating the debtor's reorganization plan, adjusting the debtor/creditor relationships, or disposing or acquiring assets of the debtor.  *See id.* at 621.

On the other hand, § 327(b) authorizes the Debtors to, *inter alia*, replace "regularly employed" "other professional persons on salary" "if necessary in the operation of such business."  Subsection (b) addresses the situation where, as here, a debtor must replace a regularly employed professional, such as a manager.  This subsection allows courts to avoid involvement in traditional management decisions, *e.g.*, hiring and firing managers.  *Johns-Manville*, 60 B.R at 620.

In assessing the transition component of the Settlement Agreement, it is noted that SC II is an LLC which functions through Windmill, the manager.  *See generally* Operating Agreement, Art. V "Rights and Duties of the Manager".  Therefore, whether or not it was in bankruptcy, SC II would require a manager to run its day-to-day operations.  Now, because of a loss of confidence in Windmill, SC II has determined that it is necessary to replace Windmill.  Indeed, Topwater concedes in its Objection that Windmill should be replaced.  *See* Topwater's Objection at 10, ¶21 (doc. #969) ("[Topwater support[s] the underlying goal of removing Windmill and the Miltons from their current management of the SageCrest Entities . . . .  The SageCrest Entities cannot function without a manager (indeed, the Operating Agreement requires that it have a manager).").[14]

Moreover, as clarified at the April 7th hearing the Debtors seek the transition of management to an *interim,* not a permanent, manager.  The issue of a permanent manager will be addressed in the plan process if these cases progress to that stage, thereby ensuring all parties an ample opportunity to be heard.  *See* 9019 Motion Hr'g Tr. 38:5-12, Apr. 7, 2010 (doc. #991).

---

[14]  Yet, at the April 7, 2010 hearing on the 9019 Motion, Topwater took the position that a Chapter 11 trustee should be appointed instead of supporting the more moderate option of appointing an interim manager.  The court notes there is no motion before the court seeking such an appointment.  But, assuming Topwater made such a motion, it has not shown by clear and convincing evidence, or even made an adequate proffer, that the appointment of a Chapter 11 trustee is warranted in this instance.  *See, e.g., Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541. 546-47 (2d Cir. 2009).

Accordingly, the court concludes that the transition of management is appropriate under §327(b), it is inextricably bound to the other provisions of the Settlement Agreement, and it does not lower that agreement below the "lowest point in the range of reasonableness.'" *In re Drexel Burnham*, 134 B.R. at 506 (further citation omitted).

### III

Topwater also argues that the 9019 Motion should be denied because the Settlement Agreement does not comply with SC II's Operating Agreement. That position is yet another hollow attempt to leverage bargaining power of its reclassification dispute with SC II and the Equity Committee.

Topwater directs the court's attention to Article Six of the Operating Agreement. In relevant part that Article provides:

> 6.3  **Continuation of the Company**.  In the event of the withdrawal, Bankruptcy or incapacity of the Manager, the Company shall be dissolved, unless the Members shall, within 90 days after the occurrence of such withdrawal, Bankruptcy or incapacity, unanimously Consent to continue the Company and unanimously Consent to the election of a new Manager. . . .

Section 6.3 of Article Six discusses three scenarios, two of which are not viable: withdrawal by a manager and incapacity of a manager. That leaves, as the sole predicate, the bankruptcy of SC II. By filing for bankruptcy, SC II triggered a dissolution. Under § 6.3, the members had 90 days within which to unanimously consent to continue the company. Since that did not occur, Article Eight of the Operating Agreement was invoked. More specifically, the liquidation section of that Article, § 8.2, states, *inter alia*:

> (a) Upon dissolution of the Company, the Manger or, if there is none, a person selected *by a majority* in Interest of the Members shall act as a liquidating trustee (the "Liquidating

> Trustee") to wind up the affairs of the Company and proceed within a reasonable period of time to sell or otherwise liquidate the assets of the Company . . .

Operating Agreement, Art. VIII, § 8.2 (emphasis added). Assuming, *arguendo*, that Topwater is determined to be a creditor, as it continues to assert, then it has no voting rights. Conversely, if it is what it argues it is not (*i.e.*, that is a member of SC II), it has not shown that it holds or joins other members in holding a majority interest.

### *Conclusion*

The Objectors have done little, if anything, to challenge the arguments of the Settlement Agreement proponents that Judge Cyganowski's efforts assisted them in removing major barriers to a joint consensual plan. There can be no reasonable debate that settling the Windmill/Milton claims and removing Windmill as the manager of SC II, is the best achievable result given the initial adversarial culture of these cases. While there is no way of knowing with certainty the fate of these cases, if the Settlement Agreement is not approved, there can be little doubt about the identity of the losers under such a scenario – the holders of allowed claims and interests who are entitled to expeditious and efficient case management. Accordingly, finding the Settlement Agreement does not fall below the lowest point in the range of reasonableness,

The objections of Art Capital and Topwater are overruled, and

The 9019 Motion is granted.

**IT IS SO ORDERED.**

*Alan H. W. Shiff*
Alan H. W. Shiff
United States Bankruptcy Judge

Dated this 18th day of May 2010 at Bridgeport, Connecticut.