UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| SAGECREST II LLC, | ) | CASE NO. 08-50754 (AHWS) |
| SAGECREST FINANCE LLC, | ) | CASE NO. 08-50755 (AHWS) |
| SAGECREST HOLDINGS LIMITED, and | ) | CASE NO. 08-50763 (AHWS) |
| SAGECREST DIXON INC., | ) | CASE NO. 08-50844 (AHWS) |
| | ) | |
| DEBTORS. | ) | JOINTLY ADMINISTERED UNDER |
| | ) | CASE NO. 08-50754 (AHWS) |

EMERGENCY MOTION OF DEUTSCHE BANK AG,
NEW YORK BRANCH, AS AGENT FOR DB STRUCTURED
PRODUCTS, INC., TO ADJOURN DISCLOSURE STATEMENT
<u>HEARING AND EXPEDITE DISCOVERY</u>

Deutsche Bank AG, New York Branch, as agent for DB Structured Products, Inc. ("<u>DB</u>")

files this motion to adjourn the hearing to determine the adequacy of the *Disclosure Statement*

*with Respect to Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code Proposed by*

*SageCrest II, LLC, SageCrest Finance LLC, SageCrest Holdings Limited, SageCrest Dixon Inc.*

*and the Official Committee of Equity Security Holders* [Docket No. 1136] (the "<u>Debtors'</u>

<u>Disclosure Statement</u>"), and respectfully states as follows:

<u>Jurisdiction</u>

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>Background</u>

2.      Pursuant to certain loan agreements dated as of April 2, 2007 (as amended,

supplemented or modified, the "<u>Loan Agreements</u>"), DB is the sole secured creditor of

SageCrest Finance LLC ("<u>Finance</u>") and SageCrest Holdings Limited ("<u>Holdings</u>") and holds a

1

first-priority, perfected security interest in substantially all of the assets of those entities.[1] Such assets include a life insurance portfolio, specialty finance loans to third parties, and real estate investments (collectively, the "SageCrest Portfolio"). As of the Petition Date (defined below), the Debtors' outstanding debt to DB was approximately $107.5 million (exclusive of default interest which has and continues to accrue).

3. On August 17, 2008 (the "Petition Date"), SC II and Finance each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On August 20, 2008, Holdings (collectively with SC II and Finance, the "Debtors") filed its voluntary petition for chapter 11 relief. The Debtors have continued in operation of their businesses as debtors-in-possession.

4. The Debtors' exclusive periods under Bankruptcy Code section 1121 to file and solicit a chapter 11 plan, and all possible extensions, expired on or before April 20, 2010.

5. On June 30, 2010, the Court entered its *Consent Order Regarding Appraisal* [Docket No. 1094] (the "Consent Order"), which provides, among other things, that the Debtors shall grant to DB and DB's financial advisors, Alvarez & Marsal ("A&M"), reasonable access to information required for A&M to perform a valuation of DB's collateral. Consent Order, ¶ 2.

6. On August 9, 2010, the Debtors filed the *Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code Proposed by SageCrest II, LLC, SageCrest Finance LLC, SageCrest Holdings Limited, SageCrest Dixon Inc. and the Official Committee of Equity Security Holders* [Docket No. 1135] (the "Debtors' Plan") and the Debtors' Disclosure Statement.

---

[1] Debtor SageCrest II LLC ("SC II") guaranteed the payment and performance of a portion of DB's loan to Finance. A more detailed description of the Loan Agreements and copies thereof were provided in connection with DB's *Motion for Relief from the Automatic Stay*, dated September 12, 2008 [Doc. No. 48].

7.     The Court has set September 28, 2010 as the date of the hearing to determine the adequacy of the Disclosure Statement (the "Disclosure Statement Hearing").

8.     The Debtors' Plan contemplates the liquidation of the Debtors' assets with distributions to creditors over a four year period.  The Debtors' Plan would permit the Debtors, in certain circumstances, not to make any distributions to DB until the end of the four year liquidation period, with junior creditors receiving payments from DB's collateral in the interim.

9.     As set forth in greater detail in DB's Objection to the Debtors' Disclosure Statement, the Debtors' Disclosure Statement contains absolutely no analysis showing that the Debtors' Plan, as proposed, is feasible.  The Debtors' Disclosure Statement contains no cash flow projections, no budgets, no estimates of costs going forward and no indication of when, or if, excess cash will be available to make distributions to creditors.

10.     The only information presented in the Debtors' Disclosure Statement to support the feasibility of the Plan is a valuation of the SageCrest Portfolio prepared by Houlihan Smith as of December 31, 2008 (the "December 2008 Valuation").  However, given the nature of the assets held by the Debtors, and the fact that many of the assumptions made in this appraisal have turned out to be incorrect in the 20 months since the appraisal was created, the December 2008 Valuation is long since outdated and of virtually no use.

11.     The December 2008 Valuation certainly is insufficient to establish, as the Debtors conclude in their disclosure statement, "that the Deutsche Bank Secured Claims are significantly over-secured and that the payment in full of all allowed General Unsecured Claims against SC II, SC Finance and SC Holdings as provided in the Plan is feasible."  Debtors' Disclosure Statement, Art. VI.D.13.

12.     On September 21, 2010, DB filed the *Joint Plan Of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Deutsche Bank AG, New York Branch, as Agent for DB Structured Products, Inc.* (as may be amended or modified, the "DB Plan") and *Disclosure Statement for the Joint Plan Of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Deutsche Bank AG, New York Branch, as Agent for DB Structured Products, Inc.* (as may be revised, the "DB Disclosure Statement").

13.     The DB Plan is substantially similar to the Debtors' Plan,[2] the main differences being that the DB Plan proposes payments in accordance with the priority set forth in the Bankruptcy Code and contains provisions that are necessary to adequately protect DB's collateral position.  Such protections are required given that (a) the value of DB's collateral that will be established by DB through the A&M valuation will be significantly less than the value in the December 2008 Valuation, and (b) DB's collateral, and the proceeds thereof, will be used to fund the Debtors' liquidation.

14.     The DB Plan and DB Disclosure Statement rely on A&M's updated valuation of the SageCrest Portfolio.  At this point, however, A&M has been unable to prepare detailed cash flow projections with respect to the DB Plan because the Debtors have not provided A&M with information concerning certain of the Debtors' assets, including assets that the Debtors claim are not part of DB's collateral package.[3]  Nor does A&M have access to any cash flow projections or budgets which would include the Debtors' best estimates of the costs that they would incur in any liquidation.

---

[2]   A blackline showing the differences between the DB Plan and the Debtors' Plan is attached hereto as Exhibit A.

[3]   On September 8, 2010 counsel for DB requested information concerning these assets.  As of the date of this filing, the Debtors have not responded to that request.

A/73500865.6

15.     Accordingly, contemporaneous with the filing of this motion (and the other pleadings filed by DB today), DB also served discovery requests (the "Discovery Requests") on the Debtors, copies of which are attached hereto as Exhibit B, in the form of document requests (the "Document Requests") and 30(b)(6) deposition notices (the "Deposition Notices") that seek, among other things, information about the Debtors' cash flow projections, any updated valuations, and other financial information that would shed light on how the Debtors believe their plan is feasible, as well as information A&M needs to create cash flow projections. The Discovery Requests also ask for information with respect to assets that A&M currently does not have sufficient information to value.

### Relief Requested

16.     By this Motion, DB seeks entry of an order adjourning the Disclosure Statement Hearing and expediting the Discovery Requests so that the Debtors' Disclosure Statement and Plan can proceed on a parallel track with the DB Disclosure Statement and Plan.

17.     It is clear that neither DB, the Debtors' other creditors nor this Court can adequately assess the feasibility of the Debtors' Plan without the information sought in the Discovery Requests, including cash flow projections, updated valuation information and a projected budget. Moreover, even if the Debtors were to produce this information now, creditors would be entitled, under Bankruptcy Rule 3017(a), to 28 days to review the information prior to a hearing on the Debtors' Disclosure Statement.

18.     The information sought in the Discovery Requests is also necessary for A&M to finalize its valuation and feasibility analysis with respect to the DB Plan.

19.     It will be much more efficient for the Court and parties in interest if the Debtors' Plan and the DB Plan proceed on parallel tracks. This would allow for a combined hearing on

both disclosure statements and, assuming that both disclosure statements are approved,[4] the simultaneous solicitation of creditors with respect to each plan.

20.     Accordingly, DB requests that the Court order the Debtors to respond to the Document Requests and produce a witness or witnesses in response to the Deposition Notices on an expedited basis that will provide DB with information sufficient for A&M to (1) prepare cash flow projections for the Debtors going forward; and (2) perform an updated valuation of all of the Debtors' assets.  DB also requests that the Court schedule a hearing on both the DB Disclosure Statement and the Debtors' Disclosure Statement for a date after the Debtors have provided the information requested in the Discovery Requests.

WHEREFORE, for the foregoing reasons, DB respectfully requests that this Court:

(i)  order the Debtors to respond to DB's Document Requests on or before October 15, 2010 and to produce a 30(b)(6) witness on a date convenient for the parties shortly thereafter (but prior to the hearing on the disclosure statements);

(ii)  adjourn the hearing on the Debtors' Disclosure Statement to a date convenient for the Court after October 21, 2010, on which date the Court can consider the Debtors' Disclosure Statement and the DB Disclosure Statement; and

(iii)  grant to DB such other and further relief as may be just and proper.

---

[4]   As set forth in DB's objection to the Debtors' Disclosure Statement, DB believes that the Debtors' Disclosure Statement cannot be approved in its current form.

Dated: September 21, 2010    BINGHAM MCCUTCHEN LLP
      Hartford, CT

By: /s/  Kate K. Simon
Robert M. Dombroff (ct05363)
Kate K. Simon (ct23489)
One State Street
Hartford, Connecticut 06103
Telephone: (860) 240-2700
Facsimile: (860) 240-2800
E-mail:  robert.dombroff@bingham.com
       kate.simon@bingham.com

Julia Frost-Davies (*pro hac vice* application
  to be submitted)
Andrew Gallo (*pro hac vice* application to be
  submitted)
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736
E-mail:  julia.frost-davies@bingham.com
       andrew.gallo@bingham.com

*Attorneys for Deutsche Bank AG, New York Branch,*
*as Agent for DB Structured Products, Inc.*

7

## EXHIBIT A

**Blackline Comparing DB Plan and the Debtors' Plan**

# UNITED STATES BANKRUPTCY COURT\
\
## DISTRICT OF CONNECTICUT\
\
## BRIDGEPORT DIVISION

| | | |
|---|---|---|
| \ | §\ | |
| \IN RE: | §\ | CHAPTER 11\ |
| \ | \§\ | |
| \SAGECREST II LLC | §\ | Case No. 08-50754 (AHWS)\ |
| \SAGECREST FINANCE LLC | §\ | Case No. 08-50755 (AHWS)\ |
| \SAGECREST HOLDINGS LIMITED | §\ | Case No. 08-50763 (AHWS)\ |
| \SAGECREST DIXON INC., | §\ | Case No. 08-50844 (AHWS)\ |
| \ | \§\ | |
| \Debtors. | §\ | Jointly Administered\ |
| \ | §\ | |

| | |
|---|---|
| **In re:** | **Chapter 11** |
| | |
| **SAGECREST II LLC,** | **CASE NO. 08-50754 (AHWS)** |
| **SAGECREST FINANCE LLC,** | **CASE NO. 08-50755 (AHWS)** |
| **SAGECREST HOLDINGS LIMITED, and** | **CASE NO. 08-50763 (AHWS)** |
| **SAGECREST DIXON INC.,** | **CASE NO. 08-50844 (AHWS)** |
| | |
| **Debtors.** | **Jointly Administered under Case No. 08-50754** |

**JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY \~~SAGECREST II, LLC, SAGECREST FINANCE LLC, SAGECREST HOLDINGS LIMITED, SAGECREST DIXON INC. AND THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS~~\DEUTSCHE BANK AG, NEW YORK BRANCH, AS AGENT FOR DB STRUCTURED PRODUCTS, INC.**

BINGHAM MCCUTCHEN LLP

By: /s/Kate K. Simon
   Robert M. Dombroff (ct05363)
   Kate K. Simon (ct23489)
   One State Street
   Hartford, Connecticut 06103
   Telephone: (860) 240-2700
   Facsimile: (860) 240-2800
   E-mail:   robert.dombroff@bingham.com

kate.simon@bingham.com

Julia Frost-Davies (*pro hac vice* to be submitted)
Andrew Gallo (*pro hac vice* to be submitted)
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736
E-mail:  julia.frost-davies@bingham.com
andrew.gallo@bingham.com

*Attorneys for Deutsche Bank AG, New York Branch, as Agent for DB Structured Products, Inc.*

NELIGAN FOLEY LLP
Douglas J. Buncher
PHV02880
Patrick J. Neligan, Jr. David Ellerbe
325 N. St. Paul
Suite 3600
Dallas, Texas 75201
Phone: (214) 840-5300
Fax: (214) 840-5301

ZEISLER & ZEISLER, P.C.
James Berman
558 Clinton Avenue
Bridgeport, CT 06605
Phone: (203) 368-4234
Fax: (203) 367-9678
**COUNSEL FOR SAGECREST II, LLC, SAGECREST FINANCE LLC AND SAGECREST DIXON INC.**

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Laurence May
Neil Y. Siegel
900 Third Avenue
New York, NY 10022
Phone: (212) 752-8000
Fax: (212) 752-8393

NEUBERT, PEPE & MONTEITH, P.C. Douglas Skalka
195 Church Street, 13th Floor
New Haven, CT 06510-2009 Phone: (203) 821-2000
Fax: (203) 821-2009
**COUNSEL FOR SAGECREST HOLDINGS LIMITED**

KILPATRICK STOCKTON LLP Dennis S. Meir
Paul M. Rosenblatt
1100 Peachtree Street, Suite 2800 Atlanta, GA 30309-4530
Phone: (404) 815-6500
Fax: (404) 815-6555

REID & RIEGE, P.C.
Eric Henzy
One Financial Plaza, 21st Floor Hartford, CT 06103-2600
Phone: (860) 240-1150
Fax: (860) 240-1002
**COUNSEL FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS**

Dated: August 9, September 21, 2010

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS, CONSTRUCTION, AND INTERPRETATION .................. 2

ARTICLE II. UNCLASSIFIED CLAIMS ....................................................... 15

    2.01 Administrative Claims ............................................................... 15

    2.02 Priority Tax Claims ................................................................... 17

    2.03 U.S. Trustee Fees ..................................................................... 17

ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS ......................... ~~17~~18

    3.01 Introduction .............................................................................. ~~17~~18

    3.02 Claims Against and Interests in the Debtors .................................... 18

ARTICLE IV. IDENTIFICATION OF UNIMPAIRED AND IMPAIRED  CLAIMS AND INTERESTS ................................................................ 19

    4.01 Unimpaired Claims and Interests ................................................. 19

    4.02 Impaired Claims and Interests ...................................................... ~~19~~20

    4.03 Controversy Concerning Impairment ............................................. 20

ARTICLE V. TREATMENT OF CLAIMS AND INTERESTS ................................. 20

    5.01 Non-Tax Priority Claims – Classes 1A, 1B, 1C~~,~~ and 1D ................. 20

    5.02 Secured Tax Claims – Classes 2A, 2B, 2C and 2D ........................... 20

    5.03 Deutsche Bank Secured Claim Against SC Finance – Class 3A; and Deutsche Bank Secured Claim Against SC Holdings – Class 3B ..................... 21

    5.04 SageCrest Regal Secured Claim Against SC Dixon – Class 4 ............... 22

    5.05 ~~Miscellaneous~~ Other Secured Claims – Classes 5A, 5B, 5C and 5D ......... ~~23~~22

    5.06 General Unsecured Claims – Classes 6A, 6B, 6C and 6D ........................ ~~25~~24

    5.07 DB Guaranty Claim Against SC II – Class 7 ................................... ~~26~~25

    5.08 Redemption Claims Against SC II – Class 8 .................................... ~~26~~25

    5.09 Intercompany Claims – Class 9 ................................................... ~~28~~27

    5.10 Interests in the Debtors – Class 10 ............................................... ~~28~~27

ARTICLE VI. MEANS FOR EXECUTION AND IMPLEMENTATION OF THIS PLAN .................................................................................. ~~30~~28

    6.01 Formation of SC Management and Other Entities; Transfer of Assets to SC Management ....................................................................... ~~30~~28

    6.02 Sources of Cash for Plan Distributions .......................................... ~~30~~29

    6.03 Management After the Effective Date ............................................. ~~31~~29

6.04 Servicing and Liquidation of Assets After the Effective Date .................... \31\29

6.05 Duties of the Committees ........................................................ \31\30

6.06 SC Management 30

6.07 Plan Administrator ........................................................... 32

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS ................................ \32\33

7.01 General Treatment of Executory Contracts: Rejected ................................ \32\33

7.02 Cure Payments and Release of Liability .................................................. \33\34

7.03 Bar to Rejection Claims ..................................................................... \33\34

7.04 Rejection Claims ........................................................................... \33\34

ARTICLE VIII. CONDITIONS TO CONFIRMATION DATE AND EFFECTIVE
DATE; EFFECT OF PLAN CONFIRMATION ................................... \34\35

8.01 Conditions Precedent to Confirmation Date .............................................. \34\35

8.02 Conditions Precedent to the Effective Date .............................................. \34\35

8.03 Consequences of Non-Occurrence of Effective Date ................................... \35\36

ARTICLE IX. EFFECT OF PLAN CONFIRMATION AND EFFECTIVE DATE ...... \35\36

9.01 Binding Effect ............................................................................. \35\36

9.02 Vesting of Assets .......................................................................... \35\36

9.03 Assertion of Causes of Action, Defenses and Counterclaims ....................... \35\37

9.04 \Discharge of Debtors ............................................................. 36\\9.05 \Release an

\9.06\9.05 ................................................................. Injunction \38\39

\9.07\9.06 ........................................... Term of Bankruptcy Injunction or Stays \38\39

\9.08\9.07 ................................. Effectuating Documents; Further Transactions; Timing \38\39

ARTICLE X. OBJECTIONS TO CLAIMS AND INTERESTS; DISTRIBUTIONS ... \39\40

10.01 Objections to Claims and Interests ............................................... \39\40

10.02 Objection Deadline ...................................................................... \39\40

10.03 Settlement of Objections to Claims or Interests ...................................... \39\40

10.04 No Interest on Claims ................................................................... 40

10.05 Setoffs by the Debtors; No Waiver ................................................. \40\41

10.06 Procedures for Treating and Resolving Disputed and Contingent Claims .... \40\41

10.07 Distributions Under the Plan ........................................................ \42\43

ii Workshare Professional comparison of
interwovenSite://IMANDMS/ACTIVE/73463213/1 and
interwovenSite://IMANDMS/ACTIVE/73465764/9. Performed on 9/21/2010.

10.08  Duty to Disgorge Overpayments.................................................... \43\44

ARTICLE XI.       ACCEPTANCE OR REJECTION OF THE PLAN............................... \43\45

11.01  Impaired Classes Entitled to Vote............................................... \43\45

11.02  Acceptance by an Impaired Class ............................................. \43\45

11.03  Section 1129(b) Cramdown ...................................................... \44\45

ARTICLE XII.      RETENTION OF JURISDICTION........................................ \44\45

12.01  Jurisdiction...................................................................... \44\45

12.02  Examination of Claims ......................................................... \44\46

12.03  Determination of Disputes.................................................... \44\46

12.04  Additional Purposes .......................................................... \45\46

12.05  Failure of the Bankruptcy Court to Exercise Jurisdiction ............................ \47\48

ARTICLE XIII.     MISCELLANEOUS PROVISIONS ..................................... \47\49

13.01  General Notices................................................................ \47\49

13.02  Plan Supplement.............................................................. \48\50

13.03  Exemption \From\from Transfer Taxes....................................... \49\51

13.04  Asserting and Curing Default Under the Plan ............................ \49\51

13.05  Compliance with Tax Requirements ....................................... \49\51

13.06  Revocation or Withdrawal of the Plan ..................................... \49\51

13.07  Modification of the Plan .................................................... \50\52

13.08  Computation of Time ........................................................ \50\52

13.09  Due Authorization............................................................ \50\52

13.10  Implementation .............................................................. \50\52

13.11  Execution of Documents..................................................... \50\52

13.12  Bankruptcy Restrictions .................................................... \50\53

13.13  Ratification.................................................................... \51\53

13.14  Integration Clause .......................................................... \51\53

13.15  Interpretation................................................................ \51\53

13.16  Severability of Plan Provisions ............................................ \51\53

13.17  Governing Law................................................................ \51\53

iii      Workshare Professional comparison of
interwovenSite://IMANDMS/ACTIVE/73463213/1 and
interwovenSite://IMANDMS/ACTIVE/73465764/9. Performed on 9/21/2010.

**INTRODUCTION**

\~~SageCrest II, LLC, SageCrest Finance, LLC, SageCrest Holdings, Limited, SageCrest Dixon Inc., and the Official Committee of Equity Security Holders of SageCrest II, LLC and SageCrest Finance, LLC (collectively, the "Proponents") propose~~\<u>Creditor Deutsche Bank AG, New York Branch, as agent for DB Structured Products, Inc. ("Deutsche Bank"), proposes</u> this Plan pursuant to Bankruptcy Code section 1121(\~~a~~\<u>c</u>). Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, business, properties, results of operations, resolutions of <u>certain</u> material disputes, projections for \~~future operations and \~~liquidation, <u>feasibility analysis,</u> risk factors, a summary and analysis of the Plan, <u>liquidation projections</u> and \~~certain \~~related matters.

THE \~~PROPONENTS URGE~~\<u>PROPONENT URGES</u> ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY. NO SOLICITATION MATERIALS OTHER THAN THE DISCLOSURE STATEMENT AND ANY DOCUMENTS, SCHEDULES OR EXHIBITS ATTACHED THERETO OR REFERENCED THEREIN HAVE BEEN AUTHORIZED BY THE \~~PROPONENTS~~\<u>PROPONENT</u> OR THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

The Distributions to be made pursuant to this Plan to Holders of Allowed Claims and Allowed Interests, in each of the Classes of Claims against and Interests in the Debtors set forth in Article III of this Plan, are set forth in Article V of this Plan.

**SUMMARY OF PLAN[1]**

This Plan provides for (a) the orderly liquidation of the Assets of all four Debtors, and several related entities, over approximately \~~four~~\<u>two (2)</u> years and distributions to \~~claimants~~\<u>creditors</u> and interest holders\~~.~~\<u>, on a schedule, and in a manner, that is consistent with the priorities established by the Bankruptcy Code;</u> (b) a fair mechanism for resolving <u>certain</u> contentious issues in the Bankruptcy Cases\~~.~~\<u>;</u> and (c) adequate \~~protections for~~\<u>protection of the interests of</u> the Debtors' major secured creditor, Deutsche Bank, throughout the liquidation process.

Based on valuation analyses performed by <u>an</u> independent third \~~parties~~\<u>party</u>, the \~~Proponents believe~~\<u>Proponent believes</u> that the \~~value of the Debtors' Assets will be more than sufficient to enable Deutsche Bank and certain other creditors to be paid or otherwise receive under the Plan the full present value of their Claims over time through an orderly liquidation that is designed to obtain maximum value for Assets of the Estates and avoid sales at discounted prices that could unduly limit recoveries by other creditors and equity interest holders. Although investors in the SageCrest funds are not expected to recover the principal amount of their investments, the orderly liquidation process~~\<u>liquidation of the Debtors' Assets pursuant to the terms of the Plan will result in payment in full of Secured Claims as well as distributions to</u>

---

[1] This Summary is intended solely to provide an overview of the Plan. The Summary shall not be binding on \~~any of \~~the \~~Proponents~~\<u>Proponent</u>, and in the event of any conflict between the Summary and any other provision of the Plan, such other provision shall be controlling.

Holders of General Unsecured Claims and Redemption Claims against SC II.  The Plan, which provides for the orderly liquidation of the Debtors' Assets over a reasonable time period based upon the nature of the Assets, is designed to maximize the return to ~~investors, and it is expected that investors will receive a significant recovery after certain creditors are paid or otherwise satisfied in full~~\the Debtors' creditors while preserving the potential ability for investors to receive distributions on account of their interests if there is sufficient value realized from the orderly liquidation of Assets after payment of senior Claims and Interests.

The Plan facilitates the \~~reorganization~~\liquidation of the Debtors by creating SC Management, a Delaware \~~entity~~\limited liability company, to, *inter alia,* hold all of the Assets of SC II (other than any direct or indirect interest it holds in SC Dixon\~~,~~\ or SageCrest Regal Inc.\~~ or the WMD Bonds~~\), SC Finance, SC Holdings, \~~and~~\SCFR and SC Limited\ ~~(other than their Interests in SC Holdings and their interests in the WMD Bonds)~~\, make distributions required by the Plan, and provide for the management of Assets of the Debtors and their affiliates (other than SC Dixon, which will retain ownership of its Assets after the Effective Date).  SC II will hold 23% of the economic interests of SC Management, and SC Holdings will hold 77% of the economic interests of SC Management.  SC Management will be managed by the Plan Administrator, who may retain additional professionals in accordance with the terms of Sections 6.06 and 6.07 of this Plan, to administer its Assets and discharge its obligations under the Plan. \~~SC Management will be managed by four members, two~~\The Plan Administrator will report to the board of directors of SC Management, which will be made up of three directors, one of whom will be appointed by Deutsche Bank, one of whom will be appointed by the JPL \~~(after consultation with the Russell Funds) and two~~\and one of whom will be appointed by the Equity Committee.  After the Effective Date, SC II will have a Manager that was not the manager of SC II as of its Petition Date.

Deutsche Bank, the prepetition secured lender to SC Finance and SC Holdings, \~~at the option of the Debtors~~\will: (1) retain its security interests in all of its pre-petition \~~collateral and will receive the DB Promissory Note,~~\and other collateral (including without limitation those postpetition assets in which Deutsche Bank was granted a lien pursuant to any Cash Collateral Order); (2) obtain a security interest in all assets of SC II, SC Finance, SC Holdings, SCFR, and SC Limited that are transferred to SC Management, the equity interests of SC Management, all proceeds of the foregoing, and all after-acquired property of SC Management; and (3) receive all rights and benefits of the DB Credit Agreement, which will be issued by SC Finance, SC II, SC Holdings, SCFR, SC Limited and SC Management and which will provide Deutsche Bank with\ ~~deferred~~\, among other things, cash payments totaling the present value of the DB Secured Claims as of the Effective Date, \~~(2) receive the indubitable equivalent of the DB Secured Claims, or (3) be treated by a combination of the foregoing options 1 and 2 that is fair and equitable to Deutsche Bank. Under the Plan, Deutsche Bank's Allowed Secured Claims will be satisfied in full no later than December 31, 2014.~~\plus accrued default interest.

The Plan resolves, settles, and compromises the redemption rights and related claims asserted at any time before SC II's Petition Date by all SC II equity investors who are parties to the Amended and Restated Operating Agreement of SC II.  The Plan classifies all such redeeming equity investors in Class 8.  Redemption Claims in Class 8 are unsecured claims\ ~~and~~\, shall be subordinated to general unsecured claims against SC II in Class 6C, and shall (i)

receive Distributions after all Allowed Claims against the Debtors in Classes 1 through 7 have received all Distributions provided for them under the Plan\.\ and (ii) receive payment in full in Cash prior to any payments being made to or for the benefit of Holders of Interests in Class 10.

## ARTICLE I.
## DEFINITIONS, CONSTRUCTION, AND INTERPRETATION

The capitalized terms used herein shall have the respective meanings set forth below. A capitalized term used herein that is not defined in this Article or otherwise defined in the Plan shall have the meaning , if any, ascribed to that term\, if any, \ in the Bankruptcy Code. To the extent that there is an inconsistency between a definition in this Plan and a definition in the Bankruptcy Code, the definition set forth in this Plan shall control. The rules of construction contained in Bankruptcy Code section 102 shall apply to the construction of the Plan, provided\;\ that in the event of any conflict between the Plan and the Disclosure Statement, the Plan shall govern over the Disclosure Statement. In the event a conflict between the Plan and any document implementing the Plan arises, the document shall govern unless the Plan provides otherwise. In the event a conflict between the Plan and the Confirmation Order arises, the Confirmation Order shall govern. Whenever the context requires, words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender and vice versa.  All exhibits and schedules to the Plan are incorporated herein.\ **PLEASE NOTE that all**\  **All Exhibits to the Plan and the Plan Supplement have been, or will be, filed electronically with the Bankruptcy Court.  Copies of those Exhibits and the Plan Supplement may be viewed and/or downloaded from the Bankruptcy Court's PACER website.**

**Further, the \Debtors\Proponent will provide copies of any or all of the Exhibits to the Plan and the Plan Supplement upon written request submitted to:**

**\Neligan Foley LLP\**
**\Attn: Kathy Gradick\**
**\325 N. St. Paul\**
**\Suite 3600\**
**\Dallas, Texas 75201\**
**\(email: kgradick@neliganlaw.com)\**

**\OR\**

**\Cole, Schotz, Meisel, Forman & Leonard, P.A. \**
**Bingham McCutchen LLP**
**Attn: \Thomas Vogel\Linda Miller**
**\900 Third Avenue\**
**\16th Floor\**
**\New York, NY 10022\**
**One State Street**
**Hartford, CT  06103**
**(email: \tvogel@coleschotz\linda.miller@bingham.com)**

**1.01.** *"Administrative Claim"* means a Claim against a Debtor (including a Claim against a Debtor by any other Debtor) for payment or reimbursement of an administrative expense of a kind within the scope of Bankruptcy Code section 503(b) and entitled to priority under Bankruptcy Code section 507(a)(2), including, without limitation, (a) actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, or commissions for services rendered, (b) Fee Claims and all other claims for compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, (c) all fees and charges assessed against the Estate under the Bankruptcy Code or under section 1930 of chapter 123 of title 28 of the United States Code, and (d) all other claims entitled to administrative priority claim status pursuant to a Final Order.

**1.02.** *"Allowance Date"* means the date on which a Claim becomes an Allowed Claim or an Interest becomes an Allowed Interest.

**1.03.** *"Allowed~~,~~"* means, with respect to a Claim, other than an Administrative Claim, or any portion thereof, ~~means~~ such a Claim (a) that has been allowed by a Final Order, (b) that either (y) was listed in the Schedules as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero or (z) is the subject of a timely filed proof of Claim as to which either (i) no objection to its allowance has been filed (either by way of objection or amendment of the Schedules) on or before the Objection Deadline or (ii) any objection to its allowance has been settled, waived through payment, withdrawn or overruled by a Final Order, or (c) that is expressly allowed in a liquidated amount in the Plan; with respect to an Administrative Claim, means an Administrative Claim for which a timely written request for payment has been made in accordance with the Plan (if such written request is required) and as to which (y) no timely objection to its allowance has been filed or (z) any objection to its allowance has been settled, waived through payment, withdrawn or overruled by a Final Order; and with respect to an Interest, means any Interest that appears, as of the Petition Date, in the Debtors' books and records except as provided in the Plan or otherwise determined by a Final Order.

**1.04.** *"~~Assets~~Asset(s)"* means any property owned by an Estate, a ~~Reorganized~~Liquidating Debtor, SCFR, SC Limited, or SC Management.

**1.05.** *"Avoidance Action"* means, with respect to each Debtor, any Cause of Action arising under chapter 5 of the Bankruptcy Code including, but not limited to, Bankruptcy Code sections 502, 510, 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553, or under any similar applicable law, including, without limitation, fraudulent transfer laws, whether or not any such Cause of Action has been asserted or commenced as of the Effective Date.

**1.06.** *"Ballot"* means the form of ballot distributed with the Disclosure Statement and the Plan to each Holder of an impaired Claim or Interest entitled to vote to accept or reject the Plan and which each such Holder may use to cast a vote to accept or reject the Plan.

**1.07.** *"Balloting Agent"* means ~~Neligan Foley LLP, 325 N. St. Paul, Suite 3600, Dallas, Texas 75201,~~Bingham McCutchen LLP, One State Street, Hartford, Connecticut, Attention: ~~Kathy Gradick~~Linda Miller.

**1.08.** ***"Balloting Deadline"*** means , _____ 2010 at __:__ _.m., the deadline set by the Bankruptcy Court's order approving the Disclosure Statement for the receipt by the Balloting Agent of Ballots for accepting or rejecting the Plan.

**1.09.** ***"Bankruptcy Case(s)"*** means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

**1.10.** ***"Bankruptcy Code"*** means title 11 of the United States Code, as now in effect or hereafter amended and as applicable to the Bankruptcy Cases.

**1.11.** ***"Bankruptcy Court"*** means the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division, or any other court or adjunct thereof having jurisdiction over the Bankruptcy Cases.

**1.12.** ***"Bankruptcy Rules"*** means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended and as applicable to the Bankruptcy Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, all as now in effect or hereafter amended.

**1.13.** ***"Bar Date"*** means the deadline for filing in the Bankruptcy Cases proofs of Claims or Interests arising before the Petition Date against or in any of the Debtors, which date was December 22, 2008 as to SC II, SC Finance, and SC Holdings, and January 18, 2009 as to SC Dixon, other than: (a) those Claims or Interests expressly excluded from such date by a Final Order, including, without limitation, the "Order Extending the Bar Date for Equity Security Holders" entered in the Bankruptcy Cases on January 30, 2009 (~~docket #~~Doc. No. 442); and (b) Claims whose filing deadline is otherwise subject to the Rejection Bar Date or the Redemption Claim Bar Date.

**1.14.** ***"Bermuda Court"*** means the Supreme Court of Bermuda.

**1.15.** ***"Budget"*** means a rolling twelve (12) month budget of ~~expenses~~cash disbursements and reserves that sets forth, for each ~~month in any~~ such ~~twelve (12)~~ month ~~period~~, all projected disbursements including (a) any Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Classes ~~1,~~1 or 2 ~~and 6~~ that are payable by SC Management, (b) all costs, expenses, fees and reserves that SC Management projects to incur or require, either directly or indirectly, to manage, maintain, operate, administer and liquidate all Assets (including the prosecution or settlement of all Causes of Action and objections to Claims or Interests) under its direction or control, whether directly or indirectly ~~(through a subsidiary or affiliate of SC Management or a Reorganized Debtor, or otherwise),~~ and (c) all costs, expenses, fees, and reserves to ~~administer~~manage each ~~Reorganized Debtor. SC Management shall deliver each Budget to Deutsche Bank on or before the tenth (10th) Business Day prior to the beginning of each calendar quarter covered by such Budget, commencing with the first (1st) full calendar quarter after the Effective Date~~Liquidating Debtor.

**1.16.** **_"Budgeted Expenses"_** means the aggregate expenses and reserves identified in each Budget, calculated ~~\quarterly\~~monthly, without regard to projected revenue during any period of any Budget.

**1.17.** **_"Business Day"_** means any day other than a Saturday, a Sunday, a "legal holiday" as such term is defined in Bankruptcy Rule 9006(a), or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

**1.18.** **_"Case Interest Rate"_** means the federal judgment rate provided in 28 U.S.C. § 1961 in effect on a respective Petition Date, which is 2.18% as to SC II, SC Finance, and SC Holdings, compounded annually on each anniversary of the Petition Date.

**1.19.** **_"Cash"_** means legal tender of the United States of America and equivalents thereof, which may be conveyed by check or wire transfer.

**1.20.** **_"Cash Collateral Orders"_** means the Preliminary Order Authorizing Use of Cash Collateral and Providing Adequate Protection ~~\of\~~to Secured Creditor, entered by the Bankruptcy Court on September 11, 2008, and all subsequent ~~\amendments of such order\~~cash collateral orders entered by the Bankruptcy Court.

**1.21.** **_"Causes of Action"_** means any and all claims, actions, arbitrations, proceedings, causes of action, rights, suits, complaints, notices of non-compliance or violation, enforcement actions, investigations, accounts, controversies, agreements, promises, rights of action, rights to legal or equitable remedies, rights to payment, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, that any Debtor and/or Estate may hold against any Person, or which could be asserted by a Debtor on behalf of any Creditor or Creditor representative under the Bankruptcy Code as a debtor in possession (under Bankruptcy Code sections 1107(a) and 1108) or by any representative of a Debtor or an Estate, including but not limited to all Avoidance Actions and actions under Bankruptcy Code section 510 to subordinate Claims, and all proceeds of and recoveries of same.

**1.22.** **_"Claim"_** shall have the meaning provided in Bankruptcy Code section 101(5).

**1.23.** **_"Collateral"_** means any property or interest in property of (a) an Estate or, (b) after the Effective Date, ~~\of\~~SC Management, that is subject to a Lien to secure the payment or performance of a Claim, which Lien is valid, perfected and enforceable under applicable law and is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

**1.24.** **_"Collateral Valuation Report"_** means the most recent of (a) that certain valuation report prepared by Alvarez & Marsal valuing certain of the DB Collateral as of July 2010, as may be amended or supplemented prior to the Effective Date, and (b) the most recent valuation report as may be provided by the Plan Administrator in accordance with the terms of the DB Credit Agreement.

**1.25.** \~~1.24.~~ *"Committee"* means any committee appointed in the Bankruptcy Cases by the United States Trustee pursuant to Bankruptcy Code section 1102(a)(1).

**1.26.** \~~1.25.~~ *"Confirmation Date"* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

**1.27.** \~~1.26.~~ *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Code section 1128 to consider confirmation of the Plan, which is scheduled to commence on _____, 2010, at ___ __.m. Eastern Time, and as may be adjourned or continued from time to time.

**1.28.** \~~1.27.~~ *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan under Bankruptcy Code section 1129.

**1.29.** \~~1.28.~~ *"Creditor"* means any Person that is the Holder of a Claim against one or more of the Debtors.

**1.30.** \~~1.29.~~ *"Cure Amount"* means any amount required to be paid as a condition for the assumption of an Executory Contract under Bankruptcy Code section 365(b).

**1.31.** \~~1.30.~~ *"DB Collateral"* means the Collateral that secures the Allowed DB Secured Claims as of the Effective Date and \~~the DB Promissory Note from and after the Effective Date~~\all assets of SC II, SC Finance, SC Holdings, SCFR, and SC Limited that are transferred to SC Management (including without limitation the interests in SC Finance held by SCII, the interests in SC Holdings held by SCFR and SC Limited, WMD Bonds, Art Capital loans, other life insurance assets), the equity interests in SC Management, all proceeds of the foregoing, and all after-acquired property of SC Management.

**1.32.** **"*DB Credit Agreement*"** means the credit agreement and such other and further documents that will be executed by SC Holdings, SC Finance, SC II, SCFR, SC Limited and SC Management as of the Effective Date to implement the treatment of the Allowed DB Secured Claims and the Allowed DB Guaranty Claim set forth in the Plan.  The form of the DB Credit Agreement will be included in the Plan Supplement.

**1.33.** \~~1.31.~~ *"DB Guaranty Claim"* means the unsecured Claim held by Deutsche Bank against SC II only, based on or arising from SC II's prepetition contractual agreement*, inter alia,* to guarantee, on an unsecured basis, ten percent (10%) of the principal amount of the advances made to SC Finance under the Loan, Security and Servicing Agreement, dated as of April 2, 2007, among, *inter alia*, Deutsche Bank, SC Finance, and SC II.

\~~**1.32. "DB Promissory Note"** means a secured promissory note and such other and further documents that will be executed by SC Holdings, SC Finance, SC II, SCFR, SC Limited and SC Management as of the Effective Date to implement the treatment of the Allowed DB Secured Claims and the Allowed DB Guaranty Claim set forth in the Plan. The form of the DB Promissory Note will be included in the Plan Supplement.~~\

**1.34.** \~~1.33.~~ *"DB Secured Claims"* means, together, the Deutsche Bank Secured Claim against SC Finance and the Deutsche Bank Secured Claim against SC Holdings.

**1.35.** *"DB Secured Default Interest Claim"* means that portion of the DB Secured Claims attributable to default interest.

**1.36.** \~~1.34.~~ *"Debtor"* means SC II, SC Finance, SC Holdings, or SC Dixon in their individual capacities. Each reference to a "Debtor" herein shall refer to an individual Debtor or multiple Debtors as the context may require.

**1.37.** \~~1.35.~~ *"Debtors"* means, collectively, SC II, SC Finance, SC Holdings, and SC Dixon.

**1.38.** \~~1.36.~~ *"Deutsche Bank"* means Deutsche Bank AG, New York Branch, as agent for DB Structured Products, Inc. or, as the context may require, the Holder of an Allowed Deutsche Bank Secured Claim if such Holder is not DB Structured Products, Inc.

**1.39.** \~~1.37.~~ *"Deutsche Bank Offshore Guaranty"* means the prepetition contractual agreement by SCFR and SC Limited, *inter alia,* to guarantee, on an unsecured basis, \~~ten~~\fifteen percent (\~~10~~\15%) of the principal amount of the advances made to SC Holdings under the Loan, Security and Servicing Agreement, dated as of April 2, 2007, among, *inter alia*, Deutsche Bank and SC Holdings.

**1.40.** \~~1.38.~~ *"Deutsche Bank/SC Finance Note"* means the Note dated April 2, 2007 in the original principal amount of $100,000,000 and payable by SC Finance to Deutsche Bank AG, as Agent.

**1.41.** \~~1.39.~~ *"Deutsche Bank/SC Holdings Note"* means the Note dated April 2, 2007 in the original principal amount of $300,000,000 and payable by SC Holdings to Deutsche Bank AG, as Agent.

**1.42.** \~~1.40.~~ *"Deutsche Bank Secured Claim"* \~~means~~\refers to a Secured Claim held by Deutsche Bank against SC Finance or SC Holdings as the context may require.

**1.43.** *"Director"* means a member of the board of directors of SC Management.

**1.44.** \~~1.41.~~ *"Disallowed,"* when used with respect to a Claim or Interest, shall mean a Claim or Interest, or a portion thereof, that (a) has been disallowed by a Final Order or any provision of the Plan, (b) is listed in the Schedules in an amount of zero or as contingent, unliquidated or disputed and as to which no proof of Claim has been filed by the applicable Bar Date or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or a Final Order or under applicable law, or (c) is not listed in the Schedules and as to which (i) no proof of Claim has been filed by the applicable Bar Date or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or a Final Order or under applicable law, or (ii) no request for the allowance of an Administrative Claim (including a Fee Claim) has been filed by the deadline in Section 2.01 of the Plan or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or a Final Order or under applicable law.

**1.45.** ~~**1.42.**~~ *"Disclosure Statement"* means the disclosure statement (including all exhibits and schedules thereto) relating to the Plan, as approved by the Bankruptcy Court and distributed contemporaneously with this Plan in accordance with Bankruptcy Code section 1125 and Bankruptcy Rule 3017, as it may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

**1.46.** ~~**1.43.**~~ *"Disputed"* means, with respect to a Claim (including any Administrative Claim) or Interest, \~~such~~\a Claim or Interest\~~,~~\ (or any portion thereof\~~,~~\) (a) \~~to the extent~~\that is neither Allowed pursuant to the Plan or a Final Order, nor deemed Allowed under Bankruptcy Code Section 502, 503 or \~~1111,~~\1111; (b) that is listed in the Schedules as disputed, contingent, or unliquidated and which has not been resolved by written agreement of the parties or a Final Order; \~~or~~\(c) for which a proof of Claim or Interest has been timely filed or deemed timely filed with the Bankruptcy Court and as to which any party in interest has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or any order of the Bankruptcy Court, or which is otherwise Disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or resolved or determined by a Final Order; or (d) that is the subject of a pending action in a forum other than the Bankruptcy Court unless such Claim or Interest has been determined by Final Order in such other forum and Allowed by Final Order. Prior to the expiration of the time within which to object to such Claim or Interest set forth herein or otherwise established by order of the Bankruptcy Court, a Claim or Interest shall be considered Disputed to the extent that (i) the amount of the Claim or Interest specified in a proof of Claim or Interest exceeds the amount listed in the Schedules \~~as disputed, contingent or unliquidated~~\and/or (ii) \~~any such~~\the Claim or Interest is classified differently in the proof of Claim or Interest than \~~as set forth~~\in the Schedules. To the extent an objection \~~related~~\to the allowance of only a \~~part~~\portion of a Claim or Interest has been timely filed, such Claim or Interest shall be a Disputed Claim only to the extent of the \~~objection~~\portion objected to.

**1.47.** ~~**1.44.**~~ *"Disputed Amount"* means (a) if a liquidated amount is set forth in a proof of Claim or Interest relating to a Disputed Claim or Interest, (i) the liquidated amount set forth in the proof of Claim or Interest relating to the Disputed Claim or Interest, (ii) an amount agreed to by the Debtor and the Holder of such Disputed Claim or Interest, or (iii) if a request for estimation is filed by any party, the amount at which such Claim or Interest is estimated by the Bankruptcy Court; (b) if no liquidated amount is set forth in the proof of Claim or Interest relating to a Disputed Claim or Interest, (i) an amount agreed to by the Debtor and the Holder of such Disputed Claim or Interest, (ii) the amount estimated by the Bankruptcy Court with respect to such Disputed Claim or Interest; or (c) zero, if the Claim or Interest was not listed on the Schedules or was listed on the Schedules as \~~unliquidated~~\disputed, contingent or unliquidated and no proof of Claim or Interest was filed, or deemed to have been filed, by the applicable Bar Date and the Claim or Interest has not been resolved by written agreement of the Debtor and the Holder of such Claim or Interest or an order of the Bankruptcy Court.

~~\**1.45.** *"Distributable Cash"* means all Cash held by SC Management after deducting amounts paid, or reserved for payment, for or on account of (a) all Allowed Administrative Claims, Allowed Priority Tax Claims and all Allowed Claims in Classes 1-7 (except Classes 4 and 5D, which are payable by Reorganized SC Dixon) in accordance with the Plan, (b) all costs,~~

~~expenses, and fees approved or projected by SC Management for the operation, maintenance, preservation, and liquidation of all Assets (including the prosecution or settlement of all Causes of Action and objections to Claims or Interests) under its direction or control, whether directly or indirectly (through a subsidiary or affiliate of SC Management or a Reorganized Debtor, or otherwise), and (c) the anticipated future working capital needs of the Reorganized Debtors and SC Management and any other liabilities, costs and expenses incident to the businesses of the Reorganized Debtors or SC Management that are anticipated to be incurred and/or to become due and payable at any time after the Effective Date, as determined by SC Management in its sole discretion.\~~

**1.48.** \*"Distributable Cash"* means, at the time of any distribution, the Excess Cash Flow Amount available for payment to Holders of Claims or Interests as applicable.

**1.49.** \~~1.46.~~ *"Distribution"* means the property to be distributed under the Plan to the Holders of Allowed Claims or Holders of Allowed Interests.

**1.50.** \~~1.47.~~ *"Distribution Date"* means the date upon which a Distribution is made in accordance with the Plan to Holders of Allowed Claims or Allowed Interests entitled to receive Distributions under the Plan.

**1.51.** \~~1.48.~~ *"Distribution Reserve Account(s)"* means a segregated account or accounts that may be established and maintained by SC Management or a \~~Reorganized~~\Liquidating Debtor from Cash to be distributed to or for the benefit of the Holders of Allowed Claims or Allowed Interests.

**1.52.** \~~1.49.~~ *"Effective Date"* means the first Business Day that is after fourteen (14) days following the Confirmation Date on which (a) no stay or motion for a stay of the Confirmation Order is in effect or pending and (b) all conditions to the Effective Date have been met or waived. The \~~Debtors~~\Proponent will file and serve notice of the Effective Date within five (5) Business Days after its occurrence.

**1.53.** \~~1.50.~~ *"Entity"* shall have the meaning provided in Bankruptcy Code section 101(15).

**1.54.** \~~1.51.~~ *"Equity Committee"* means the Official Committee of Equity Security Holders appointed in the Bankruptcy Cases of SC II and SC Finance by the United States Trustee pursuant to Bankruptcy Code section 1102(a)(1).

**1.55.** \~~1.52.~~ *"Estate(s)"* means, individually, the estate of any Debtor and, collectively, the estates of multiple applicable Debtors, as the context may require, created under Bankruptcy Code section 541.

**1.56.** *"Excess Cash Flow Amount"* means, with respect to any month, (A) beginning Cash on hand plus (B) all revenues and other Cash (or cash equivalents) received by the Plan Administrator during such month (including without limitation the proceeds from any sale, liquidation or other disposition of any SC Management Asset (less reasonable and customary direct expenses paid in Cash by the Plan Administrator in order to consummate such sale,

liquidation or other disposition)), minus (C) the sum of (1) the amount of budgeted operating and capital expenses actually paid by the Plan Administrator in Cash during such month, (2) the amount of budgeted operating and capital expenses of the Plan Administrator for the six-month period commencing at the end of such month, and (3) $1,000,000.

**1.57.** \~~1.53.~~ *"Executory Contract"* means any prepetition executory contract or unexpired lease within the meaning of Bankruptcy Code section 365 between a Debtor and any other Person(s).

**1.58.** \~~1.54.~~ *"Face Amount"* means (a) when used in reference to a Disputed Claim or Interest, the Disputed Amount of such Claim or Interest, and (b) when used in reference to an Allowed Claim or Interest, the Allowed amount of such Claim or Interest.

**1.59.** \~~1.55.~~ *"Fair Market Value"* means the value that would be obtained in an arm's-length sale between an informed and willing buyer under no compulsion to purchase and an informed and willing seller unaffiliated with such buyer under no compulsion to sell.

**1.60.** \~~1.56.~~ *"Fee Application"* means an application for the allowance and/or payment of a Fee Claim.

**1.61.** \~~1.57.~~ *"Fee Claim"* means a Claim against a Debtor by a Professional or any other party pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503(b) or 1103 or otherwise for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.

\~~compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.~~\

**1.62.** \~~1.58.~~ *"Final Decree"* means the final decree entered by the Bankruptcy Court pursuant to Bankruptcy Rule 3022, which shall, *inter alia*, close the Bankruptcy Case(s).

**1.63.** \~~1.59.~~ *"Final Order"* means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction that has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; provided, however, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure may be filed with respect to such order or judgment.

**1.64.** \~~1.60.~~ *"General Unsecured Claim"* means a Claim other than an Administrative Claim, a Non-Tax Priority Claim, a Priority Tax Claim, a Secured Claim, the DB Guaranty Claim, an Intercompany Claim, or a Redemption Claim.

**1.65.** \~~1.61.~~ *"Holder"* means the beneficial owner of a Claim or an Interest. For purposes of voting to accept or reject the Plan, a Person must be a Holder as of the Voting Record Date.

**1.66.** \~~1.62.~~ *"Holdings Bermuda Proceeding"* means proceeding 2009: No. 49 before the Bermuda Court regarding SC Holdings.

\~~1.63.~~ ~~*"Initial Distribution Date"* means the first Distribution Date following the Effective Date, which date shall be no later than thirty (30) days after the Effective Date.~~\

**1.67.** \~~1.64.~~ *"Intercompany Claim"* means any Claim against any Debtor or against SCFR or SC Limited held by any Debtor or by SCFR or SC Limited, including but not limited to any Claim or any other legal right arising from or related to a Master Investment Agreement or a Participation Interest.

**1.68.** \~~1.65.~~ *"Interest"* means (a) the legal, equitable, contractual, and/or other rights of any Person with respect to any capital stock or other ownership interest in any Debtor, whether or not transferable, and any option, warrant or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor, and (b) for purposes of classification and Distributions under this Plan with respect to SC II, a Claim against SC II that is subordinated by a Final Order to all other Claims against SC II, but not to other Interests in SC II, pursuant to Bankruptcy Code section 510(b) or 510(c) or otherwise.

**1.69.** \~~1.66.~~ *"JPL"* means, collectively, the individual or individuals serving as of the Effective Date as appointees of the Bermuda Court as the liquidator(s) of SC Holdings in the Holdings Bermuda Proceeding.

**1.70.** \~~1.67.~~ *"Lien"* has the meaning provided in Bankruptcy Code section 101(37) and shall include a "statutory lien" as defined in Bankruptcy Code section 101(53).

**1.71.** *"Life Assets"* means Assets of the Debtors' life insurance portfolios, consisting of both premium finance loans and life settlement policies, and all interests in the foregoing.

**1.72.** *"Liquidating Debtor"* means a Debtor after the Effective Date.

**1.73.** \~~1.68.~~ *"Manager"* means the manager of SC II from and after the Effective Date. The initial Manager shall be identified \~~in the Plan Supplement.~~\by SC II prior to the Effective Date. The removal or resignation \~~or~~\of, and appointment of a successor to, any Manager shall be governed by the SC II Operating Agreement, as amended pursuant to this Plan or from time to time after the Effective Date.

**1.74.** *"Marketing Plan"* means a written marketing plan for the liquidation of the Assets of SC Management, which shall demonstrate compliance with the covenants contained in the DB Credit Agreement, including the repayment thereof on the terms set forth therein. The Marketing Plan and any amendments thereof shall be in form and substance acceptable to Deutsche Bank.

**1.75.** \~~1.69.~~ *"Master Investment Agreement"* means (a) the Amended Master Investment Agreement between SC II, as seller, and SCFR, as purchaser, dated September 21, 2006, or (b) the Amended Master Investment Agreement between SC II, as seller, and SC Limited, as purchaser, dated September 21, 2006.

**1.76.** \1.70. *"Milton Parties"* shall have the meaning provided for such term in the Windmill Settlement Agreement.

\1.71. *"Miscellaneous Secured Claim"* means a Secured Claim other than a Deutsche Bank Secured Claim, a Secured Tax Claim, or a SageCrest Regal Secured Claim against SC Dixon.\

**1.77.** \1.72. *"Non-Tax Priority Claim"* means any Claim that, if Allowed, would be entitled to priority in payment under Bankruptcy Code section 507(a) other than a Priority Tax Claim or an Administrative Claim.

**1.78.** \1.73. *"Objection Deadline"* means the last day for filing objections (including, without limitation, requests for subordination) to Claims (other than Administrative Claims or Fee Claims) or Interests, which day shall be the later of (a) \180 days\three (3) years after the Effective Date, (b) 90 days after the filing date of any proof of Claim or Interest that is timely filed after the Confirmation Date, or (c) such other day as the Bankruptcy Court may order. The filing of a motion to extend the Objection Deadline shall automatically extend the Objection Deadline until an order ruling on such motion becomes a Final Order. If such motion to extend the Objection Deadline is denied, the Objection Deadline shall be the later of the current Objection Deadline (as previously extended, if applicable) or thirty (30) days after the Bankruptcy Court's order denying such motion becomes a Final Order.

**1.79.** \1.74. *"One-Month LIBOR"* means the one-month LIBOR rate as published by the Wall Street Journal.

**1.80.** \1.75. *"Ordinary Course of Business"* shall have the meaning provided under Bankruptcy Code section 363 and judicial interpretations thereof.

**1.81.** *"Other Secured Claim"* means a Secured Claim other than the Deutsche Bank Secured Claims, a Secured Tax Claim, or a SageCrest Regal Secured Claim against SC Dixon.

**1.82.** \1.76. *"Participation Interest"* means any and all contractual rights asserted by SC Holdings, SCFR, SC Limited, or any other Person in or to the Assets of each Estate or their proceeds arising under or related to a Master Investment Agreement or similar participation agreement.

\1.77. *"Payment Default"* means the failure of the obligors under the DB Promissory Note to pay any amount of principal when due under the terms of the DB Promissory Note.\

**1.83.** \1.78. *"Person"* means any Entity, natural person, corporation, limited partnership, general partnership, joint venture, trust, land trust, business trust, unincorporated organization, or other organization (irrespective of whether it is a legal entity), and any "governmental unit" as that term is defined in Bankruptcy Code section 101(27).

**1.84.** \1.79. *"Petition Date"* means the date a Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code; namely, August 17, 2008 as to SC II and SC Finance; August 20, 2008 as to SC Holdings; and September 11, 2008 as to SC Dixon.

**1.85.** \1.80. *"Plan"* means this Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by \~~SageCrest II, LLC, SageCrest Finance LLC, SageCrest Holdings, Limited, SageCrest Dixon, Inc. and the Official Committee of Equity Security Holders~~\Deutsche Bank, all exhibits or agreements annexed to such \~~plan~~\Plan, referenced in such \~~plan~~\Plan, or included in the Plan Supplement, as the same may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**1.86.** *"Plan Administrator"* means the sole responsible officer of SC Management selected pursuant to Section 6.07 of the Plan and having the primary duties set forth in Section 6.07(b) of the Plan.

**1.87.** \1.81. *"Plan Supplement"* means the exhibits, schedules, agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, which, unless otherwise specified in the Plan, shall be filed by \~~the Proponents~~\Deutsche Bank no later than ten (10) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court without further notice to parties in interest, and as may be amended thereafter\~~. All documents comprising the Plan Supplement shall be in form and substance acceptable to the Debtors, the Equity Committee, the JPL and the Russell Funds~~\.

**1.88.** \1.82. *"Priority Tax Claim"* means any Claim that, if Allowed, would be entitled to priority under Bankruptcy Code section 507(a)(8).

**1.89.** \1.83. *"Professional"* means (a) any Person employed in one or more of the Bankruptcy Cases pursuant to Bankruptcy Code sections 327, 328 or 1103 or otherwise and (b) any Person seeking compensation or reimbursement of costs and expenses in connection with the Bankruptcy Cases pursuant to Bankruptcy Code section 503(b)(4) or 1129(a)(4).

\~~1.84. *"Proponents"* means SC II, SC Finance, SC Holdings, SC Dixon, and the Equity Committee.~~\

**1.90.** \*"Proponent"* means Deutsche Bank.

**1.91.** \1.85. *"Pro Rata"* means, at any time, the proportion that the Allowed Amount of a Claim or an Interest in a particular Class bears to the aggregate Face Amount of all Claims or Interests (including Disputed Claims or Interests, but excluding Disallowed Claims or Interests) in that Class as of the date of the relevant determination, unless the Plan provides otherwise.

**1.92.** \1.86. *"Redemption Claim"* means an unsecured, non-priority Claim against SC II asserted by an equity security holder of SC II that arises from and by virtue of a request, made at any time before the Petition Date, to redeem an Interest in SC II. All Redemption Claims are classified in Class 8 under the Plan.

**1.93.** \1.87. *"Redemption Claim Bar Date"* means the deadline by which any Person who asserts a Redemption Claim and either did not receive a Ballot for Class 8 (Redemption Claims), or disputes the amount of the Claim stated on the Ballot, must file a proof of a

Redemption Claim to assert that such Person (a) holds a Claim that is properly classified in Class 8 ~~and~~/or (b) holds a Redemption Claim in an Allowed amount that is ~~greater~~different than the amount specified in the Class 8 ~~ballot~~Ballot distributed ~~by SC II~~to such Person. The Redemption Claims Bar Date shall be twenty-one (21) days before the Balloting Deadline.

**1.94.** ~~1.88.~~ *"Rejection Bar Date"* means the deadline by which any Person must file a Rejection Claim, which deadline shall be the later of (a) thirty (30) days after service of a notice of the Effective Date or (b) such other date as is prescribed by the Bankruptcy Court.

**1.95.** ~~1.89.~~ *"Rejection Claim"* means a Claim by a party to an Executory Contract that has not been assumed by the Debtor pursuant to the Plan or a prior Final Order entered in the Bankruptcy Cases for damages arising from the rejection by a Debtor of such Executory Contract under Bankruptcy Code section 365.

**1.96.** ~~1.90.~~ *"Releasees"* means ~~the Debtors, the Equity Committee,~~DB Structured Products, Inc.; Deutsche Bank National Trust Company (individually and in its capacity as custodian under any loan agreement or other agreement with one or more of the Debtors); CSC Logic, Inc. (individually and in its capacity as backup servicer under any loan agreement or other agreement with one or more of the Debtors); Deutsche Bank AG, New York Branch (individually and in its capacity as agent for DB Structured Products, Inc., and as administrative agent and collateral agent under any loan agreement or other agreement with one or more of the Debtors or, as the context may require, as the Holder of an Allowed Deutsche Bank Secured Claim if such Holder is not DB Structured Products, Inc.; each affiliate of any of the foregoing; the Debtors; the Equity Committee; each current or former member of the Equity Committee in such capacity~~,~~; Matthew C. Harrison, Jr.~~,~~; Ralph H. Harrison, III~~,~~; NJF Advisors LLC~~,~~; SCFR~~,~~; SC Limited~~, the JPL and the Russell Funds~~; the JPL; Russell Alternative Investment Funds PLC; the Alternative Strategies Fund; Russell Alternative Strategies Fund II PLC; Russell Diversified Alternatives Fund – U.S. Benefit Plans Ltd.; and Russell Alternative Strategies Fund N1; and with respect to each of the foregoing, their respective directors, officers, agents, attorneys, accountants, financial advisors, representatives or other professionals, solely in their capacity as such; provided, however, that the Releasees shall not include the Milton Parties or the Windmill Employees except to the extent of any release provided for such Persons under the terms of the Windmill Settlement Agreement.

~~1.91. *"Reorganized Debtor"* means a Debtor after the Effective Date.~~

~~1.92. *"Russell Funds"* means Russell Alternative Investment Funds PLC, the Alternative Strategies Fund, Russell Alternative Strategies Fund II PLC, Russell Diversified Alternatives Fund – U.S. Benefit Plans Ltd., and Russell Alternative Strategies Fund N1.~~

~~1.93. *"Russell Funds Fee Claim"* means the Claim of the Russell Funds for fees and expenses (including attorneys' fees) incurred by or on behalf of the Russell Funds in connection with or related to the Bankruptcy Cases or which provided a direct or indirect benefit to SC Holdings~~

**1.97.** ~~1.94.~~ *"SageCrest Regal Secured Claim"* means the Secured Claim against SC Dixon held by SageCrest Regal Inc.

**1.98.** \~~1.95.~~ *"SC II"* means SageCrest II, LLC, the Debtor in Bankruptcy Case no. 08-50754.

**1.99.** \~~1.96.~~ *"SC II Operating Agreement"* means the Amended and Restated Operating Agreement of SC II dated December 18, 2002.

**1.100.** \~~1.97.~~ *"SC Dixon"* means SageCrest Dixon\~~,~~\ Inc., the Debtor in Bankruptcy Case no. 08-50844.

**1.101.** \~~1.98.~~ *"SC Finance"* means SageCrest Finance, LLC, the Debtor in Bankruptcy Case no. 08-50755.

**1.102.** \~~1.99.~~ *"SCFR"* means SCFR Limited.

**1.103.** \~~1.100.~~ *"Schedule of Assumed Contracts"* means the schedule that identifies Executory Contracts, if any, to be assumed under Bankruptcy Code sections 365 and 1123(b)(2) under the Plan and proposed Cure Amounts related thereto. The Schedule of Assumed Contracts shall be included in the Plan Supplement.

**1.104.** \~~1.101.~~ *"Schedules"* means, with respect to each Debtor, the schedules of Assets and liabilities, the list of Holders of Interests, and the statement of financial affairs filed by such Debtor under Bankruptcy Code section 521 and Bankruptcy Rule 1007, as such items have been or may be modified, supplemented or amended.

**1.105.** \~~1.102.~~ *"SC Holdings"* means SageCrest Holdings Limited, the Debtor in Bankruptcy Case No. 08-50763.

**1.106.** \~~1.103.~~ *"SC Limited"* means SageCrest Limited.

**1.107.** \~~1.104.~~ *"SC Management"* means a Delaware limited liability company created for purposes of the Plan as described in greater detail in the Plan. All documents necessary to establish SC Management under the laws of Delaware shall be provided in the Plan Supplement.

**1.108.** \~~1.105.~~ *"Secured Claim"* means a Claim secured by a Lien that is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, on or against property in which an Estate has an interest, or a Claim that is subject to setoff under Bankruptcy Code section 553, but only to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to Bankruptcy Code section 506(a) or, in the case of setoff, pursuant to Bankruptcy Code section 553, or in either case as agreed upon in writing by the \~~relevant Debtor~~\Plan Administrator (or SC Dixon, if such Claim is asserted against SC Dixon) and the Holder of such Claim. Secured Claims shall include Claims secured by Liens junior in priority to other Liens, whether by operation of law, contract, or otherwise, but solely to the extent of the value, as of the Effective Date or such other date established by the Bankruptcy Court, of such Claim Holder's interest in the Estate's interest in such property after giving effect to all Liens that are senior in priority. The amount of any Claim that exceeds the value of the

Holder's interest in the Estate's interest in property or the amount subject to setoff shall be treated as a General Unsecured Claim.

**1.109.** \~~1.106.~~ *"Secured Tax Claim"* means a Claim by a governmental unit for the payment of a tax assessed against property of an Estate and that is secured as of the Effective Date by a Lien against such property, which Lien is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value of the property securing such Claim.

**1.110.** \~~1.107.~~ *"Unclaimed Property"* means any Distribution under the Plan that, for a period of one year after the applicable Distribution Date (unless otherwise extended by an order of the Bankruptcy Court or an agreement with the relevant Debtor), is either (a) attributable to the Holder of an Allowed Claim that has failed to prepare, execute and return an Internal Revenue Service Form W-9, (b) returned as undeliverable, or (c) otherwise unclaimed.

**1.111.** \~~1.108.~~ *"Voting Record Date"* means _____, 2010.

**1.112.** \~~1.109.~~ *"Windmill"* means Windmill Management LLC.

**1.113.** \~~1.110.~~ *"Windmill Employees"* shall have the meaning provided for such term in the Windmill Settlement Agreement.

**1.114.** \~~1.111.~~ *"Windmill Settlement Agreement"* means the Settlement Agreement dated as of June 24, 2010 by and among SC II, SC Finance, SC Holdings, SCFR, SC Limited, Windmill, Alan Milton, Philip Milton, DB Structured Products, Inc., Deutsche Bank National Trust Company, Deutsche Bank AG, New York Branch, and the Equity Committee, and any amendments or modifications thereto.

**1.115.** \~~1.112.~~ *"WMD Bonds"* means those certain bonds identified on **Exhibit A** \~~to the Plan~~\hereto, which are subject to a Participation Agreement among SC Limited, SCFR and SC II dated July 28, 2006 and \~~such further agreement that shall be included in the Plan Supplement~~\which shall be contributed to SC Management on or prior to the Effective Date.

### ARTICLE II.
### UNCLASSIFIED CLAIMS

**2.01**  Administrative Claims.

(a)  **Time for Filing Administrative Claims.** The Holder of any Administrative Claim that is incurred, accrued or in existence prior to the Effective Date, other than (i) a Fee Claim, (ii) an Allowed Administrative Claim, or (iii) a liability in the Ordinary Course of Business must file with the Bankruptcy Court and serve on all parties required to receive such notice a request for the allowance of such Administrative Claim on or before thirty (30) days after the Effective Date. Such request must include at a minimum (i) the name of the Holder of the Claim, (ii) the amount of the Claim, and (iii) the basis of the Claim. Failure to timely and properly file and serve the request required under this Section may result in the

Administrative Claim being forever barred and discharged. Objections to such requests must be filed and served pursuant to the Bankruptcy Rules on the requesting party, the Plan Administrator, and the \~~Reorganized~~\Liquidating Debtors within thirty (30) days after the filing of the applicable request for payment of an Administrative Claim.

(b) **Time for Filing Fee Claims.** Any Person who holds or asserts an Administrative Claim that is a Fee Claim shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice (including without limitation the Plan Administrator) a Fee Application within thirty (30) days after the Effective Date\~~. The Russell Funds shall have standing to assert the Russell Funds Fee Claim as an Administrative Claim allocated to SC Holdings and shall be permitted to file a Fee Application in accordance with this Section 2.01(b). The Russell Funds are, and shall be deemed, qualified applicants under Section 503(b)(3)(D) of the Bankruptcy Code with respect to any Fee Application for payment of the Russell Funds Fee Claim as an Administrative Claim allocated to SC Holdings~~\. Failure to timely and properly file and serve a Fee Application as required under this Section may result in the Fee Claim being forever barred and discharged. No Fee Claim will be deemed Allowed until an order allowing the Fee Claim becomes a Final Order. Objections to Fee Applications must be filed and served pursuant to the Bankruptcy Rules on the \~~Reorganized~~\Liquidating Debtors, the Plan Administrator, and the Person to whose application the objections are \~~filed~~\directed or made within thirty (30) days after the filing of the Fee Application subject to objection. No hearing may be held on a Fee Application until the foregoing objection period has expired.

(c) **Allowance of Administrative Claims.** An Administrative Claim with respect to which a request for payment is required and has been properly filed pursuant to Section 2.01(a) of the Plan shall become an Allowed Administrative Claim if no timely objection is filed. If a timely objection is filed, the Administrative Claim shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order. An Administrative Claim that is a Fee Claim, and with respect to which a Fee Application has been properly filed and served pursuant to Section 2.01(b) of the Plan, shall become an Allowed Administrative Claim only to the extent Allowed by a Final Order.

(d) **Payment of Allowed Administrative Claims.** Except to the extent that a Holder of an Allowed Administrative Claim has been paid prior to the Effective Date, or agrees to a different treatment, each Holder of an Allowed Administrative Claim (other than Allowed Administrative Claims incurred in the Ordinary Course of Business, which are paid pursuant to Section 2.01(e) below) shall receive, in full satisfaction, release and discharge of and exchange for such Administrative Claim, and after the application of any retainer or deposit held by such Holder, Cash from SC Management equal to the Allowed amount of such Administrative Claim within ten (10) Business Days after the Allowance Date with respect to such Allowed Administrative Claim, provided, however, that in the event

SC Management has insufficient Cash to pay all Allowed Fee Claims \(including an Allowed Russell Funds Fee Claim) \in full as set forth above, then SC Management and all Holders of Allowed Fee Claims shall agree to alternative treatment for the payment of all Allowed Fee Claims. SC Management shall allocate each Allowed Fee Claim among SC II, SC Finance and SC Holdings according to their respective liability for any Allowed Fee Claim\, and any Allowed Russell Funds Fee Claim shall be allocated solely to SC Holdings\. SC Management shall carry such allocations on the books and records of SC Management and shall take such allocations and the source of any payment made at any time on an Allowed Fee Claim into account and adjust the amount of any Distributable Cash allocable or payable to SC II or SC Holdings by SC Management pursuant to Section 6.02 of the Plan to ensure that SC II, SC Finance and SC Holdings pay their allocable portions of Allowed Fee Claims.

(e) **Administrative Claims Incurred in the Ordinary Course of Business.** Holders of Administrative Claims based on liabilities incurred in the Ordinary Course of Business of the Debtors during the Bankruptcy Cases (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes, or alleged Administrative Claims arising in tort) shall not be required to file any request for payment of such Claims. Administrative Claims incurred in the Ordinary Course of Business of the Debtors will be paid by SC Management pursuant to the terms and conditions of the transaction giving rise to such Administrative Claim, without any further action by the Holders of such Administrative Claim. The \Debtors reserve and SC Management\Plan Administrator (or SC Dixon, if such Claim is asserted against SC Dixon) shall have the right to object before the Objection Deadline to any Administrative Claim arising, or asserted as arising, in the Ordinary Course of Business, and shall withhold payment of such claim until such time as any objection is resolved pursuant to a settlement or a Final Order.

**2.02    Priority Tax Claims.**

Except to the extent that an Allowed Priority Tax Claim has been paid or otherwise satisfied prior to the \Initial\first Distribution Date, each Holder of an Allowed Priority Tax Claim, in full satisfaction, release, settlement, and discharge of and exchange for such Claim, shall receive from SC Management (in the event that such Claim is asserted against a Liquidating Debtor other than SC Dixon) (a) deferred Cash payments over a period not exceeding five (5) years after the Petition Date in an aggregate principal amount equal to the Allowed amount of such Priority Tax Claim, plus interest, from the Petition Date through the date such Claim is paid in full, on the unpaid portion thereof at the rate of interest determined under applicable nonbankruptcy law as of the calendar month in which the Confirmation Date occurs, in equal annual installments with the first payment to be due on the later of (i) the \Initial\first Distribution Date or (ii) five (5) Business Days after the date when a Priority Tax Claim becomes an Allowed Priority Tax Claim, and subsequent payments to be due on each anniversary of the \Initial\first Distribution Date, or (b) such other less favorable treatment to which such Holder and \SC Management or the relevant Reorganized Debtor\the Plan

Administrator (or SC Dixon if such claim is asserted against SC Dixon) agree in writing. Notwithstanding the foregoing, (a) any Claim or demand for payment of a penalty (other than a penalty of the type specified in Bankruptcy Code section 507(a)(8)(G)) shall be Disallowed pursuant to the Plan and the Holder thereof shall not assess or attempt to collect such penalty from any Debtor, \~~Reorganized~~\Liquidating Debtor, or SC Management or from any of their Assets, and (b) SC Management (or, if applicable, SC Dixon) shall have the right to pay any Allowed Priority Tax Claim, or any unpaid balance of such Claim, in full, at any time after the Effective Date, without premium or penalty. SC Management shall allocate each Allowed Priority Tax Claim to the specific Debtor against which such Priority Tax Claim is Allowed, and SC Management shall take such allocations into account in determining the amount of any Distributable Cash allocable or payable to SC II or SC Holdings by SC Management pursuant to Section 6.02 of the Plan. No Debtor or \~~Reorganized~~\Liquidating Debtor shall have any liability or obligation for payment or other satisfaction of any Priority Tax Claim that is Allowed against any other Debtor or \~~Reorganized~~\Liquidating Debtor.

### 2.03    U.S. Trustee Fees.

SC Management shall timely pay to the United States Trustee on behalf of each \~~Reorganized~~\Liquidating Debtor all quarterly fees incurred by such Debtor pursuant to 28 U.S.C. § 1930(a)(6) until the Bankruptcy Case of such Debtor is closed. SC Management or each \~~Reorganized~~\Liquidating Debtor shall serve on the United States Trustee a quarterly financial report for each quarter (or portion thereof) after the Effective Date that such \~~Reorganized~~\Liquidating Debtor's Bankruptcy Case remains open.

## ARTICLE III.
## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.01    Introduction.

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified.

The Plan\~~, though proposed jointly by all of the Debtors and the Equity Committee,~~\ constitutes a separate plan for each Debtor. The Plan contemplates separate Classes for each Debtor for voting and distribution purposes, and Ballots will be tabulated separately for each of the Debtors.

Except for the unclassified Claims discussed in Article II above, Section 3.02 of the Plan sets forth a designation of Classes of all Claims and Interests in accordance with Bankruptcy Code section 1122(a). A Claim or Interest is classified in a particular Class only to the extent any portion of the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent any portion of the Claim or Interest qualifies within the description of that different Class. If a Claim or Interest is acquired or transferred, the Claim or Interest shall be placed in the Class in which it would have been placed if it were owned by the original Holder of such Claim or Interest. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions only to the extent that such Claim or Interest is an Allowed

Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, satisfied or released before the Effective Date.

### 3.02    Claims Against and Interests in the Debtors.

      (a)     Class 1: Non-Tax Priority Claims

(i)     Class 1A: Non-Tax Priority Claims Against SC Finance
(ii)     Class 1B: Non-Tax Priority Claims Against SC Holdings
(iii)     Class 1 C: Non-Tax Priority Claims Against SC II
(iv)     Class 1D: Non-Tax Priority Claims Against SC Dixon

      (b)     Class 2: Secured Tax Claims

(i)     Class 2A: Secured Tax Claims Against SC Finance
(ii)     Class 2B: Secured Tax Claims Against SC Holdings
(iii)     Class 2C: Secured Tax Claims Against SC II
(iv)     Class 2D: Secured Tax Claims Against SC Dixon

      (c)     Class 3: Deutsche Bank Secured Claims

(i)     Class 3A: DB Secured Claim Against SC Finance
(ii)     Class 3B: DB Secured Claim Against SC Holdings

      (d)     Class 4: SageCrest Regal Secured Claim Against SC Dixon

      (e)     Class 5: \~~Miscellaneous~~\<u>Other</u> Secured Claims

(i)     Class 5A: \~~Miscellaneous~~\<u>Other</u> Secured Claims Against SC Finance
(ii)     Class 5B: \~~Miscellaneous~~\<u>Other</u> Secured Claims Against SC Holdings
(iii)     Class 5C: \~~Miscellaneous~~\<u>Other</u> Secured Claims Against SC II
(iv)     Class 5D: \~~Miscellaneous~~\<u>Other</u> Secured Claims Against SC Dixon

      (A)     Class 5D.1: T. Harris Environmental Management, Inc.
      (B)     Class 5D.2: Other Holders

      (f)     Class 6: General Unsecured Claims

(i)     Class 6A: General Unsecured Claims Against SC Finance
(ii)     Class 6B: General Unsecured Claims Against SC Holdings
(iii)     Class 6C: General Unsecured Claims Against SC II
(iv)     Class 6D: General Unsecured Claims Against SC Dixon

      (g)     Class 7: DB Guaranty Claim Against SC II

(h)      Class 8: Redemption Claims Against SC II

(i)      Class 9: Intercompany Claims

(i)     Class 9A: Intercompany Claims Against SC Finance
(ii)    Class 9B: Intercompany Claims Against SC Holdings
(iii)   Class 9C: Intercompany Claims Against SC II
(iv)   Class 9D: Intercompany Claims Against SC Dixon

(j)      Class 10: Interests in the Debtors

(i)     Class 10A: Interests in SC Finance
(ii)    Class 10B: Interests in SC Holdings
(iii)   Class 10C: Interests in SC II
(iv)   Class 10D: Interests in SC Dixon

## ARTICLE IV.
## IDENTIFICATION OF UNIMPAIRED AND IMPAIRED CLAIMS AND INTERESTS

### 4.01    Unimpaired Claims and Interests

Claims against the Debtors in Classes 1, 2, 5A, 5B and 5C, and Interests in SC Finance (Class 10A) are not impaired under the Plan, and the Holders of those Claims and Interests are conclusively presumed to have accepted the Plan under Bankruptcy Code section ~~\1 126\~~1126(f) and are thus not entitled to vote on the Plan.

### 4.02    Impaired Claims and Interests

Claims against the Debtors in Classes 3, 4, 5D, 6, 7, 8 and 9, and Interests in SC Holdings (Class 10B), SC II (Class 10C) and SC Dixon (Class 10D) are impaired under the Plan and the Holders of those Claims and Interests are entitled to vote to accept or reject the Plan.

### 4.03    Controversy Concerning Impairment

In the event of a controversy as to whether any Claim or Interest or any Class of Claims or Interests is impaired under the Plan, the Bankruptcy Court will determine the controversy, after notice and a hearing.

## ARTICLE V.
## TREATMENT OF CLAIMS AND INTERESTS

### 5.01    Non-Tax Priority Claims – Classes 1A, 1B, 1C~~,~~ and 1D

On or as soon as practicable after the later of (a) the ~~\Initial\~~first Distribution Date or (b) the Allowance Date with respect to a Non-Tax Priority Claim, the Holder of such Allowed Non-Tax Priority Claim shall receive from SC Management in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Non-Tax Priority Claim, (y) Cash in an

amount equal to the Allowed amount of its Non-Tax Priority Claim, or (z) such other, less favorable treatment to which such Holder and \SC Management\the Plan Administrator or the relevant \Reorganized\Liquidating Debtor agree in writing. To the extent an Allowed Non-Tax Priority Claim entitled to priority treatment under 11 U.S.C. §§ 507(a)(4) or (5) exceeds the statutory cap applicable to such Claim, such excess amount shall be treated as a Class 6 General Unsecured Claim against the relevant Debtor.

### 5.02 Secured Tax Claims – Classes 2A, 2B, 2C and 2D

\With respect to any Allowed Secured Tax Claim for tax years prior to 2009, to the extent not already paid or otherwise satisfied, on\On or as soon as practicable after the later of (a) the \Initial\first Distribution Date or (b) the Allowance Date with respect to a Secured Tax Claim, \the\each Holder of \such\an Allowed Secured Tax Claim for tax years prior to 2009 (to the extent not already paid or otherwise satisfied) shall receive (from SC Management or \Reorganized\reorganized SC Dixon, as applicable\,\) in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Secured Tax Claim, (\x\1) Cash equal to the \value\Allowed amount of its Allowed Secured Tax Claim, \including\plus interest \thereon \at the \applicable rate provided \under applicable\by non-bankruptcy law pursuant to Section 511 of the Bankruptcy Code \section 511 \from the Petition Date \through\to the date such Claim is paid in full\;\; (\y\2) the Collateral securing the Allowed Secured Tax Claim, or (\z\3) such other\;\ less favorable treatment as may be agreed upon in writing by such Holder and \SC Management or Reorganized\the Plan Administrator or reorganized SC Dixon, as applicable.

The Holder of a Secured Tax Claim for *ad valorem* taxes for any tax year from 2009 and thereafter shall retain all rights and remedies for payment thereof in accordance with applicable non-bankruptcy law.

Notwithstanding any other provision of the Plan, each Holder of an Allowed Secured Tax Claim shall retain its Lien \in the\on any Collateral that secures its Claim or the proceeds of such Collateral (to the extent such Collateral is sold by SC Management or \Reorganized\reorganized SC Dixon, as applicable, free and clear of such Lien) to the same extent and with the same validity and priority as such Lien held as of the Petition Date until (a) the Holder of such Allowed Secured Tax Claim (i) has been paid Cash equal to the value of its Allowed Secured Tax Claim and/or (ii) has received a return of the Collateral securing its Allowed Secured Tax Claim, or (iii) has been afforded such other treatment as to which such Holder and \SC Management or Reorganized\the Plan Administrator or reorganized SC Dixon, as applicable, have agreed upon in writing, or (b) such purported Lien has been determined by a Final Order to be invalid or avoidable. To the extent that a Secured Tax Claim exceeds the value of the interest of the Estate in the property that secured such Claim, such Claim shall be deemed Disallowed pursuant to Bankruptcy Code section 502(b)(3). Notwithstanding the foregoing, the Debtors and \Reorganized\Liquidating Debtors are authorized to transfer, and shall transfer, their Assets as of the Effective Date to SC Management in accordance with Section 6.01 of the Plan, and such Assets shall remain subject to any Lien securing an Allowed Secured Tax Claim until such Lien is released in accordance with this Section 5.02.

If SC Management or \Reorganized\reorganized SC Dixon fails to timely \pay\make any payment to a Holder of an Allowed Secured Tax Claim as required under this Section 5.02 of the

Plan, the affected Holder ~~of an Allowed Secured Tax Claim~~ shall send written notice of default to SC Management or ~~Reorganized~~ reorganized SC Dixon, as applicable. If the default is not cured within twenty-one (21) days after notice of default is mailed, such Holder may proceed with any remedies for collection of ~~all~~ amounts due under applicable non-bankruptcy law without further order of the Bankruptcy Court.

### 5.03 Deutsche Bank Secured Claim Against SC Finance – Class 3A; and Deutsche Bank Secured Claim Against SC Holdings – Class 3B

The DB Secured Claims against SC Finance and SC Holdings are separately classified in Class 3A and Class 3B, respectively, and Deutsche Bank shall be entitled to submit a separate Ballot for each such Class. However, each of the Allowed DB Secured Claims shall receive identical, consolidated treatment under the Plan ~~as set forth in this Section 5.03 of the Plan~~.

    (a)    Allowance of the DB Secured Claims ~~. Each of the~~: The DB Secured Claims shall be ~~Allowed in an amount to be determined by the Bankruptcy Court~~ deemed allowed in full as of the Effective Date in the amount asserted by Deutsche Bank in its proofs of claim plus fees, costs, including without limitation the expenses of Deutsche Bank's financial consultant (Alvarez & Marsal), and default interest.

    (b)    Payment of Interest at the Default Rate: The Allowed DB Secured Claims shall include all principal, fees, costs, and interest including payment of interest at the default rate provided, however, that payment of that portion of the DB Secured Claims attributable to default interest (the "DB Secured Default Interest Claim") shall be made on a *pari passu* basis with payments to Holders of Allowed Claims in Classes 6A, 6B, and 6C.

    (c)    ~~(b)~~ Treatment ~~. In full satisfaction, settlement, release and discharge of and in exchange for the Allowed DB Secured Claims and all Liens securing such Claims,~~: Deutsche Bank shall receive ~~, on or as soon as practicable after the later of the Effective Date or the Allowance Date with respect to the DB Secured Claims: (i) property of the Debtors that is the indubitable equivalent of all or a portion of such Allowed Claims; and/or (ii) the DB Promissory Note~~ on the Effective Date the DB Credit Agreement, which shall be issued by SC Finance, SC II, SC Holdings, SCFR, SC Limited and SC Management in the principal amount of the ~~Allowed DB Secured Claims less an amount equal to the value of the property of the Debtors, if any, that is transferred to Deutsche Bank pursuant to the foregoing clause (i). The Plan Supplement shall identify the property of the Debtors, if any, to be transferred to Deutsche Bank pursuant to the foregoing clause (i), the value of such property as of the Effective Date, and the principal amount of the DB Promissory Note, and the Plan Supplement shall include the form of the DB Promissory Note. To the extent there is any inconsistency or conflict between the DB Promissory Note and the Plan, the provisions of the Plan shall control. The DB Promissory Note shall include the following terms:~~ asserted amount of the prepetition DB Secured Claims plus fees, costs, and default interest. The DB

Credit Agreement shall contain the terms set forth in this Section 5.03 and in the term sheet attached hereto as **Exhibit C**.

\(i)    Joint and Several Liability. SC Finance, SC II, SC Holdings, SCFR, SC Limited and SC Management shall each be jointly and severally liable for all obligations arising under the DB Promissory Note.\

\(ii)    Collateral. The DB Collateral shall consist of all Collateral that secures the Allowed DB Secured Claims as of the Effective Date, plus all assets of SC II, SCFR and SC Limited that are transferred to SC Management on the Effective Date pursuant to Section 6.01 of the Plan (which excludes the WMD Bonds and any interest in the WMD Bonds). Deutsche Bank shall retain its Liens on the DB Collateral and the proceeds of the DB Collateral, if any, until: (A) the DB Promissory Note has been satisfied by its terms, (B) the DB Collateral has been transferred or abandoned to, or foreclosed upon by, Deutsche Bank, or (C) the obligors under the DB Promissory Note and Deutsche Bank have agreed in writing upon such other treatment of the DB Collateral. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors are authorized to transfer their Assets as of the Effective Date to SC Management in accordance with Section 6.01 of the Plan, and such Assets shall remain subject to all Liens securing the Allowed DB Secured Claims until such Liens are released in accordance with this Section 5.03(b)(ii).\

\(iii)    Interest. Interest on the unpaid principal balance of the DB Promissory Note shall accrue at a rate per annum (computed on a 360-day basis for the actual number of days elapsed) equal to One-Month LIBOR plus 5.5% and, at the option of the obligors under the DB Promissory Note, shall be (A) paid in Cash quarterly in arrears on the fifth (5th) Business Day following the last day of each calendar quarter after the Effective Date, or (B) added to the principal amount due under the DB Promissory Note monthly in arrears.\

\(iv)    Payment of Principal. On or before the fifth (5th) Business Day following the last day of each calendar quarter, commencing after the fourth (4th) full calendar quarter following the Effective Date, SC Management shall make a principal payment on the DB Promissory Note in an amount equal to the amount of cash held by SC Management on the last Business Day of the immediately preceding calendar quarter less the aggregate Budgeted Expenses for the following twelve (12)-month period.\

\(v)    Prepayment. The obligors under the DB Promissory Note may pay or prepay the principal amount due under DB Promissory Note at any time prior to its maturity date without penalty or premium.\

\(vi)    Maturity Date. The DB Promissory Note shall mature on December 31, 2014.\

\(vii)    Payment Default. The sole event of default under the DB Promissory Note shall be a Payment Default.\

\(viii)    Remedies Upon Payment Default; Opportunity to Cure. Upon the occurrence of a Payment Default, Deutsche Bank may deliver a notice of Payment Default to the

~~obligors under the DB Promissory Note. The obligors under the DB Promissory Note shall have a period of ninety (90) days after receipt of a notice of Payment Default to cure such default. If such Payment Default has not been cured within such 90-day period, then Deutsche Bank may pursue the rights and remedies available to it under the DB Promissory Note.~~

~~(ix) Collateral Report. No less than ninety (90) days after the end of each calendar year after the Effective Date, SC Management shall deliver to Deutsche Bank an appraisal of the DB Collateral.~~

No payments will be made to junior Classes, including Holders of Claims or Interests in Classes 6, 8, or 10, until all Allowed Claims in Class 3 have been indefeasibly paid in full in Cash.

**5.04    SageCrest Regal Secured Claim Against SC Dixon – Class 4**

The Holder of the Allowed SageCrest Regal Secured Claim shall receive from SC Dixon, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Claim, a Cash payment equal to the Allowed amount of such Claim within thirty (30) days after the later of (a) the closing on a sale of the Collateral that secures the Allowed SageCrest Regal Secured Claim or (b) the Allowance Date with respect to the Allowed SageCrest Regal Secured Claim. The timing of the sale of the Collateral that secures the Allowed SageCrest Regal Secured Claim shall be within the discretion of SC Dixon. Notwithstanding any other provision of the Plan, the Holder of the Allowed SageCrest Regal Secured Claim shall retain its Lien in the Collateral that secures its Claim or the proceeds of such Collateral (to the extent such Collateral is sold by SC Dixon free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until (a) the Holder of the Allowed SageCrest Regal Secured Claim has been paid Cash equal to the value of the Allowed SageCrest Regal Secured Claim, or (b) such purported Lien has been determined by a Final Order to be invalid or avoidable.

If the Allowed SageCrest Regal Secured Claim exceeds the value of the Collateral securing such Claim, then pursuant to Bankruptcy Code section 506(a), any such excess amount shall be deemed to be and shall be treated as a Class 6D General Unsecured Claim against SC Dixon.

**5.05    ~~Miscellaneous~~Other Secured Claims – Classes 5A, 5B, 5C and 5D**

(a)    **~~Miscellaneous~~Other Secured Claims Against SC II (Class 5A), SC Finance (Class 5B) and SC Holdings (Class 5C).** Classes 5A, 5B and 5C are each a separate Class of ~~Miscellaneous~~Other Secured Claims against SC II, SC Finance and SC Holdings, respectively, and each such Class shall contain a separate subclass for each ~~Miscellaneous~~Other Secured Claim in such Class. Each such subclass is deemed to be a separate Class for all purposes under the Bankruptcy Code and the Plan.

On or as soon as practicable after the later of (i) the ~~Initial~~first Distribution Date or (ii) the Allowance Date, each Holder of an Allowed ~~Miscellaneous~~Other Secured Claim in Class 5A, 5B or 5C shall receive from SC Management, in full satisfaction, settlement, release and

discharge of and in exchange for such Claim, (i) Cash equal to the value of its Allowed ~~Miscellaneous~~\Other Secured Claim, (ii) the Collateral securing the Allowed ~~Miscellaneous~~\Other Secured Claim, or (iii) such other, less favorable treatment as to which such Holder ~~and SC Management or the relevant Reorganized Debtor shall have agreed upon~~\may agree in writing.

Notwithstanding any other provision of the Plan, each Holder of an Allowed ~~Miscellaneous~~\Other Secured Claim in Classes 5A, 5B and 5C shall retain its Lien in the Collateral that secures its Claim or the proceeds of such Collateral (to the extent such Collateral is sold by SC Management free and clear of such Lien) to the same extent and with the same validity and priority as such Lien held as of the Petition Date until (i) the Holder of such Allowed ~~Miscellaneous~~\Other Secured Claim has received (A) Cash equal to the value of its Allowed ~~Miscellaneous~~\Other Secured Claim, (B) a return of the Collateral securing its Allowed Other Secured\ ~~Tax~~\ Claim, or (C) such other treatment as to which such Holder and \~~SC Management or the relevant Reorganized Debtor~~ \the Plan Administrator shall have agreed upon in writing, or (ii) such purported Lien has been determined by a Final Order to be invalid or avoidable. Notwithstanding the foregoing, SC II, SC Finance and SC Holdings are authorized to transfer, and shall transfer, their Assets as of the Effective Date to SC Management in accordance with Section 6.01 of the Plan, and such Assets shall remain subject to any Lien securing an Allowed ~~Miscellaneous~~\Other Secured Claim until such Lien is released in accordance with this Section 5.05(a).

If any Allowed \~~Miscellaneous~~\Other Secured Claim in Class 5A, 5B or 5C exceeds the value of the Collateral securing such Claim, then pursuant to Bankruptcy Code section 506(a), any such excess amount shall be deemed to be and shall be treated as a Class 6 General Unsecured Claim.

      (b)    **\~~Miscellaneous~~\Other Secured Claims Against SC Dixon (Class 5D).** Class 5D shall contain a separate subclass for each \~~Miscellaneous~~\Other Secured Claim against SC Dixon. Each such subclass is identified in Section 3.02(e)(iv) of the Plan and shall be deemed to be a separate Class for all purposes under the Bankruptcy Code and the Plan. The treatment of each such subclass is as follows:

      (i)    **Class 5D.1: T. Harris Environmental Management, Inc.** As a compromise and settlement of all Claims asserted by T. Harris Environmental Management, Inc. ("Harris") against SC Dixon, Harris shall hold an Allowed \~~Miscellaneous~~\Other Secured Claim against SC Dixon in the amount of CDN$55,000.00. Such Allowed \~~Miscellaneous~~\Other Secured Claim shall be secured by a Lien in the Collateral that secures Harris'\~~s~~\ Claim, and such Lien shall be senior to any and all other Liens in such Collateral, including without limitation, any such Liens asserted by SageCrest Regal. In full satisfaction, settlement, release and discharge of and in exchange for the Class 5D.1 Allowed Other Secured Claim and all other Claims, if any, against SC Dixon held or asserted by Harris, Harris shall receive a Cash payment from SC Dixon in the amount of CDN$55,000.00, without interest, within thirty (30) days after the earlier of (A) the sale by SC Dixon of the Collateral that secures the Allowed Other Secured Claim held by Harris; (B) the refinancing of such Collateral by SC Dixon, or (C) the fifth (5th) anniversary of the Effective Date.

Harris shall retain its Lien in the Collateral that secures its Allowed Other Secured Claim against SC Dixon or the proceeds of such Collateral (to the extent such Collateral is sold by SC Dixon free and clear of such Lien) until Harris has received the Cash payment provided in this Section 5.5(b)(i) of the Plan. Within seven (7) days after Harris' receipt of such Cash payment, Harris shall file a release of all Liens and any related Claims against any and all property of ~~Reorganized~~reorganized SC Dixon in the real property records where any such Lien or related Claim has been registered.

As of the Effective Date, Harris and its officers, employees, agents, successors and assigns (the "Harris Releasors") shall be deemed to irrevocably release and forever discharge SC Dixon and its affiliates and their respective officers, directors, shareholders, managers, employees, agents and advisors (the "SC Dixon Releasees") from all actions, causes of action, suits, proceedings, liabilities, debts, sums of money, obligations, duties, dues, accounts, interest, bonds, covenants, contracts, Claims, damages, and claims for costs and demands that the Harris Releasors ever had, now have, can, shall or may have against any of the SC Dixon Releasees, whether known or unknown, arising from any matter in connection with the foregoing Collateral, Harris'~~s Miscellaneous~~ Other Secured Claim against SC Dixon and/or based on or arising from the payment of approximately CDN$1,367,178 by SC Dixon to Terrasan Environmental Solutions, Inc. on or about September 10, 2008, save and except for the payment by SC Dixon required by this Section 5.05(b)(i) of the Plan.

(ii) **Class 5D.2: Other Holders.** Each Holder of an Allowed ~~Miscellaneous~~Other Secured Claim against SC Dixon in Class 5D.2 shall receive from SC Dixon, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Claim, a Cash payment equal to the Allowed amount of such Claim within thirty (30) days after the later of (A) the closing on a sale of the Collateral that secures such Allowed Claim or (B) the Allowance Date with respect to such Allowed Claim. The timing of the sale of the Collateral that secures an Allowed ~~Miscellaneous~~Other Secured Claim against SC Dixon in Class 5D.2 shall be within the discretion of SC Dixon. Notwithstanding any other provision of the Plan, the Holder of an Allowed ~~Miscellaneous~~Other Secured Claim against SC Dixon in Class 5D.2 shall retain its Lien in the Collateral that secures its Claim or the proceeds of such Collateral (to the extent such Collateral is sold by SC Dixon free and clear of such Lien) to the same extent and with the same validity and priority as such Lien held as of the Petition Date until (i) the Holder of such Allowed Claim has been paid Cash equal to the value of such Allowed Claim, or (ii) such purported Lien has been determined by a Final Order to be invalid or otherwise avoidable.

If an Allowed ~~Miscellaneous~~Other Secured Claim against SC Dixon in Class 5D.2 exceeds the value of the Collateral securing such Claim, then pursuant to Bankruptcy Code section 506(a), any such excess amount shall be deemed to be and shall be treated as a Class 6D General Unsecured Claim against SC Dixon.

**5.06    General Unsecured Claims – Classes 6A, 6B, 6C and 6D**

(a)    **General Unsecured Claims Against SC Finance (Class 6A), SC Holdings (Class 6B), and SC II (Class 6C).** Each Allowed General Unsecured Claim in Class 6A (SC Finance), Class 6B (SC Holdings), and Class 6C

(SC II) shall include interest thereon, at the Case Interest Rate, from the Petition Date through the date such Allowed General Unsecured Claim is paid in full.

\(b)    If all of Classes 6A, 6B and 6C accept the Plan, then each Holder of an Allowed General Unsecured Claim in Classes 6A, 6B, and 6C shall receive from SC Management quarterly Cash payments, commencing with the first full calendar quarter after the Effective Date and continuing until all Allowed General Unsecured Claim in Classes 6A, 6B, and 6C are paid in full, totaling the Allowed amount of such Claim in full satisfaction, settlement, release and discharge of and in exchange for such Claim. Each quarterly Cash payment shall be made no later than ten (10) Business Days after the end of each calendar quarter. Each quarterly Cash payment to a Holder of a General Unsecured Claim under this Section of the Plan shall be of an amount equal to the lesser of such Holder's Pro Rata (calculated using all Allowed and Disputed General Unsecured Claims in Classes 6A, 6B and 6C) share of $300,000 or the unpaid balance of such Allowed General Unsecured Claim.\

\(c)    If Class 6A, 6B or 6C rejects the Plan, then each Holder of an Allowed General Unsecured Claim in Classes 6A, 6B, and 6C shall receive from SC Management a payment of Cash equal to the amount of such Allowed General Unsecured Claim, plus interest at the Case Interest Rate from the Petition Date through the date of payment, on the later of (i) the Allowance Date or (ii) the first (1st) Business Day that is four (4) years after the Effective Date.\

(i)    \Payment: After indefeasible payment in full in Cash of the DB Secured Claims *other than* the DB Secured Default Interest Claim, Cash payments shall be made on a monthly basis by the Plan Administrator to each Holder of an Allowed General Unsecured Claim in Classes 6A, 6B and 6C, on a *pro rata* basis with payments to be made to Deutsche Bank on account of the DB Secured Default Interest Claim from the Excess Cash Flow Amount with respect to the preceding month. No payments shall be made to junior Classes, including Holders of Claims or Interests in Classes 8 or 10, until all Allowed Claims in Classes 6A, 6B, and 6C have been indefeasibly paid in full in Cash.

(ii)    Disputed Claims Reserve: Should a Class 6A, 6B, or 6C Claim not yet be Allowed at the time of any proposed distribution to other members of that class, the full face amount of such Claim shall be reserved by the Plan Administrator pending allowance or disallowance of such Claim.

(b)    \(d) **General Unsecured Claims Against SC Dixon – Class 6D**. On or as soon as practicable after the later of (i) the first Distribution Date after all Allowed Claims in Classes 4 and 5D have been paid or otherwise satisfied in full, or (ii) the Allowance Date, each Holder of an Allowed General Unsecured Claim in Class 6D (SC Dixon), in full satisfaction, settlement, release and discharge of and in exchange for such Claim, shall receive from SC Dixon \or SC Management \a Cash payment equal to a Pro Rata share of the Cash, if any, derived from the liquidation of the Assets of SC Dixon that remain after all Allowed Claims in Classes 4 and 5D have been paid or otherwise satisfied in full. Each Allowed General Unsecured Claim against SC Dixon shall be satisfied solely from such Cash of SC Dixon.

**5.07    DB Guaranty Claim Against SC II – Class 7**

In full satisfaction, settlement, release and discharge of and in exchange for the Allowed DB Guaranty Claim, SC II shall execute the DB ~~Promissory Note~~Credit Agreement on the Effective Date and SC II shall be jointly and severally liable for all obligations arising under the DB ~~Promissory Note~~Credit Agreement.

**5.08    Redemption Claims Against SC II – Class 8**

(a)    **Members of Class 8.** Class 8 includes, and is limited to, all Redemption Claims, which are unsecured, non-priority Claims against SC II asserted by any equity security holder of SC II that arises from and by virtue of a request, made at any time before the Petition Date, to redeem an Interest in SC II pursuant to the SC II Operating Agreement. ~~SC II has identified~~The Debtors shall identify all Holders of Redemption Claims according to ~~its~~SC II's books and records and ~~has notified~~such Holders shall be notified that they are entitled to participate in Class 8 of the Plan by ~~providing them~~their receipt of a Class 8 Ballot for purposes of voting to accept or reject the Plan. **Any Person who did not receive a Class 8 Ballot and believes they are a Holder of a Redemption Claim and entitled to participate in Class 8 must file a proof of claim asserting a Redemption Claim with the Bankruptcy Court no later than the Redemption Claim Bar Date, which is _____, 2010.** The Bankruptcy Court shall determine whether any Person who timely files a Redemption Claim is entitled to vote and otherwise participate in Class 8 as the Holder of a Redemption Claim.

(b)    **Settlement and Compromise.** As discussed more fully in the Disclosure Statement, during the Bankruptcy Cases, various disputes have arisen concerning the characterization, allowability, priority, and subordination of alleged Claims and rights arising from the prepetition requests by certain investors in SC II to redeem their Interests in SC II. The classification of all Redemption Claims in Class 8 and the treatment of all Redemption Claims set forth in this Section 5.08 of the Plan represents a compromise and settlement of all such disputes pursuant to Bankruptcy Code section 1123(b)(3)(A).

(c)    **Allowed Redemption Claim Amount.** The Allowed amount of each Redemption Claim shall be equal to the following:

(i)    for a Holder of a Redemption Claim that requested (in one or more requests at any time before the Petition Date) to redeem 100% of such Holder's Interest in SC II:

(A)    if such Holder had a positive capital account balance reflected on its June 30, 2007 capital account statement from SC II, the amount reflected on the "Value on June 30, 2007" line of such statement *plus* the unpaid amount reflected on the "June Redemption" line of such statement, or

(B)     if such Holder had a capital account balance of zero in SC II as of June 30, 2007, as reflected on its June 30, 2007 capital account statement from SC II or otherwise, the unpaid amount reflected on the "March Redemption" line of such Holder's March 31, 2007 capital account statement from SC II, valued as of June 30, 2007, *plus* the unpaid amount reflected on the "June Redemption" line of such Holder's June 30, 2007 capital account statement from SC II; or

(ii)     for a Holder of a Redemption Claim that requested (in one or more requests at any time before the Petition Date) to redeem less than 100% of its interest in SC II, the unpaid amount of such requested redemption.

**The proposed Allowed amount of each Redemption Claim is set forth in the Class 8 Ballot distributed \by SC II \to each such Holder. Such Ballot shall constitute an objection\ by SC II\ to the Allowed amount of any Redemption Claim that exceeds the amount set forth on such Ballot. The amount of a Redemption Claim set forth in a Class 8 Ballot shall be binding on the Holder of such Redemption Claim and shall establish the Allowed amount of such Redemption Claim for all purposes unless such Holder files a proof of a Redemption Claim before the Redemption Claim Bar Date. Therefore, any Holder of a Redemption Claim who contends that the Allowed amount of its Redemption Claim is greater than the amount set forth on such Holder's Class 8 Ballot must file a proof of claim asserting a Redemption Claim with the Bankruptcy Court no later than the Redemption Claim Bar Date. Any such timely filed proof of claim shall be treated as a motion by such Holder to estimate the Allowed amount of its Redemption Claim for purposes of voting on the Plan. The Class 8 Ballot distributed by \SC II\the Proponent shall be treated as an objection by the \Proponents\Proponent\ to any such motion to estimate.**

(d)     **Treatment.**

(i)     \Each Holder of an Allowed Redemption Claim shall receive Cash payments from SC II up to the Allowed amount of such Claim, without interest, in full satisfaction, settlement, release and discharge of and in exchange for such Claim. All Cash payments by SC II to Holders of Allowed Redemption Claims shall be made on a *pari passu* basis with Cash payments by SC II to Holders of Allowed Interests in SC II in Class 10C pursuant to Section 5.1 0(c) of the Plan. Cash payments will be made on a quarterly basis no later than ten (10) Business Days after the end of each calendar quarter, commencing with the first full calendar quarter during which SC II receives a payment of Distributable Cash from SC Management pursuant to Section 6.02 of the Plan and after all Allowed amounts payable under Section 5.08(d)(ii) of the Plan have been paid in full, and shall continue thereafter until all Allowed Redemption Claims have been paid in full or SC II determines that no additional Cash is available for distribution to Holders of Allowed Redemption Claims in Class 8 and Holders of Allowed Interests in SC II in Class 10C. Each such quarterly Cash payment shall be in an amount equal to the lesser of a Pro Rata share of the Distributable Cash received by SC II from SC Management pursuant to Section 6.02 of the Plan or the unpaid balance of each Allowed Redemption Claim.\After indefeasible payment in full in Cash of (a) the Deutsche Bank Secured Claim and (b) all Allowed Claims in Classes 6A, 6B, and 6C, payments shall be made by the

Plan Administrator to Holders of Allowed Class 8 Claims on a *pro rata* basis from the Excess Cash Flow Amount with respect to the preceding month. No payments shall be made to Holders of any Interests, including Class 10B or 10C, until indefeasible payment in full in Cash of Class 8 Claims.

(ii) In addition to the Cash payments provided for in the preceding Section 5.08(d)(i), any Holder of a Redemption Claim who has paid any fees or expenses incurred in litigating or otherwise asserting in the Bankruptcy Cases the allowance or priority of such Holder's Redemption Claim shall receive Cash from SC II equal to 100% of such reasonable fees and expenses in an Allowed amount agreed to by such Holder and ~~SC II~~the Proponent or established by a Final Order of the Bankruptcy Court upon application by such Holder filed no later than sixty (60) days after the Effective Date; provided that the aggregate amount of all amounts Allowed and payable pursuant to this Section 5.08(d)(ii) shall not exceed $500,000, and if such aggregate Allowed amounts exceed $500,000, the Holders of such Claims shall receive a Pro Rata portion of $500,000 in full satisfaction thereof. All amounts payable pursuant to this Section 5.08(d)(ii), not to exceed $500,000 in the aggregate, shall be paid in full before SC II may make any other Distribution to any Holder of an Allowed Redemption Claim pursuant to Section 5.08(d)(i) or to any Holder of an Allowed Interest in SC II pursuant to Section 5.10(c) of the Plan.

~~(iii) Notwithstanding any other provision of the Plan (including Section 5.08(d)(i)), no Distribution shall be made to any Holder of an Allowed Redemption Claim pursuant to this Section 5.08(d) unless and until all Allowed Administrative Claims and Allowed Priority Claims against all Debtors, and all Allowed Claims against SC II in Classes 1C, 2C, 5C, 6C, and 7 have been paid or otherwise satisfied in full as provided in this Plan. SC II, in its sole discretion, shall determine the amount and timing of any Distributions to Holders of Allowed Redemption Claims and Allowed Interests in SC II.~~

### 5.09 Intercompany Claims – Class 9

On the Effective Date, all Intercompany Claims shall be cancelled, discharged and eliminated in full~~,~~ and the Holders of Intercompany Claims shall not receive or retain any property or any interest in property on account of such Intercompany Claims~~; provided, however, that SC Management shall use Distributable Cash to pay in full each Intercompany Claim that is attributable to any share of an Allowed Fee Claim that is allocated to SC II, SC Finance or SC Holdings under Section 2.01(d) of the Plan and that remains unpaid on or after the Effective Date~~.

### 5.10 Interests in the Debtors – Class 10

(a) **Interests in SC Finance (Class 10A).** SC II, the sole Holder of all Allowed Interests in SC Finance, shall retain its Interest in SC Finance, as reorganized under the terms of the Plan. In accordance with Section 6.01 of the Plan, SC II shall contribute its Interests in SC Finance to SC Management.

(b) **Interests in SC Holdings (Class 10B).** Each Holder of an Allowed Interest in SC Holdings shall retain its Interest in SC Holdings, as SC

Holdings is reorganized under the terms of the Plan. Each such Holder shall receive Distributions from SC Holdings, on a Pro Rata basis, from \~~the Distributable Cash received by SC Holdings~~\any Cash Distributions that may be made by the Plan Administrator from SC Management \~~pursuant to Section 6.02 of the Plan, net of allocations and reserves for Fee Claims paid by SC Management on behalf of such entities in accordance with Section 2.01(d) of the Plan. No Distribution shall be made to any Holder of an Allowed Interest in SC Holdings pursuant to this Section 5.10(b) unless and until all Allowed Administrative Claims and Allowed Priority Claims against all Debtors, and all Allowed Claims against SC Holdings in Classes 113, 213, 313, 513, and 613 have been paid or otherwise satisfied in full as provided in this Plan. SC Holdings, in its sole discretion, shall determine the amount and timing of any Distributions to Holders of Allowed Interests in SC Holdings~~\to SC Holdings, which payments may only be made after the payment in full in Cash of the Allowed Claims of Classes 3, 6A, 6B, 6C, and 8 under the Plan.

(c)     **Interests in SC II (Class 10C).** Each Holder of an Allowed Interest in SC II shall retain its Interest in SC II\~~,~~\ as SC II is reorganized under the terms of the Plan\~~ pursuant to an amended SC II Operating Agreement that will be included in the Plan Supplement.~~\.   Each such Holder shall receive Distributions from SC II, on a Pro Rata basis, from any Cash Distributions that may be made by the Plan Administrator from SC Management to SC II, which payments may only be made after the payment in full in Cash of the Allowed Claims of Classes 3, 6A, 6B, 6C, and 8 under the Plan.   The Allowed amount of each Interest in SC II shall be equal to the following:

(i)     for a Holder of such Interest that requested (in one or more requests at any time before the Petition Date) to redeem less than 100% of such Holder's Interest in SC II, the amount reflected on the "Value on June 30, 2007" line of such Holder's June 30, 2007 capital account statement from SC II *minus* the unpaid amount of such Holder's requested redemption(s); or

(ii)     for a Holder of such Interest that did not request, at any time before the Petition Date, to redeem any portion of its Interest in SC II, the amount reflected on the "Value on June 30, 2007" line of such Holder's June 30, 2007 capital account statement from SC II.

**The proposed Allowed amount of each Interest in SC II is set forth in the Class 10C Ballot distributed \~~by SC II~~\to each Holder of an Interest in SC II. The Allowed amount of an Interest in SC II set forth in such Class 10C Ballot shall be binding on the Holder of such Interest in SC II and shall establish the Allowed amount of such Interest in SC II for all purposes unless such Holder submits a Class 10C Ballot before the Balloting Deadline that asserts a higher amount. Therefore, any Holder of an Interest in SC II who contends that the Allowed amount of its Interest in SC II is greater than the amount set forth \~~by SC II~~\on such Holder's Class 10C Ballot must state the amount it asserts as the Allowed amount of its Interest in SC II on its Class 10C Ballot and must submit such Class 10C Ballot to the Balloting Agent no later than the Balloting Deadline. Any such timely submitted Class 10C Ballot shall be treated as a motion by such Holder to estimate the Allowed amount of its**

**Interest in SC II for purposes of voting on the Plan. The Class 10C Ballot \~~distributed by SC II~~\shall be treated as an objection by the \~~Proponents~~Proponent to any such motion to estimate\~~.~~.\\** ~~Each such Holder of an Allowed Interest in SC II shall receive Distributions from SC II, on a Pro Rata basis, from the Distributable Cash received by SC II from SC Management pursuant to Section 6.02 of the Plan, net of allocations and reserves for Fee Claims paid by SC Management on behalf of SC II in accordance with Section 2.01(d) of the Plan. Such Distributions shall be made on a *pari passu* basis with Cash payments by, or on account of, SC II to Holders of Allowed Redemption Claims in Class 8 pursuant to Section 5.08(d)(i) of the Plan. No Distribution shall be made to any Holder of an Allowed Interest in SC II pursuant to this Section 5.10(c) unless and until all Allowed Administrative Claims and Allowed Priority Claims against all Debtors, all Allowed Claims against SC II in Classes 1C, 2C, 5C, 6C, and 7, and all payments to Holders of Allowed Class 8 Claims pursuant to Section 5.08(d)(ii) of the Plan have been paid or otherwise satisfied in full as provided in the Plan. SC II, in its sole discretion, shall determine the amount and timing of any Distributions to Holders of Allowed Interests in SC II\~~.~~**

(d)     **Interests in SC Dixon (Class 10D).** The Holder of Allowed Interests in SC Dixon shall retain such Allowed Interests in SC Dixon, as SC Dixon is reorganized under the terms of the Plan; however, \~~but~~no such Holder shall\~~not~~\ be entitled to receive or retain, and shall not receive or retain, any Cash or other property under the Plan on account of its Allowed Interests in SC Dixon. \~~Upon~~All Interests in SC Dixon shall be cancelled and SC Dixon shall be dissolved upon the liquidation of all \~~property of the Estate~~Assets of SC Dixon and the distribution of all resulting proceeds \~~of such liquidation~~to Holders of Allowed Claims against SC Dixon\~~ in accordance with the Plan, all Interests in SC Dixon shall be canceled and SC Dixon shall be dissolved in accordance with applicable law~~\.

<u>ARTICLE VI.</u>
**MEANS FOR EXECUTION AND IMPLEMENTATION OF THIS PLAN**

**6.01     Formation of SC Management and Other Entities; Transfer of Assets to SC Management.**

\~~Before~~On or before the Effective Date, \~~the Debtors shall cause SC Management and the other entities set forth on~~ **~~Exhibit B~~** ~~to the Plan (as such exhibit may be amended or otherwise modified up to and including the date of the Confirmation Hearing) that are not in existence as of the Confirmation Date to be formed and in good standing under the laws of the State of Delaware.~~ \SC Management shall be established as a Delaware limited liability company.

On the Effective Date: (a) \~~Reorganized~~ \SC Finance and \~~Reorganized~~ \SC II shall contribute all of their Assets\~~ (other than the WMD Bonds or any interest in the WMD Bonds)~~\ to SC Management and receive in exchange for such contributions 23% of the equity ownership of SC Management**,** provided that \~~Reorganized~~ \SC II shall not contribute its equity interest in SageCrest Canada Holdings, Inc. or any interest, whether direct or indirect, in SC Dixon or any Assets of SC Dixon, to SC Management, but \~~Reorganized~~ \SC II shall transfer all Cash that it receives at any time after the Effective Date on account, directly or indirectly, of its equity

34     Workshare Professional comparison of interwovenSite://IMANDMS/ACTIVE/73463213/1 and interwovenSite://IMANDMS/ACTIVE/73465764/9. Performed on 9/21/2010.

interest in SageCrest Canada Holdings, Inc. to SC Management within five (5) Business Days after \~~Reorganized~~ \SC II's receipt thereof; and (b) \~~by and through contributions of entities set forth on **Exhibit B** to the Plan (as such exhibit may be amended or otherwise modified up to and including the date of the Confirmation Hearing)~~ \all of the Assets of \~~Reorganized~~ \SC Holdings, SCFR and SC Limited\ ~~(except for (i) the Interests in SC Holdings held by SCFR and SC Limited, and (ii) the WMD Bonds or any interest in the WMD Bonds)~~\ shall be contributed to SC Management, and \~~Reorganized~~\ SC Holdings shall receive in exchange for such contributions 77% of the equity ownership of SC Management.

### 6.02   Sources of Cash for Plan Distributions

The sources of Cash necessary for SC Management to pay Allowed Claims that are to be paid in Cash by SC Management under the Plan will be: (a) the Cash of the Debtors, SCFR and SC Limited on hand as of the Effective Date, which will be transferred to SC Management; (b) Cash arising from the operation, ownership, maintenance, and/or sale of the Assets owned, managed, and/or serviced by or at the direction of \~~SC Management~~\the Plan Administrator, including, without limitation, the DB Collateral; (c) any Cash generated or received by SC Management after the Effective Date from any other source, including, without limitation, any recoveries from the prosecution of all Causes of Action (which shall be transferred to SC Management on the Effective Date). The sources of Cash necessary for SC II and SC Holdings to pay Allowed Claims and/or Allowed Interests that are to be paid by SC II or SC Holdings in Cash under the Plan will be distributions from SC Management. \~~SC Management~~\The Plan Administrator shall pay 23% of all Distributable Cash to SC II and shall pay 77% of all Distributable Cash to SC Holdings in amounts and at times that \~~SC Management~~\the Plan Administrator shall determine in \~~its~~\his or her sole discretion, provided that the timing of such payments shall be on a *pari passu* basis\~~. SC Management, in its sole discretion, may pay Cash to SC II or SC Holdings at any time as an advance against future Distributable Cash payable by SC Management to SC II or SC Holdings, and SC Management shall carry any such advance payments as debts on its books and records accordingly and shall satisfy such debts by charging any advances against Distributable Cash before making any subsequent payments of Distributable Cash to such entities~~\ and provided, further, that no such payment may be made in contravention of the provisions and priorities set forth in this Plan or the documents implementing the Plan. The source of Cash necessary for SC Dixon to pay Allowed Claims against SC Dixon that are to be paid by SC Dixon in Cash under the Plan will be the proceeds from the sale of the Assets of SC Dixon, net of any costs and expenses of such sale(s).

### 6.03   Management After the Effective Date

From and after the Effective Date: (a) the Manager shall be the manager of \~~Reorganized~~ \SC II and shall perform the management responsibilities of SC II pursuant to the SC II Operating Agreement, as amended; (b)\ ~~Reorganized~~\ SC Holdings shall be managed in accordance with its articles of organization and, if applicable, orders of the Bermuda Court; and (c) SC Management shall be managed as set forth in Section 6.06 below.

**6.04    Servicing and Liquidation of Assets After the Effective Date**

SC Management and ~~\Reorganized\~~reorganized SC Dixon shall manage and service (\~~directly or via~~\through third party contractors and in accordance with the terms of this Plan) each of their respective Assets and any other assets within their control, directly or indirectly, and shall liquidate all such Assets and any other assets as expeditiously as reasonably possible\~~, consistent with the goal of maximizing the value thereof for the benefit of Creditors and Interest Holders. SCFR, SC Limited, and other non Debtor affiliates of the Debtors may execute management agreements with SC Management.~~\

As set forth in Section 6.07(b)(ii) and (iii) of this Plan, within thirty (30) days of the Effective Date, the Plan Administrator shall (1) sell the Life Assets; (2) sell the Asset consisting of real property in Oxford, Mississippi; and (3) present to Deutsche Bank and the board of directors of SC Management a Marketing Plan for the liquidation of all other Assets of SC Management.

**6.05    Duties of the Committees**

The duties of the Committees and their Professionals will terminate on the Effective Date except as necessary to resolve (a) any Fee Applications filed or objected to by the Committees or their Professionals, and (b) any adversary proceeding or contested matter that is pending in the Bankruptcy Cases as of the Effective Date until such proceeding or matter is resolved by a settlement of the parties or a Final Order. Upon the termination of the duties of the Committees and their Professionals, the Committees will be dissolved and their members will be deemed released by the Debtors and their Estates from (a) all their duties, responsibilities and obligations in connection with the Bankruptcy Cases, and (b) all claims and Causes of Action relating to or arising directly or indirectly from services performed; provided that this provision does not release members of the Committees from any Avoidance Action that may be asserted against them. Upon the dissolution of the Committees, no notice to the Committees that might otherwise be required pursuant to an order of the Bankruptcy Court shall be required.

**6.06    SC Management.**

(a)    **Establishment; Governance.** SC Management shall be established and become effective as of the Effective Date. SC Management \~~will~~\shall be governed by a membership agreement and bylaws, the forms of which will be included in the Plan Supplement.

(b)    \~~**Managers; Voting**~~\**Board of Directors.** SC Management shall \~~be managed by~~\have a board of directors consisting of \~~four (4) managers. The initial managers shall be two (2) managers~~\three (3) members, one of whom shall be appointed by Deutsche Bank, one of whom shall be appointed by the JPL, and one of whom shall be appointed by the Equity Committee\~~in its sole discretion and two (2) managers appointed by the JPL in its sole discretion after consultation with the Russell Funds. All initial members shall be identified in the Plan Supplement. Each member shall have one equally weighted vote and all material decisions shall require majority vote to be effective.~~\   Each party shall have the

36    Workshare Professional comparison of
interwovenSite://IMANDMS/ACTIVE/73463213/1 and
interwovenSite://IMANDMS/ACTIVE/73465764/9. Performed on 9/21/2010.

sole right to remove and replace any director that it appoints unless and until the Claims or Interests of that party are indefeasibly paid in full in Cash.

(c) \~~Resignation; Removal.~~ ~~Any manager of SC Management may resign at any time for any reason. The bylaws of SC Management may provide for the removal of a manager. Upon the resignation or removal of a manager, a replacement manager shall be appointed by the other manager of SC Management who (or whose predecessor) was appointed by the same party that appointed the resigning or removed manager.~~\**Quorum and Voting**. Three (3) Directors shall constitute a quorum. Each Director shall have one equally weighted vote. Actions requiring approval of the board of directors of SC Management shall receive such approval by a vote of a simple majority of the Directors, provided that approval of the following actions will require that such majority include the consent of Deutsche Bank's Director unless and until the DB Secured Claims are indefeasibly paid in full in Cash:

(i) Commencement by SC Management of a voluntary proceeding under the bankruptcy, insolvency, or other similar laws of any jurisdiction, commencement of a receivership under any law, an assignment for the benefit of creditors, or the commencement of any other similar action or proceeding;

(ii) Adoption (or amendment) by SC Management of an expense budget or revenue budget for any period;

(iii) Amendment of the governing documents of SC Management;

(iv) Approval of the sale of any Asset of SC Management (or any participation interest therein) for less than 90% of the high range of the most recent appraised value of such Asset as reflected on the most recent Collateral Valuation Report;

(v) Approval of any merger or consolidation of SC Management with any other person;

(vi) Adoption (or amendment) by SC Management of any Marketing Plan presented by the Plan Administrator;

(vii) Incurrence by SC Management of any indebtedness/guaranty other than trade payables in the ordinary course of business;

(viii) SC Management's entry into any transaction with any affiliate of SC Management;

(ix) Making of any loan to, or investment in, any person by SC Management;

(x) Consent by SC Management to the granting of any lien on any SC Management Asset;

(xi)     Removal, replacement or appointment of an appraiser, or establishment of criteria for the appraisal of any SC Management Asset;

(xii)     Consent to any settlement with a borrower or guarantor of any SC Management Asset, or release of any borrower or guarantor of any SC Management Asset;

(xiii)     Consent to any amendment of any SC Management Asset that would reduce the interest or fees accruing thereon or would delay the date upon which any payment of principal, interest or fees is payable;

(xiv)     Consent to the release of any collateral securing any SC Management Asset, or consent to the subordination of any lien securing any SC Management Asset;

(xv)     Removal, replacement or appointment of any Plan Administrator;

(xvi)     Commencement by or on behalf of SC Management of any litigation, arbitration or other legal proceeding in respect of any SC Management Asset;

(xvii)     Appointment of counsel to represent SC Management in respect of any SC Management Asset;

(xviii)     Filing by SC Management of any motion or commencement of any adversary or other proceedings in bankruptcy court in respect of any SC Management Asset;

(xix)     Approval by SC Management of any dividend or other distribution to the members of SC Management;

(xx)     Approval of the retention of any and all professionals to be used to carry out the Plan Administrator's duties including, without limitation, the liquidation of the Assets of SC Management; and

(xxi)     Approval of any dissolution of SC Management.

(d)     **Oversight of Asset Liquidation.** SC Management shall oversee all aspects of the liquidation of the \~~DB Collateral and all other~~ \Assets of SC Management\~~.~~\ with the assistance of the Plan Administrator.

(e)     **Standing.** SC Management shall have the right to appear in the Bankruptcy Court or any other court of competent jurisdiction and be heard on any matter relating to the interpretation or implementation of the Plan.

**6.07     Plan Administrator.**

(a)     **Selection of Plan Administrator.** Prior to the Effective Date, an initial Plan Administrator that is acceptable to Deutsche Bank will be selected, subject to the approval of the Bankruptcy Court. The Plan Administrator shall be the sole responsible officer of SC Management.

(b)        **Primary Duties.**  The Plan Administrator shall at all times serve at the direction of the board of directors of SC Management and in accordance with the terms of the Plan.  Without limiting the foregoing, the Plan Administrator shall have the following primary duties:

(i)        Operation of SC Management:  The Plan Administrator shall operate SC Management in accordance with the terms of the Plan and any governing documents, including without limitation operating in compliance with the operating budget and the Marketing Plan required to be provided to Deutsche Bank and to the board of directors of SC Management.

(ii)        Liquidation of the Assets of SC Management:  The Plan Administrator shall take all steps reasonably necessary to liquidate the Assets of SC Management in accordance with the terms of the Plan.  The Plan Administrator shall have sole authority and discretion to sell any Asset of SC Management for a price that is no less than 90% of the high range of the appraised value of such Asset as reflected in the Collateral Valuation Report.  Within 30 days of Effective Date, the Plan Administrator shall sell (1) the Life Assets and (2) the Asset consisting of real property in Oxford, Mississippi.

(iii)        Marketing Plan and Status Reports: Within thirty (30) days of the Effective Date, the Plan Administrator shall present the Marketing Plan to Deutsche Bank and the board of directors of SC Management. The Plan Administrator will be required to comply with the Marketing Plan.  Within 10 days of each month end following approval of the Marketing Plan pursuant to the Plan, the Plan Administrator shall provide Deutsche Bank with a written status report, in form and substance acceptable to Deutsche Bank, of each element of the Marketing Plan.

(iv)        Retention of Professionals:  In accordance with the terms of the Plan and any governing documents, the Plan Administrator shall retain such professionals as reasonably necessary to carry out the Plan Administrator's duties including, without limitation, the liquidation of the Assets of SC Management in accordance with the terms of the Plan.

(v)        Payment of the Plan Administrator and Professionals:  The Plan Administrator and any professionals of the Plan Administrator shall be paid reasonable and customary fees and expenses out of available Cash of SC Management.

(vi)        Payment of Plan Distributions: The Plan Administrator shall make all payments and distributions required to be made to Holders of Allowed Claims in Classes 3, 6A-C, and 10B and 10C.

(vii)        Claims Resolution: The Plan Administrator shall have the authority to object to and settle Claims and Interests.

(viii)        Causes of Action: The Plan Administrator shall have the authority to prosecute any Causes of Action vested in SC Management.

(ix)    Insurance:  The Plan Administrator shall purchase or create and carry all insurance policies and pay all insurance premiums and costs deemed necessary or advisable by the Plan Administrator.

(x)    Dissolution and Wind-Up of SC Management:  At a time to be determined by the board of directors of SC Management, the Plan Administrator shall cause the dissolution of SC Management.

(xi)    Other: The Plan Administrator shall take and perform all other actions and duties as necessary or appropriate to implement the Plan pursuant to its terms and the terms of the definitive Plan documents and the Confirmation Order.

## ARTICLE VII.
## TREATMENT OF EXECUTORY CONTRACTS

**7.01    General Treatment of Executory Contracts: Rejected**

The Plan constitutes and incorporates a motion \by the Debtors \under Bankruptcy Code sections 365 and 1123(b)(2) to (a) reject, as of the Effective Date, all Executory Contracts to which a Debtor is a party, except for any Executory Contract that was terminated before the Effective Date or has been assumed or rejected pursuant to an order of the Bankruptcy Court entered before the Effective Date, and (b) assume all Executory Contracts identified in the Schedule of Assumed Contracts that will be included in the Plan Supplement.

The Confirmation Order shall constitute an order of the Bankruptcy Court under Bankruptcy Code sections 365 and 1123(b)(2) approving the rejection or assumption, as applicable, of Executory Contracts pursuant to the Plan as of the Effective Date. Notice of the Confirmation Hearing shall constitute notice to any non-debtor party to an Executory Contract that is to be assumed or rejected under the Plan of the \Debtors' intent to assume or reject\proposed assumption or rejection of such Executory Contract and any \related\proposed Cure Amount\ proposed by the Debtors\.

The SC II Operating Agreement shall be amended to, *inter alia*, remove all redemption rights of any investor. The SC II Operating Agreement, as amended, shall be included in the Plan Supplement and it shall be executed by the Manager and become effective as of the Effective Date.

**7.02    Cure Payments and Release of Liability**

Except as otherwise provided in a Final Order, pursuant to Bankruptcy Code sections 365(a), (b), (c) and (f), all Cure Amounts that may require payment under Bankruptcy Code section 365(b)(1) under any Executory Contract that is assumed pursuant to a Final Order shall be paid by SC Management within fifteen (15) Business Days after such order becomes a Final Order with respect to undisputed Cure Amounts or within fifteen (15) Business Days after a Disputed Cure Amount is Allowed by agreement of the parties or a Final Order. If a party to an assumed Executory Contract has not filed an appropriate pleading on or before the date of the Confirmation Hearing disputing the amount of any proposed Cure Amount\ proposed by the

~~Debtor~~\, the cure of any other defaults, the promptness of the Cure Amount payments, or the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters. Any party to an assumed Executory Contract that receives full payment of a Cure Amount shall waive the right to receive any payment on a Class 6 General Unsecured Claim that relates to or arises out of such assumed Executory Contract.

### 7.03    Bar to Rejection Claims

If the rejection of an Executory Contract pursuant to Section 7.01 of the Plan gives rise to a Claim by any non-Debtor party or parties to such Executory Contract, such Claim shall be forever barred and shall not be enforceable against the Debtor, the \~~Reorganized~~\Liquidating Debtors, SC Management, the Estates, or the agents, successors, or assigns of the foregoing, unless a proof of such Claim is filed with the Bankruptcy Court and served upon the \~~Reorganized~~\Liquidating Debtors on or before the Rejection Bar Date. Any Holder of a Claim arising out of the rejection of an Executory Contract that fails to file a proof of such Claim on or before the Rejection Bar Date shall be forever barred, estopped, and enjoined from asserting such Claim against the Debtors, \~~Reorganized~~\Liquidating Debtors, SC Management, the Estates or any of their Assets and properties. Nothing contained herein shall extend the time for filing a proof of Claim for rejection of any Executory Contract rejected before the Confirmation Date.

### 7.04    Rejection Claims

Any Rejection Claim arising from the rejection of an Executory Contract shall be treated as a General Unsecured Claim pursuant to the Plan, except as limited by the provisions of Bankruptcy Code sections 502(b)(6) and 502(b)(7) and mitigation requirements under applicable law. Nothing contained herein shall be deemed an admission by the Debtors that such rejection gives rise to or results in a Rejection Claim or shall be deemed a waiver by the Debtors or any other party in interest of any objections to such Rejection Claim if asserted.

### <u>ARTICLE VIII.</u>
### CONDITIONS TO CONFIRMATION DATE AND EFFECTIVE DATE; EFFECT OF PLAN CONFIRMATION

### 8.01    Conditions Precedent to Confirmation Date

The occurrence of the Confirmation Date of the Plan is subject to satisfaction or waiver by the \~~Proponents~~\Proponent of each of the following conditions:

(a)    \~~The Bankruptcy~~\the Court shall have \~~approved the Disclosure Statement by~~\entered a Final Order, in form and substance acceptable to the \~~JPL (after consultation with the Russell Funds), the Debtors, and the Equity Committee~~\Proponent, in its sole and absolute discretion, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

(b)    \~~The~~\the proposed Confirmation Order shall be in form and substance acceptable to \~~the JPL (after consultation with the Russell Funds), the~~

~~Debtors, and the Equity Committee~~\Proponent, in its sole and absolute discretion; and

    (c)   \~~All provisions, terms and conditions of the Plan shall be approved in the Confirmation Order.~~\all of the schedules, documents, supplements, and exhibits to the Plan shall have been filed in form and substance acceptable to the Proponent, in its sole and absolute discretion.

**8.02**   **Conditions Precedent to the Effective Date**

The occurrence of the Effective Date of the Plan is subject to the occurrence or waiver by the Proponent of the following conditions precedent:

    (a)   \~~The 14-day period under Bankruptcy Rule 8002(a) for filing a notice of appeal of~~\the Confirmation Order shall have ~~expired (whether or not any such notice of appeal is actually filed) and no stay or injunction of the Confirmation Order shall then be in effect~~\become a Final Order in form and substance acceptable to Deutsche Bank, in its sole and absolute discretion;

    (b)   \~~All documents constituting the Plan Supplement shall be in form and substance acceptable to the JPL (after consultation with the Russell Funds), the Debtors, and the Equity Committee and shall have been executed and delivered by the parties thereto, and all conditions to the effectiveness of such documents shall have been satisfied or waived as provided therein; and~~\Deutsche Bank shall have received a 13-week operating cash flow report (excluding asset sales) and a Budget as of the Effective Date, each of which shall be in form and substance acceptable to Deutsche Bank;

    (c)   \~~The Bermuda Court shall have entered in the Holdings Bermuda Proceeding any order or orders necessary or appropriate to authorize the JPL, SC Holdings, SCFR and SC Limited to execute and perform under the Plan.~~\Assets to be transferred to SC Management in accordance with the Plan shall have been so transferred and filings, deliveries and actions to be taken in conjunction with such transfers pursuant to the Plan in order to fully perfect any lien held or to be held by Deutsche Bank (or any custodian or collateral agent designated by Deutsche Bank) shall have been made and taken;

    (d)   SC Management shall have been established in conformity with Delaware law and the Plan Administrator and Directors (including Deutsche Bank's Director) shall have been appointed;

    (e)   all of the schedules, documents (including the DB Credit Agreement and the governing documents of SC Management), supplements, and exhibits relating to the Plan shall have been filed in form and substance acceptable to Deutsche Bank, in its sole and absolute discretion; and

    (f)   the Confirmation Date shall have occurred.

The foregoing conditions to the Effective Date may be waived ~~by the Proponent~~ in whole or in part~~, but only if waived by the JPL (after consultation with the Russell Funds), the Debtors, and the Equity Committee,~~ without notice to any other parties in interest or the Bankruptcy Court, without any hearing or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Without limiting the foregoing, if the Proponent so elects, the Effective Date may occur without the giving of any notice to any party (a) notwithstanding the pendency of an appeal of the Confirmation Order, so long as there is no stay in effect, ~~if the JPL (after consultation with the Russell Funds), the Debtors, and the Equity Committee so elect in writing. The Effective Date may occur~~and/or (b) before the expiration of time to take an appeal or to seek reconsideration of the Confirmation Order~~without the giving of any notice to any objecting party, if the JPL (after consultation with the Russell Funds), the Debtors, and the Equity Committee so elect in writing. In the event of any such appeal, the Debtors or any other party in interest may seek the dismissal of such appeal on any grounds. The failure of the Debtors, the Equity Committee or the JPL to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time. The Debtors~~. The Proponent will file with the Bankruptcy Court, and serve a copy on all parties in interest, a notice of the Effective Date within five (5) Business Days after its occurrence.

### 8.03    Consequences of Non-Occurrence of Effective Date

If the Effective Date does not timely occur, ~~each of~~the ~~Proponents~~Proponent reserves all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated and/or that the Plan be null and void in all respects. If the Bankruptcy Court enters an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject, all Executory Contracts not previously assumed, assumed and assigned, or rejected shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated or as further extended by the Bankruptcy Court.

### ARTICLE IX.
### EFFECT OF PLAN CONFIRMATION AND EFFECTIVE DATE

### 9.01    Binding Effect

From and after the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the ~~Reorganized~~Liquidating Debtors, the Manager, the JPL, SC Management, all former, present and future Holders of Claims and Interests, and their respective successors and assigns, and all other parties in interest in the Bankruptcy Cases. Confirmation of the Plan binds each Holder of a Claim or an Interest to the terms and conditions of the Plan, whether or not such Holder has accepted the Plan.

### 9.02    Vesting of Assets

Except as otherwise provided in this Plan and the Confirmation Order, all property and Assets of each Estate shall be transferred to and shall vest in ~~the respective Reorganized Debtor~~SC Management on the Effective Date free and clear of all Claims, Interests, Liens, encumbrances, charges and other interests.    Commencing on the Effective Date, the

\~~Reorganized~~\Liquidating Debtors and SC Management may deal with the Assets and their property and conduct their businesses without any supervision by, or permission from, the Bankruptcy Court or the Office of the United States Trustee, and free of any restriction imposed on the Debtors by the Bankruptcy Code or by the Bankruptcy Court during the Bankruptcy Cases, other than any restrictions contained in this Plan and related documents.

### 9.03 Assertion of Causes of Action, Defenses and Counterclaims

Except as set forth in the Plan or the Confirmation Order, effective as of the Effective Date without further action by any party, all Causes of Action, and all defenses, counterclaims, setoffs and rights related thereto, shall be and shall be deemed to be transferred to SC Management. From and after the Effective Date, \~~SC Management~~\the Plan Administrator shall have the exclusive right to prosecute, settle, or compromise any Cause of Action vested in or transferred to \~~it~~\SC Management under the Plan. To the extent any Cause of Action, or any defense, counterclaim, setoff or right related thereto, is not transferable by a Debtor to SC Management under applicable law, the relevant \~~Reorganized~~\Liquidating Debtor shall retain such Cause of Action, defense, counterclaim, setoff or right, and SC Management shall be entitled to prosecute such Cause of Action, defense, counterclaim, setoff or right in the name of the relevant \~~Reorganized~~\Liquidating Debtor. Each \~~Reorganized~~\Liquidating Debtor shall retain and may prosecute and enforce all other defenses, counterclaims, and rights that it has asserted or could assert against or with respect to all Claims asserted against such Debtor or property of its Estate. No claim, right, Cause of Action, or other Asset shall be deemed waived or otherwise forfeited by virtue of a Debtor's failure to identify such property in the Schedules or the Disclosure Statement unless otherwise ordered by the Bankruptcy Court. A description of the Causes of Action or potential Causes of Action is contained in Section VII.B of the Disclosure Statement.

### \9.04   \\~~Discharge of Debtors~~\

\~~Except as provided in the Bankruptcy Code, the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against and Interests in the Debtors of any nature whatsoever, whether known or unknown, or against the Assets or properties of the Debtors that arose before the Effective Date. Except as provided in the Bankruptcy Code, the Plan or the Confirmation Order, upon the Effective Date, entry of the Confirmation Order acts as a discharge and release under Bankruptcy Code section 1141(d)(1)(A) of all Claims against and Interests in the Debtors and their Assets, arising at any time before the Effective Date, regardless of whether a proof of Claim or Interest was filed, whether the Claim or Interest is Allowed, or whether the Holder of the Claim or Interest votes to accept the Plan or is entitled to receive a Distribution under the Plan. Except as provided in the Plan or the Confirmation Order, upon the Effective Date, any Holder of a discharged Claim or Interest will be precluded from asserting against the Reorganized Debtors or any Assets of the Reorganized Debtors or SC Management any other or further Claim or Interest based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Effective Date. Except as provided in the Plan or the Confirmation Order, and subject to the occurrence of the Effective Date, the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtors to the extent allowed under Bankruptcy Code section 1141, and the Debtors will not be liable for~~\

any Claims or Interests and will only have the obligations as are specifically provided for in the Plan.\

### 9.04 \9.05 Release and Exculpation

(a) <u>Release by Debtors.</u> *Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, the Debtors and the \~~Reorganized~~\Liquidating Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or \~~Reorganized~~\Liquidating Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered or executed thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the \~~Reorganized~~\Liquidating Debtors, the Bankruptcy Cases, or the Plan; provided, however, that no Releasee shall be released or discharged from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such Releasee from any of the Debtors or from any Claim or Cause of Action specifically preserved or transferred under the Plan.*

(b) <u>Limited Release by Deutsche Bank of Guaranty Claims Against SCFR and SC Limited.</u> *Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, in consideration for SCFR and SC Limited (1) becoming co-obligors on the DB \~~Promissory Note~~\Credit Agreement and assuming joint and several liability for all obligations arising under the DB \~~Promissory Note~~\Credit Agreement, (2) contributing and transferring a substantial portion of their Assets to SC Management on the Effective Date, and (3) subjecting such Assets to the Liens of Deutsche Bank as Assets constituting part of the DB Collateral for all purposes under the Plan, Deutsche Bank, Deutsche Bank AG, New York Branch, and their respective affiliates shall be deemed to have forever waived, released and discharged SCFR and SC Limited from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on the Deutsche Bank Offshore Guaranty. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third -party release, and further, shall constitute its findings that such third -party release is: (1) in*

*exchange for the good and valuable consideration provided by SCFR and SC Limited, a good faith settlement and compromise of the claims released by such third -party release; (2) in the best interests of the Debtors and all Holders of Claims and Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar against Deutsche Bank, Deutsche Bank AG, New York Branch, and their respective affiliates asserting any of the foregoing released claims against SCFR and SC Limited.*

        (c)    <u>Exculpation.</u> *Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, the Debtors and all other Persons, along with their respective present or former employees, agents, officers, directors and principals, shall be deemed to have released the Releasees from, and none of the Releasees shall have or incur any liability or obligation for, any Claim, cause of action or other assertion of liability, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise, to any Holder of a Claim or Interest or any other Person for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to or arising out of the Bankruptcy Cases, the operation of the Debtors' business during the Bankruptcy Cases, the formulation, negotiation, preparation, filing, dissemination, approval, or confirmation of the Plan, the Disclosure Statement, the solicitation of votes for or confirmation of the Plan, the consummation or administration of the Plan, or the property to be liquidated and or distributed under the Plan, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction. The foregoing parties will be entitled to rely reasonably upon the advice of counsel in all respects regarding their duties and responsibilities under the Plan.*

*Each Person to which this Section applies shall be deemed to have granted the releases set forth in this Section notwithstanding that it may hereafter discover facts in addition to, or different from, those that it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Persons expressly waive any and all rights that they may have at common law or under any statute or other applicable law that would limit the effect of such releases to those claims or causes of action actually known or suspected to exist as of the Effective Date.*

### **9.05** \\**9.06** Injunction

*Except as otherwise provided in the Plan, the Confirmation Order shall provide that from and after the Effective Date, all Holders of Claims against and Interests in the Debtors are permanently enjoined from taking any of the following actions against the Debtors, the \\Reorganized\\Liquidating Debtors, SC Management, the entities set forth on **Exhibit B** to the Plan (as such exhibit may be amended or otherwise modified up to and including the date of the Confirmation Hearing), SCFR, and/or SC Limited, or any of their property on account of any such Claim or Interest: (a) commencing or continuing in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering by any manner or means*

*any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance or Lien; (d) asserting a setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors; and (e) commencing or continuing, in any manner or in any place, any action that does not conform to or comply with, or is inconsistent with, the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order. If allowed by the Bankruptcy Court, any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.*

### 9.06 \9.07 Term of Bankruptcy Injunction or Stays

Unless otherwise provided herein or in an order of the Bankruptcy Court (including without limitation the Confirmation Order), all injunctions or stays provided in the Bankruptcy Cases under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Upon the Effective Date, the injunction provided in Section \9.06\9.05 of the Plan shall \apply\be effective.

### 9.07 \9.08 Effectuating Documents; Further Transactions; Timing

The Debtors, the Manager, and the JPL are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously, unless otherwise provided in the Plan.

### ARTICLE X.
### OBJECTIONS TO CLAIMS AND INTERESTS; DISTRIBUTIONS

### 10.01   Objections to Claims and Interests

Any party in interest, including the \Reorganized\Liquidating Debtors and SC Management, may file objections to Claims and Interests (other than Claims that have been previously Allowed or that are Allowed under the Plan). The \Reorganized\Liquidating Debtors (or their designees, successors and assigns) and SC Management are not obligated to object to any Claim or Interest, but will nevertheless have standing to object to any such Claim or Interest from and after the Effective Date, if they so elect. Nothing in this Section is intended to limit the right of any party to object to Claims or Interests.

### 10.02   Objection Deadline

Except as set forth in Sections 2.01(a) and 2.01(b) of the Plan with respect to Administrative Claims and Fee Claims, any objections to Claims and Interests must be filed no later than the Objection Deadline. An objection to a Claim or Interest will be deemed properly served on the Holder thereof if service is effected by any of the following methods: (a) in

accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Holder is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or Interest or other representative identified on the proof of Claim or Interest or any attachment thereto; (c) by first class mail, postage prepaid, on any counsel that has appeared on \the \behalf of the Holder in the Bankruptcy Case; or (d) if no proof of Claim or Interest has been filed, by first class mail, postage prepaid, on the Holder of such Claim or Interest at the address set forth in the Schedules.

### 10.03   Settlement of Objections to Claims or Interests

From and after the Effective Date, the \Reorganized\Liquidating Debtors and SC Management are authorized to approve compromises of all Claims or Interests, Disputed Claims or Interests, and Liens pursuant to Bankruptcy Rule 9019(b) and to execute necessary documents, including Lien releases (subject to the written consent of the party having such Lien) and stipulations of settlement, compromise or release, without further order of the Bankruptcy Court, but subject to the following notice provisions. SC Management or a \Reorganized\Liquidating Debtor, as applicable, shall give notice of any settlement and compromise of any Claim or Interest, Disputed Claim or Interest, or Lien that results in the allowance of any Claim, Interest or Lien in excess of $100,000 to any Person who received ECF notification or filed a notice of appearance in the Bankruptcy Cases. If a dispute with respect to such settlement and compromise cannot be resolved within fourteen (14) days of the receipt of such notice, any party in interest shall have the right to file an objection and request a hearing before the Bankruptcy Court.

### 10.04   No Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or an Interest shall be entitled to interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim or Interest for the period from the Petition Date to the date a Distribution is made when and if such Disputed Claim or Interest becomes an Allowed Claim or Interest. To the extent any Holder of an Allowed Claim or Interest is entitled to interest accruing on or after the Petition Date, such interest shall accrue and be payable at the Case Interest Rate.

### 10.05   Setoffs by the Debtors; No Waiver

\Reorganized \SC Holdings shall, and the other \Reorganized\Liquidating Debtors and SC Management may but shall not be required to, set off against any Claim or Interest or any payment or Distribution to be made pursuant to the Plan in respect of such Claim or Interest, any Claim or Cause of Action of any nature whatsoever that the Debtors, the \Reorganized\Liquidating Debtors or SC Management may have to the fullest extent permitted under applicable law. Any dispute related to the setoff rights of the Debtors, the \Reorganized\Liquidating Debtors or SC Management shall be determined by the Bankruptcy Court. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the \Reorganized\Liquidating Debtors or SC

Management of any such Claims or Causes of Action that any of them may have against such Holder or any affiliate of such Holder.

### 10.06 Procedures for Treating and Resolving Disputed and Contingent Claims

(a) **No Distributions Pending Allowance.** Notwithstanding any other provision of the Plan, SC Management and the \~~Reorganized~~\Liquidating Debtors shall make Distributions only to Holders of Allowed Claims and Interests. No Holder of a Disputed Claim or Interest will receive any Distribution on account thereof until and to the extent that its Disputed Claim or Interest becomes an Allowed Claim or Interest. To the extent a Claim or Interest is not a Disputed Claim or Interest but is held by a Holder that is or may be liable to a Debtor (in the first instance) on account of a Cause of Action, no payments or Distributions shall be made with respect to all or any portion of such Claim or Interest unless and until such Cause of Action has been settled, withdrawn, or determined by a Final Order or such other court having jurisdiction over the matter.

In determining the amount of a Pro Rata Distribution due to the Holders of Allowed Claims and Interests, SC Management and the \~~Reorganized~~\Liquidating Debtors may, in their discretion, make the Pro Rata calculation as if all Disputed Claims or Interests were Allowed in the full amount claimed or in the amount estimated under Section 10.06(b) hereof. SC Management and the \~~Reorganized~~\Liquidating Debtors, in their discretion, may withhold Distributions otherwise due hereunder to the Holder of a Disputed Claim or Interest until the Objection Deadline, to enable SC Management, the \~~Reorganized~~\Liquidating Debtors or any other party in interest to file a timely objection thereto.

(b) **Claim Estimation.** SC Management and the \~~Reorganized~~\Liquidating Debtors may request estimation or limitation of any Claim or Interest pursuant to Bankruptcy Code section 502(c) regardless of whether that Claim or Interest was previously objected to or whether the Bankruptcy Court has ruled on any such objection; provided, however, that the Bankruptcy Court will determine (i) whether such Claims or Interests are subject to estimation pursuant to Bankruptcy Code section 502(c) and (ii) the timing and procedures for such estimation proceedings, if any. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Interest at any time during litigation concerning any objection to any Claim or Interest, including, without limitation, during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Claim or Interest, the amount so estimated shall constitute either the Allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Interest, SC Management or a \~~Reorganized~~\Liquidating Debtor may pursue supplementary proceedings to object to the allowance of such Claim or Interest. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims or Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

(c)  **Distribution Reserve Accounts.** On or after the Effective Date, SC Management and the \~~Reorganized~~\Liquidating Debtors may create one or more separate Distribution Reserve Accounts as is appropriate from the Cash to be distributed to or for the benefit of the Holders of Disputed Claims or Interests pending the allowance thereof, and may adjust the amount thereof from time to time in their sole discretion. Each Distribution Reserve Account may be segregated by Class or, as applicable, by Administrative Claims and Priority Tax Claims. A Holder of a Claim or Interest will not be entitled to receive or recover any amount in excess of the amount provided in the Distribution Reserve Account to pay such Claim or Interest unless permitted by a Final Order. As stated above, nothing in the Plan will be deemed to entitle the Holder of a Disputed Claim or Interest to post-petition interest on such Claim or Interest, if Allowed, unless otherwise required under the Plan.

(d)  **Distributions After Allowance of Disputed Claim or Interest.** Distributions to each Holder of a Disputed Claim or Interest, to the extent it becomes an Allowed Claim or Interest, will be made in accordance with the provisions of the Plan that govern Distributions to such Holders of Claims or Interests in the applicable Class. Unless otherwise provided in the Plan, as promptly as practicable after the date on which a Disputed Claim or Interest becomes an Allowed Claim or Interest, and in any event not later than ten (10) Business Days after the Disputed Claim or Interest becomes an Allowed Claim or Interest, SC Management or the \~~Reorganized~~\Liquidating Debtor, as applicable, shall distribute to the Holder thereof from the applicable Distribution Reserve Account, if any, any Distribution that would have been made to such Holder had its Claim or Interest been an Allowed Claim or Interest on the date that Distributions were previously made to Holders of Allowed Claims or Interests in the applicable Class, without interest (except as otherwise provided by the Plan) and net of any setoff and/or any required withholding of applicable taxes. After all Disputed Claims and Interests have been resolved by a Final Order or other final resolution, any remaining Cash in a relevant Distribution Reserve Account shall be distributed in accordance with the other provisions of the Plan.

(e)  **Allowance of Claims Subject to Bankruptcy Code Section 502(d).** Allowance of Claims will in all respects be subject to the provisions of Bankruptcy Code section 502(d), except as provided by a Final Order or a settlement among the relevant parties.

**10.07  Distributions Under the Plan**

(a)  **Distributions to be Pro Rata Within a Class.** Except as otherwise provided in the Plan, all Distributions constituting a partial payment to Holders of Allowed Claims or Interests within a specific Class shall be made on a Pro Rata basis to the Holders of Allowed Claims or Interests in such Class.

(b)  **Means of Cash Payment.** Except as otherwise provided in the Plan, Cash payments made pursuant to the Plan shall be in U.S. dollars and may

be made, at the option of and in the sole discretion of SC Management and the ~~Reorganized~~\Liquidating Debtors, by checks drawn on or wire transfers from a domestic bank; provided, that in the case of foreign Holders of Allowed Claims or Interests, Cash payments may be made, at the option of and in the sole discretion of SC Management and the ~~Reorganized~~\Liquidating Debtors, in such currency and by such means as are necessary or customary in a particular jurisdiction.

(c)     **Delivery of Distributions.** All Distributions to any Holder of an Allowed Claim or Interest shall be made at the address of each such Holder as set forth on the proof of Claim or Interest filed by such Holder (or at the last address of such a Holder known to the Debtor if no proof of Claim or Interest is filed or if the Debtor has been notified in writing of a change of address). If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until SC Management and the relevant ~~Reorganized~~\Liquidating Debtor, as applicable, is notified in writing of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest. Any Holder of an Allowed Claim whose Distribution is undeliverable must make demand for such Distribution to the relevant Debtor in writing on or before 120 days after the date such undeliverable Distribution was initially made, after which the Distribution shall be deposited into a pool for redistribution to other Holders of Allowed Claims or Interests in the same Class as the intended recipient of the undeliverable Distribution, and any claim by such intended recipient with respect to such undeliverable Distribution shall be discharged and forever barred. SC Management and the ~~Reorganized~~\Liquidating Debtors may employ or contract with other Persons to assist in or make the Distributions required under the Plan. **SC Management, the \~~Reorganized~~\Liquidating Debtors, and their agents and professionals are under no duty to take any action to either attempt to locate any Holder of a Claim or Interest, or obtain an executed Internal Revenue Service Form W-9 from any Holder of a Claim or Interest.**

(d)     **Fractional Dollars; De Minimis Distributions.** Any other provision of the Plan notwithstanding, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of the fraction to the nearest whole dollar (up or down), with half dollars being rounded down. No payment of less than one hundred dollars ($100.00) shall be made with respect to any Allowed Claim or Allowed Interest, and SC Management or the relevant ~~Reorganized~~\Liquidating Debtor, as applicable, shall retain any such payment and shall deposited same into a pool for redistribution to other Holders of Allowed Claims or Interests in the same Class.

(e)     **Unclaimed Property.** Any Distributions that become Unclaimed Property shall be retained by SC Management or the ~~Reorganized~~\Liquidating Debtors, as applicable, free and clear of any claims or restrictions thereon, and any entitlement of any Holder of any Claim or Interest to

such Distributions shall be extinguished and forever barred. Unclaimed Property shall be deposited into a pool for redistribution to other Holders of Allowed Claims or Interests in the same Class as the intended recipient of the Unclaimed Property.

(f) **Withholding and Reporting Requirements.** In accordance with Bankruptcy Code section 346 and in connection with the Plan and all Distributions thereunder, SC Management and the \~~Reorganized~~\Liquidating Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any U.S. federal, state or local taxing authority or any non-U.S. taxing authority. SC Management and the \~~Reorganized~~\Liquidating Debtors shall be authorized to take any and all actions necessary and appropriate to comply with such requirements. All Distributions under the Plan may be subject to withholding and reporting requirements. As a condition for making any Distribution under the Plan, SC Management and the \~~Reorganized~~\Liquidating Debtors may require the Holder of an Allowed Claim or Interest to provide such Holder's taxpayer identification number and such other information, certification, or forms necessary to comply with applicable tax reporting and withholding laws. Notwithstanding any other provision of the Plan, each Person receiving a Distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

### 10.08 Duty to Disgorge Overpayments

To the extent the Holder of any Allowed Claim or Interest receives more than what such Holder is permitted to receive under the Plan, such Holder shall immediately return such excess payment(s) to SC Management or the relevant \~~Reorganized~~\Liquidating Debtor, as applicable, failing which, SC Management or such \~~Reorganized~~\Liquidating Debtor may sue such Holder for the return of the overpayment in the Bankruptcy Court or any other court of competent jurisdiction.

### ARTICLE XI.
### ACCEPTANCE OR REJECTION OF THE PLAN

### 11.01 Impaired Classes Entitled to Vote

Each impaired Class entitled to vote to accept or reject the Plan will vote separately. A Holder of a Claim or Interest as to which an objection has been filed and that has not been temporarily allowed for purposes of voting on the Plan may not vote. A Holder of a contingent or unliquidated Claim or Interest may vote on the Plan in an amount based on the portion, if any, of the Claim or Interest shown as non-contingent, liquidated and undisputed in the Schedules, or equal to $1.00 if not so shown.

### 11.02 Acceptance by an Impaired Class

A Class of Claims that is entitled to vote to accept or reject the Plan shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan. A Class of Interests

that is entitled to vote to accept or reject the Plan shall have accepted the Plan if it is accepted by the Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have voted on the Plan. Any Ballot that is not properly completed and timely received by the Balloting Deadline will not be counted.

### 11.03   Section 1129(b) Cramdown

If any impaired Class of Claims or Interests fails to accept the Plan in accordance with Bankruptcy Code section 1129(a), the \Proponents\Proponent will seek confirmation of the Plan by the Bankruptcy Court pursuant to the "cramdown" provisions in Bankruptcy Code section 1129(b). The \Proponents assert\Proponent asserts that the Plan provides for fair and equitable treatment of all Classes of Claims and Interests. The \Proponents reserve\Proponent reserves the right to amend the Plan as may be necessary to obtain confirmation of the Plan under Bankruptcy Code section 1129(b).

**ARTICLE XII.**
**RETENTION OF JURISDICTION**

### 12.01   Jurisdiction

Until the Bankruptcy Cases are closed, the Bankruptcy Court will retain the fullest and most extensive jurisdiction as is legally permissible under applicable law, including under Bankruptcy Code sections 105(a) and 1142, including that which is necessary to ensure that the purpose and intent of the Plan are carried out and to hear and determine all objections thereto that could have been brought before the entry of the Confirmation Order. The Bankruptcy Court will retain jurisdiction to hear and determine all Claims against and Interests in the Debtors and to enforce all Causes of Action and any related counterclaims, cross-claims, and/or third-party claims over which the Bankruptcy Court otherwise has jurisdiction. Nothing contained in the Plan will prevent \the Debtors or \SC Management or the Plan Administrator from taking any action as may be necessary to enforce any Cause of Action that may exist on behalf of the Debtors and that may not have been enforced or prosecuted by the Debtors.

### 12.02   Examination of Claims

Following the Confirmation Date, the Bankruptcy Court will retain jurisdiction to decide disputes concerning the classification and allowance of any Claim or Interest and the reexamination of Claims and Interests that have been allowed for the purposes of voting, and the determination of any objections as may be filed to Claims and Interests. The failure by the Debtors to object to, or to examine, any Claim or Interest for the purposes of voting will not be deemed a waiver of their right to object to, or to re-examine, the Claim or Interest in whole or in part.

### 12.03   Determination of Disputes

The Bankruptcy Court will retain jurisdiction after the Confirmation Date to determine (a) all questions and disputes regarding title to the Assets, (b) disputes concerning the allowance of Claims and Interests, (c) all Causes of Action, controversies, disputes, or conflicts, whether or

not subject to any pending action, as of the Confirmation Date, to recover property pursuant to the provisions of the Bankruptcy Code, and (d) all disputes and controversies regarding the operation, implementation, and interpretation of the Plan, the Confirmation Order, and any agreements that are identified or implement the Plan or the Confirmation Order.

### 12.04 Additional Purposes

Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order, occurrence of the Effective Date and/or substantial consummation of the Plan, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of or related to the Bankruptcy Cases and the Plan to the fullest extent permitted by applicable law, including but not limited to jurisdiction to:

> (a)     hear and determine any modification of the Plan or the Plan Supplement pursuant to Bankruptcy Code section 1127, to cure any defect or omission or reconcile any inconsistency in the Plan, the Plan Supplement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary or appropriate to carry out the purposes and effects thereof;

> (b)     hear and determine disputes, issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the terms and conditions of the Plan and the Plan Supplement and the transactions contemplated thereunder, the Confirmation Order, the Disclosure Statement, or any other order of the Bankruptcy Court, or to maintain the integrity of the Plan following confirmation;

> (c)     hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of or related to the Bankruptcy Cases or the Plan;

> (d)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered or approved in the Bankruptcy Cases;

> (e)     hear and determine all disputes involving the existence, nature, or scope of the discharge, injunctions, releases, exculpations, and indemnifications granted pursuant to the Plan or the Confirmation Order;

> (f)     hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan, the Confirmation Order, any transactions, performance or payments provided for or contemplated in the Plan or the Confirmation Order, or any agreement, instrument or other document governing or relating to any of the foregoing;

> (g)     construe and apply any findings of fact and/or conclusions of law made in or in connection with the Confirmation Order;

(h)     adjudicate matters arising in the Bankruptcy Cases, including matters relating to the formulation and consummation of the Plan;

(i)     enter any orders, including injunctions, as are necessary to enforce title, rights, and powers of the \~~Reorganized~~\Liquidating Debtors and SC Management to impose any limitations, restrictions, terms and conditions on such title, rights, and powers as the Bankruptcy Court may deem necessary;

(j)     hear and determine all questions and disputes regarding title to or recovery of the Assets and property of the Debtors;

(k)     enter a Final Decree closing any or all of the Bankruptcy Cases;

(l)     correct any defect, cure any omission, or reconcile any inconsistency in the Plan, the Plan Supplement, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, the Plan Supplement, and the Confirmation Order including the adjustment of the date(s) of performance under the Plan, the Plan Supplement, and any other documents related thereto if the Effective Date does not occur as provided herein, so that the intended effect of the Plan, the Plan Supplement, and such other documents may be substantially realized thereby;

(m)     enter, implement or enforce such orders as may be appropriate if the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(n)     hear and determine all applications for compensation and reimbursement of expenses of Professionals or any other Person under the Plan or under Bankruptcy Code sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of fees and expenses of professionals retained by SC Management or a \~~Reorganized~~\Liquidating Debtor shall be made in the ordinary course of business and shall not be subject to approval of the Bankruptcy Court;

(o)     hear and determine issues concerning federal tax reporting and withholding that arise in connection with the confirmation or consummation of the Plan;

(p)     hear and determine issues concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

(q)     hear and determine all matters regarding the assumption or rejection of Executory Contracts, including any disputes concerning Rejection Claims or Cure Amounts;

(r)　　hear and determine any objection to any Claim (including any Administrative Claim or Redemption Claim) or any Interest, including the allowance, classification, priority, secured status, compromise, estimation, subordination, or payment thereof;

(s)　　allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim (including any Administrative Claim or Redemption Claim) or any Interest and to re-examine Claims or Interests that have been allowed for purposes of voting;

(t)　　hear and determine any Cause of Action and any collection or settlement matters related thereto;

(u)　　hear and determine any disputes or litigation regarding the validity, priority, or extent of any Lien and any Claim associated therewith; and

(v)　　hear and to determine any other matter related hereto and not inconsistent with the Plan, the Confirmation Order, the Bankruptcy Code, or Title 28 of the United States Code.

### 12.05　Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Bankruptcy Cases, including the matters set forth in Article XII of this Plan, the provisions of this Article XII shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## <u>ARTICLE XIII.</u>
## MISCELLANEOUS PROVISIONS

### 13.01　General Notices

Any notice, request, or demand required or permitted to be given in connection with the Plan shall be (a) in writing, (b) served to the parties and addresses set forth below by certified mail, return receipt requested, hand delivery, overnight delivery, first class mail, or fax transmission, and (c) deemed to have been given or made when actually delivered or received:

**–to Deutsche Bank:**

Valerie Shapiro, CFA
Workout & Restructuring
Deutsche Bank
60 Wall Street
New York, New York 10005

Kevin Tanzer
Director

　Workshare Professional comparison of interwovenSite://IMANDMS/ACTIVE/73463213/1 and interwovenSite://IMANDMS/ACTIVE/73465764/9. Performed on 9/21/2010.

Deutsche Bank Securities Inc. - Credit Solutions Group
60 Wall Street
New York, New York 10005

**-to counsel for Deutsche Bank:**

Robert M. Dombroff
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
Fax: 212-702-3650

**–to SC II, SC Finance, or SC Dixon:**

Ralph H. Harrison, III
Zakas & Leonard LLP
3155 Roswell Road, Suite 330
Atlanta, GA 30305

**–with a copy to counsel for SC II, SC Finance, and SC Dixon:**

Patrick J. Neligan, Jr.
David Ellerbe
Neligan Foley LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201
Fax: 214-840-5301

**-to SC Holdings:**

| | |
|---|---|
| Martin Zolnai | James Keyes |
| Beacon Management Ltd. | Appleby's |
| PO Box HM 2763 | Canon Court 22 Victoria Street |
| Hamilton HM LX | PO Box HM 1179 |
| Bermuda | Hamilton HM EX |
| | Bermuda |

Robert Mulderig
Woodmont Management Ltd.
Par-la-Ville
14 Par-la-Ville Road
PO Box HM 2958
Hamilton, HM MX
Bermuda

**–with a copy to counsel for SC Holdings:**

57    Workshare Professional comparison of
interwovenSite://IMANDMS/ACTIVE/73463213/1 and
interwovenSite://IMANDMS/ACTIVE/73465764/9. Performed on 9/21/2010.

Laurence May
Cole, Schotz, Meisel, Forman & Leonard, P.A.
900 Third Avenue
New York, NY 10022
Fax: 212-752-8393

**–to SC Management:**

_____

_____

_____

_____

**-to counsel for the Equity Committee:**

Paul M. Rosenblatt
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Fax: 404-541-3373

### 13.02   Plan Supplement

No later than ten (10) days prior to the Confirmation Hearing, or no later than any other deadline specified in the Plan with respect to a specific agreement or document, the \Debtors\Proponent shall file with the Bankruptcy Court the Plan Supplement and such exhibits, schedules, agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Upon the filing of the Plan Supplement, (a) the \Debtors\Proponent will serve copies of the Plan Supplement on the Office of the United States Trustee and (b) the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the \Debtors'\Proponent's counsel. The Plan Supplement is incorporated into, and is a part of, the Plan as if set forth in full herein, and all references to the Plan shall refer to the Plan together with all documents contained in the Plan Supplement.

### 13.03   Exemption \From\from Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), the issuance, transfer, or exchange of securities or other property under the Plan; the creation, transfer, filing, or recording of any mortgage, deed of trust, financing statement, or other security interest; or the making, delivery, filing, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp tax, real estate tax, conveyance, filing, or transfer fees, mortgage, recording, or other similar tax or other government assessment.

The Confirmation Order shall direct all appropriate governmental officials or agents to forgo the collection of any such tax or assessment and to accept such documents delivered under the Plan without the imposition or payment of any charge, fee, governmental assessment, or tax.

### 13.04   Asserting and Curing Default Under the Plan

Except as otherwise provided in the Plan, if a \~~Reorganized~~\Liquidating Debtor or SC Management defaults under the provisions of the Plan (as opposed to default under the documentation executed in implementing the terms of the Plan\~~, which documents may provide independent bases for relief concerning the assertion and cure of defaults~~\), any Creditor or party in interest desiring to assert a default will provide the relevant \~~Reorganized~~\Liquidating Debtor or SC Management, as applicable, and their counsel with written notice of the alleged default. The \~~Reorganized~~\Liquidating Debtors and SC Management will have thirty (30) days from receipt of written notice to cure the alleged default. If the default is not cured, any Creditor or party in interest may then file with the Bankruptcy Court, and serve on the relevant \~~Reorganized~~\Liquidating Debtor and SC Management, as applicable, and their counsel, a motion to compel compliance with the applicable provision of the Plan. The Bankruptcy Court, on finding a material default, will issue orders compelling compliance with the pertinent provisions of the Plan.

### 13.05   Compliance with Tax Requirements

In connection with the Plan, SC Management and the \~~Reorganized~~\Liquidating Debtors will comply with any withholding and reporting requirements imposed by federal, state, and local taxing authorities, and Distributions will be subject to the withholding and reporting requirements.

### 13.06   Revocation or Withdrawal of the Plan

The \~~Proponents reserve~~\Proponent reserves the right to revoke and/or withdraw the Plan at any time before the Confirmation Date. If the \~~Proponents revoke or withdraw~~\Proponent revokes or withdraws this Plan, or if confirmation or the Effective Date of the Plan does not occur, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors or any other Person.

### 13.07   Modification of the Plan

The \~~Proponents reserve~~\Proponent reserves the right to modify the Plan in writing at any time before the Confirmation Date, provided that (a) the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and (b) the \~~Proponents~~\Proponent shall have complied with Bankruptcy Code section 1125. The \~~Proponents~~\Proponent further \~~reserve~~\reserves the right to modify the Plan in writing at any time after the Confirmation Date and before substantial consummation of the Plan, provided that (a) the Plan, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123, (b) the Proponents shall have complied with Bankruptcy Code section 1125, and (c) the Bankruptcy Court, after notice and a

hearing, confirms the Plan as modified, under Bankruptcy Code section 1129. A Holder of a Claim or Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

### 13.08   Computation of Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 13.09   Due Authorization

Each and every Holder of an Allowed Claim or Interest that receives a Distribution under the Plan warrants that it is authorized to accept, in consideration of such Claim or Interest, the Distributions provided for in the Plan and that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by it under the Plan.

### 13.10   Implementation

The \~~Proponents~~\Proponent, the \~~Reorganized~~\Liquidating Debtors, SC Management, the JPL (subject to requirements of the Bermuda Court and the Bermuda Proceeding) and the Manager may execute such documents, take such other actions, and perform all acts necessary or appropriate to implement the terms and conditions of the Plan without the need for further Bankruptcy Court approval.

### 13.11   Execution of Documents

Upon application by the Debtors, the \~~Reorganized~~\Liquidating Debtors, the Equity Committee, or SC Management, the Bankruptcy Court may issue an order directing any necessary party to execute or deliver, or to join in the execution or delivery of, any instrument or document, and to perform any act, necessary for the consummation or implementation of the Plan.

### 13.12   Bankruptcy Restrictions

From and after the Effective Date, the \~~Reorganized~~\Liquidating Debtors shall no longer be subject to the restrictions and controls provided by the Bankruptcy Code (e.g., sections 363 or 364) except as the Bankruptcy Code may specifically provide otherwise. No monthly operating reports will be filed after the Effective Date; however, the \~~Reorganized~~\Liquidating Debtors or SC Management shall provide the U.S. Trustee such financial reports as may be required by law.

### 13.13   Ratification

The Confirmation Order will ratify all transactions effected by the Debtors during the pendency of the Bankruptcy Cases.

### 13.14   Integration Clause

This Plan is a complete and integrated statement of the binding agreement among the Debtors, the Holders of Claims and Interests, and other parties in interest upon the matters herein. Parol evidence shall not be admissible in an action regarding the Plan or its provisions.

### 13.15   Interpretation

Unless otherwise specified, all Section, Article and exhibit references in the Plan are to the respective Section in, Article of or exhibit to the Plan, as the same may be amended, waived, or modified from time to time. The headings of the Articles, paragraphs, and Sections of the Plan and table of contents in the Plan are inserted for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan or its interpretation. Nothing herein shall be deemed as a judicial admission by the \~~Proponents~~\Proponent. Likewise, any defined terms in the Plan not defined shall have the same meaning as that term has under the Bankruptcy Code.

### 13.16   Severability of Plan Provisions

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable before the Confirmation Date, the Bankruptcy Court, at the request of the \~~Proponents~~\Proponent, will have the power to alter or interpret the Plan to make such term or provision valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and the term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by the holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.17   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), (a) the laws of the State of Connecticut shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation, formation, or organization of a Debtor shall govern corporate or other governance matters with respect to such Debtor, in either case without giving effect to the principles of conflicts of law thereto.

\~~SAGECREST II LLC~~\

\~~By:~~ ~~*/s/ Ralph H. Harrison, III*~~\
\~~Ralph H. Harrison, III~~\
\~~Its Authorized Representative~~\


\**SAGECREST FINANCE LLC**\

\By: */s/ Ralph H. Harrison, III*\
   \Ralph H. Harrison, III\
   \Its Authorized Representative\

### \**SAGECREST HOLDINGS LLC**\

\By: */s/ Martin S. Zolnai*\
   \Martin S. Zolnai\
   \Its Authorized Representative\

### \~~SAGECREST DIXON, INC.~~\

\By: */s/ Ralph H. Harrison, III*\
   \Ralph H. Harrison, III\
   \Its Authorized Representative\

BINGHAM MCCUTCHEN LLP

By: /s/Kate K. Simon
   Robert M. Dombroff (ct05363)
   Kate K. Simon (ct23489)
   One State Street
   Hartford, Connecticut 06103
   Telephone: (860) 240-2700
   Facsimile: (860) 240-2800
   E-mail: robert.dombroff@bingham.com
          kate.simon@bingham.com

### \~~OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF SAGECREST II LLC AND SAGECREST FINANCE LLC~~\

   Julia Frost-Davies (*pro hac vice* to be submitted)
   Andrew Gallo (*pro hac vice* to be submitted)
   One Federal Street
   Boston, Massachusetts 02110
   Telephone: (617) 951-8000
   Facsimile: (617) 951-8736
   E-mail: julia.frost-davies@bingham.com
          andrew.gallo@bingham.com

\By: */s/ James E. Lineberger, Jr.*\
   \James E. Lineberger, Jr.\
   \Its Chairman\

*Attorneys for Deutsche Bank AG, New York Branch, as Agent for DB Structured Products, Inc.*

# EXHIBIT A\
to Joint Plan of Liquidation \

## List of WMD Bonds

| Bond Name | CAS Code | Purchase Date | Cusip | Issuer | Issue | Coupon |
|---|---|---|---|---|---|---|
| Greentree Bond | 6310 | 7/28/2006 | 393505XJ6 | GreenTree | 1997-6 Class B 1 | 7.17% |
| WMD (68400XAD2) | 6560 | 11/9/2006 | 68400XAD2 | Mesa | 2001-5 Class M2 | 8.32% |
| WMD (592188AY2-1) | 6540 | 11/15/2006 | 592188AY2-1 | Metro | 2000-B Class B1 | 9.00% |
| WMD (592188AY2-2) | 6550 | 11/15/2006 | 592188AY2-2 | Metro | 2000-B Class B1 | 9.00% |
| WMD (90263ABY5) | 6590 | 11/21/2006 | 90263ABY5 | UCFC | 1998-2 Class M1 | 6.73% |
| WMD (67087TDY4) | 6720 | 12/26/2006 | 67087TDY4 | Oakwood | 2002-C Class M1 | 6.89% |
| WMD (393505NDO) | 6770 | 1/10/2007 | 393505NDO | GreenTree | 1996-5 Class B1 | 10.00% |
| WMD (67087TBP5) | 6780 | 1/23/2007 | 67087TBP5 | Oakwood | 2000-C Class M1 | 8.49% |
| WMD (67087TDY4-2) | 6870 | 3/23/2007 | 67087TDY4-2 | Oakwood | 2002-C Class M1 | 6.89% |
| WMD (591739AT4) | 6970 | 5/14/2007 | 591739AT4 | Metro | 1998-A Class B2 | 6.00% |
| WMD (393505XJ6-2) | 6990 | 5/31/2007 | 393505XJ6-2 | GreenTree | 1997-6 Class B 1 | 7.17% |
| WMD (045413CW9) | 7030 | 7/5/2007 | 045413CW9 | ABSHE | 2002-HE2 Class B | 8.55% |

**EXHIBIT B**

**EXHIBIT C**

**Term Sheet for DB Credit Agreement**

This term sheet summarizes the key terms of the DB Credit Agreement referenced in Section 5.03 of Deutsche Bank's Plan.

      a.      Obligors and Amount: On the Effective Date, Deutsche Bank shall receive the DB Credit Agreement, which shall be issued by SC Finance, SC II, SC Holdings, SCFR, SC Limited and SC Management in the principal amount of the asserted amount of the prepetition DB Secured Claims plus fees, costs, including without limitation the expenses of Deutsche Bank's financial consultant (Alvarez & Marsal) and default interest.

      b.      Joint and Several Liability:  SC Finance, SC II, SC Holdings, SCFR, SC Limited, and SC Management shall each be jointly and severally liable for all obligations arising under the DB Credit Agreement.

      c.      Collateral:  Deutsche Bank shall have an unavoidable, senior, first priority Lien on all of the DB Collateral until the Allowed DB Secured Claims are indefeasibly paid in full in Cash.  The Debtors and Liquidating Debtors are authorized to transfer all of the their Assets as of the Effective Date to SC Management in accordance with the terms of the Plan notwithstanding Deutsche Bank's Lien thereon and all such Assets and proceeds thereof shall remain subject to Deutsche Bank's Lien.  In conjunction with the transfers of Assets to SC Management, and, with respect to each Asset, not later than the time that such Asset is transferred to SC Management, the Debtors and the Liquidating Debtors, in coordination with SC Management, shall take such action as may be necessary (or deemed advisable by Deutsche Bank) for the following to occur: (A) each promissory note or other evidence of indebtedness that is an Asset to be transferred to SC Management shall be collaterally assigned to a custodian designated by Deutsche Bank, and possession of each original executed note shall be delivered to a custodian designated by Deutsche Bank; (B) each mortgage, security interest, financing statement, and other collateral securing any such promissory note or other evidence of indebtedness shall be collaterally assigned of record to a custodian or collateral agent designated by Deutsche Bank and possession of the original executed stock certificates and other collateral, of which the Debtors, Liquidating Debtors or SC Management has possession, that secure any such promissory note or other evidence of collateral, shall be delivered to such custodian or collateral agent designated by Deutsche Bank; (C) each Asset to be transferred to SC Management that consists in whole or in part of real property shall be made subject to a Lien in favor of Deutsche Bank (or a collateral agent designated by Deutsche Bank), pursuant to a mortgage (and related documents) in form and substance acceptable to Deutsche Bank; (D) a financing statement listing each Asset to be transferred to SC Management that consists in whole or in part of personal property that is subject to Article 9 of the Uniform Commercial Code (including any such Assets referred to in clauses (A) and (B) of this sentence) and listing SC Management as the debtor and Deutsche Bank (or a collateral agent designated by Deutsche Bank) as the secured party shall be filed in each applicable jurisdiction in the United States; (E) each bank account of SC Management shall be made subject to a control agreement in favor of Deutsche Bank (or a collateral agent designated by Deutsche Bank) in form and substance acceptable to Deutsche Bank; and (F) such other filings, deliveries and actions as may be reasonably requested by Deutsche Bank in order to

fully perfect any Lien held or to be held by Deutsche Bank (or any custodian or collateral agent designated by Deutsche Bank) shall be made and taken.

d.     Interest:  Interest on the unpaid principal balance of the DB Credit Agreement shall accrue at a rate per annum (computed on a 360-day basis for the actual number of days elapsed) equal to one month LIBOR plus 8%, with a LIBOR floor of 2%.  Default interest shall accrue at a rate per annum (computed on a 360-day basis for the actual number of days elapsed) equal to one month LIBOR plus 13%, with a LIBOR floor of 2%.

e.     Mandatory Prepayments:  SC Management shall pay to Deutsche Bank on or before the third (3rd) Business Day after each month end, the Excess Cash Flow Amount with respect to the preceding month.

f.     Maturity Date: Two (2) calendar years following the Effective Date.

g.     Reporting:

A.  Prior to the Effective Date, the Debtors shall provide Deutsche Bank with a 13-week operating cash flow report (excluding asset sales) and a Budget as of the Effective Date, each of which shall be in form and substance acceptable to Deutsche Bank.

B.  For every week following the week in which the Effective Date occurs through the date of indefeasible payment of the Deutsche Bank Secured Claims in full in Cash, no later than the Tuesday following each week end, SC Management and/or the Liquidating Debtors, as applicable, shall provide Deutsche Bank with the following:

(1) a comparison of cash flows for such week to projected cash flows for such week with respect to each line item in the applicable 13-week cash flow report, including an explanation for all week over week and cumulative variances from the Effective Date for the applicable 13-week cash flow report greater than 10% for any line item and 10% in the aggregate;

(2) an updated 13-week cash flow report (an "Updated Cash Flow Report") detailing cash receipts and disbursements on a weekly basis with respect to the 13 weeks beginning with the 14th week after the Effective Date which shall be used to establish the baseline projected cash flows for each of the subsequent 13 weeks (with similar new baselines established each 13 weeks, as applicable; and

(3) any other information respecting the condition or operations, financial or otherwise, of SC Management as Deutsche Bank may, from time to time, reasonably request.

The form and substance of any Updated Cash Flow Report shall be approved by Deutsche Bank, which approval shall be deemed granted after 7 days following Deutsche Bank's receipt thereof unless Deutsche Bank informs SC Management and/or the Liquidating Debtors as applicable to the contrary prior to the end of such 7-day period.

C.  For each month following the month in which the Effective Date occurs through the date of indefeasible payment of the Deutsche Bank Secured Claims in full in Cash, no later than 7 days after the last day of each month, SC Management and/or the Liquidating Debtors, as applicable, shall provide Deutsche Bank with the following:

(1) for such month and the period from the Effective Date through the last day of such month, a comparison of the actual cash disbursements during such period to the projected cash disbursements set forth in the applicable Budget for each line item during such periods, including an explanation for all month-over-month and cumulative variances from the Effective Date for the applicable Budget line item greater than 15%; and

(2) At the election of SC Management and/or the Liquidating Debtors a revised Budget (a "Revised Budget") for the period commencing the month following the month in which the Revised Budget is delivered through the following 12 months.

The form and substance of any Revised Budget shall be approved by Deutsche Bank, which approval shall be deemed granted after 7 days following Deutsche Bank's receipt thereof unless Deutsche Bank informs SC Management and/or the Liquidating Debtors to the contrary prior to the end of such 7-day period.

D. Within 10 days of each month end and 30 days after each year end, monthly and annual GAAP financial statements for each obligor under the DB Credit Agreement. Deutsche Bank shall also receive complete copies of the minutes to each meeting of the board of directors of SC Management as well as any presentations/materials given to the board of directors at such meeting.

h.    Financial Covenants:  The DB Credit Agreement will require a minimum cash balance of $1,000,000 to be maintained at all times, monthly cash disbursements not to exceed 115% of projected cash disbursements set forth in the Budget or Revised Budget most recently approved by Deutsche Bank, and a prepayment of the outstanding principal balance of the DB Credit Agreement in an amount sufficient for the midpoint between the high and low ranges of the appraised value of the DB Collateral per the then most recent collateral appraisal to be not less than 120% of the aggregate outstanding principal balance of the DB Credit Agreement.

i.    Marketing Plan and Status Report: The Plan Administrator will be required to comply with the Marketing Plan.  Within 10 days of each month end following approval of the Marketing Plan pursuant to the Plan, the Plan Administrator shall provide Deutsche Bank with a written status report, in form and substance acceptable to Deutsche Bank, of each element of the Marketing Plan.

j.    Collateral Appraisal:  An appraisal of the DB Collateral will be completed, at SC Management's expense, by an independent appraiser acceptable to Deutsche Bank within thirty (30) days of each of (A) six (6) months after the Effective Date and (B) every six (6) months thereafter.

k. **Representations and Warranties:** The DB Credit Agreement will contain representations and warranties (which representations and warranties shall be effective through the Maturity Date) substantially similar to those contained in those certain Loan, Security and Servicing Agreements, dated as of April 2, 2007 (as amended, supplemented or modified from time to time) that were executed in connection with the Deutsche Bank/SC Holdings Note and the Deutsche Bank/SC Finance Note concerning the following: organization and good standing; due qualification; power and authority; security interest/binding obligations; no violation; no proceedings; no consents; compliance with laws; taxes; no liens, etc.; ERISA compliance; investment company status; and use of proceeds.

l. **Other Covenants:** In addition to covenants set forth herein, the DB Credit Agreement will contain other covenants, substantially similar to those contained in those certain Loan, Security and Servicing Agreements, dated as of April 2, 2007 (as amended, supplemented or modified from time to time) that were executed in connection with the Deutsche Bank/SC Holdings Note and the Deutsche Bank/SC Finance Note, concerning the following: protection of security interest; no other liens or interests; payment of costs and expenses; no stock, merger consolidation; no change in name; no indebtedness/guarantees; limitation on transactions with affiliates; no cancellation, termination, amendment, consent, waiver or approval of documents; preservation of existence; keeping of records and books of account; limitation on loans and investments; no dividends/distributions; maintenance of records of assets; performance of documents; notice of material adverse claim; further assurances/financing statements; and payment upon dissolution of subsidiaries; and access to documentation and information regarding the DB Collateral. The DB Credit Agreement will also contain covenants with respect to the board of directors of SC Management as set forth in Section 6.06 of the Plan.

m. **Events of Default:** The DB Credit Agreement will provide that the following events constitute an event of default thereunder: the failure to make any payment when due; any representation or warranty shall prove to have been false or incorrect in any material respect and the falseness or incorrectness has a material adverse effect on the obligors under the DB Credit Agreement or Deutsche Bank; the failure to comply with the reporting requirements set forth in the DB Credit Agreement and such failure is not cured within three (3) business days; the failure to comply with any other covenant or term of the DB Credit Agreement; the occurrence of any insolvency event with respect to any obligor under the DB Credit Agreement; the filing of any lien by the IRS or PBGC with regard to any asset of SC Management and such lien is not released within thirty (30) days; and, unless insured, the rendering of a final judgment for the payment of money in excess of $50,000 against any obligor under the DB Credit Agreement and such judgment remains undischarged for a period of thirty (30) days during which execution shall not be effectively stayed or contested in good faith.

n. **Remedies Upon Default:** The DB Credit Agreement will provide Deutsche Bank with (A) customary remedies upon the occurrence of an "Event of Default" under the DB Credit Agreement and (B) the right to elect to a majority of the board of directors of SC Management and to take immediate action to take possession of and to exercise its remedies with respect to any or all of the DB Collateral in the event that SC Management or its directors or equity holders take any action (or any other event occurs) that results in SC Management's board of directors no longer including a designee of Deutsche Bank or in such designee not being removed or replaced

in accordance with Deutsche Bank's instructions, or if any of the requirements regarding consent of SC Management's board of directors set forth in Section 6.06 of the Plan are amended or deleted without Deutsche Bank's consent.

o.      Transferability: Deutsche Bank will have the right to assign all or a portion of its loan under the DB Credit Agreement, or participations therein, to other persons.  In connection therewith, Deutsche Bank will have the right to disclose to any prospective lender any and all information regarding or related to the DB Credit Agreement or the obligors thereunder subject to customary confidentiality provisions to be set forth in the DB Credit Agreement.

70      Workshare Professional comparison of
interwovenSite://IMANDMS/ACTIVE/73463213/1 and
interwovenSite://IMANDMS/ACTIVE/73465764/9. Performed on 9/21/2010.

# **EXHIBIT B**

## **Discovery Requests**

| | |
|---|---|
| In re: | Chapter 11 |
| **SAGECREST II LLC,** | **CASE NO. 08-50754 (AHWS)** |
| **SAGECREST FINANCE LLC,** | **CASE NO. 08-50755 (AHWS)** |
| **SAGECREST HOLDINGS LIMITED, and** | **CASE NO. 08-50763 (AHWS)** |
| **SAGECREST DIXON INC.,** | **CASE NO. 08-50844 (AHWS)** |
| **Debtors.** | **Jointly Administered under Case No. 08-50754** |

## FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS BY DEUTSCHE BANK AG, NEW YORK BRANCH, AS AGENT FOR DB STRUCTURED PRODUCTS, INC., IN CONNECTION WITH PROPOSED PLANS OF LIQUIDATION PROPOUNDED UPON THE DEBTORS

Pursuant to Rules 9014, 7026 and 7034 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Deutsche Bank AG, New York Branch, as agent for DB Structured Products, Inc. ("Deutsche Bank") requests that debtors SageCrest II LLC, SageCrest Finance, LLC, SageCrest Holdings Limited, and SageCrest Dixon Inc. produce and permit Deutsche Bank to inspect and copy the documents described below at the offices of Deutsche Bank's counsel, Bingham McCutchen LLP, One State Street, Hartford, Connecticut, 06103, attention: Kate K. Simon, Esq., on or before October 15, 2010.

## INSTRUCTIONS

A.      In responding to these Requests for Production, if the responding party encounters any ambiguity in construing a Request for Production or any definitions and instructions relevant thereto, that party shall set forth the matter or term deemed "ambiguous" and the construction chosen or used in responding to such Request for Production.

B.     If a privilege is claimed as the basis for objection to producing any Document, the responding party shall: (i) state the nature of the privilege claimed; (ii) state the date of such Document; (iii) identify the person who prepared such Document; (iv) identify the person(s) to whom the Document was directed or circulated; (v) identify the person(s) who has custody of such Document or a copy of such Document; (vi) state any and all facts and reasons that the responding party claims support each objection; (vii) state the reason(s) for the preparation of the Document; (viii) identify each person(s) who has knowledge of any of the facts or reasons that the responding party claims support such objection; and (ix) provide all information relating thereto which is not within the scope of the privilege claimed.

C.     If anything has been deleted or redacted from a Document produced in response to these Requests for Production of Documents, you shall state with specificity: (i) the nature of the material deleted or redacted; and (2) the reason for deletion or redaction.

D.     If no Documents are in existence that are responsive to a particular request or subsection thereof, your answer must so indicate.

E.     These Requests for Production of Documents shall be deemed continuing and to require supplemental productions should you locate additional responsive Documents at any time after your initial production of Documents.

F.     Except as otherwise noted, the period of time covered by each Request for Production herein is to date.

G.     To the extent that a Debtor has already provided a Document or access to a Document to Deutsche Bank that is responsive to a Request for Production, the Debtor should note when and how such Document was provided in response to the Request for Production and is not required to produce such Document a second time.

A/73499434.6

## DEFINITIONS AND RULES OF CONSTRUCTION

A.       Any capitalized term that is not defined herein shall have the meaning ascribed to it in the *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Deutsche Bank AG, New York Branch, as Agent for DB Structured Products, Inc.*, dated September 21, 2010.

B.       "Assets" shall mean all portfolio assets belonging to SageCrest Entity.

C.       "Bankruptcy Case(s)" means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

D.       "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended and as applicable to the Bankruptcy Cases.

E.       "DB's Claim" refers to the secured claim held by Deutsche Bank against SC Finance or SC Holdings as the context may require.

F.       "DB's Plan" means the *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Deutsche Bank*, all exhibits or agreements annexed to such plan, referenced in such plan, or included in a plan supplement, as the same may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

G.       "DB's Disclosure Statement" means the *Disclosure Statement for Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by Deutsche Bank* and filed by Deutsche Bank on September 21, 2010.

H.     "Debtors" means SageCrest II LLC, SageCrest Finance, LLC, SageCrest Holdings Limited, and SageCrest Dixon Inc. and their respective employees, agents, representatives, professionals, predecessors and all other persons acting or purporting to act for or on their behalf, and shall refer to the Debtors collectively or any of them as necessary to make the request inclusive rather than exclusive.

I.     "Debtors' Disclosure Statement" means the *Disclosure Statement with Respect to Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code Proposed by SageCrest II, LLC, SageCrest Finance LLC, SageCrest Holdings Limited, SageCrest Dixon Inc. and the Official Committee of Equity Security Holders* [Docket No. 1136] filed on August 9, 2010.

J.     "Debtors' Plan" means the *Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code Proposed by SageCrest II, LLC, SageCrest Finance LLC, SageCrest Holdings Limited, SageCrest Dixon Inc. and the Official Committee of Equity Security Holders* [Docket No. 1135] filed on August 9, 2010, all exhibits or agreements annexed to such plan, referenced in such plan, or included in the plan supplement, as the same may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

K.     "Deutsche Bank" means Deutsche Bank AG, New York Branch, as agent for DB Structured Products, Inc.

L.     "Document" or "Documents" means all written, recorded or graphic material, however produced or reproduced, in the actual or constructive possession, custody or control of the responding party, including documents accessible at the responding party's request, as defined in Federal Rules of Evidence Rule 1001, Federal Rule of Civil Procedure 34(a) and Bankruptcy Rule 7034.

M.  "EBIT" means earnings before interest and taxes.

N.  "EBITDA" means earnings before interest, taxes, depreciation and amortization.

O.  "Life Insurance Assets" means any investments made by the Debtors in life insurance policies, either through purchasing those policies from third parties or making loans to individuals to finance premium payments using the policies as collateral.

P.  "Petition Date" means the date a Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code; namely, August 17, 2008 as to SC II and SC Finance; August 20, 2008 as to SC Holdings; and September 11, 2008 as to SC Dixon.

Q.  "Reorganized Debtors" has the meaning attributed to that term in the Debtors' Plan.

R.  "SageCrest Entity" means any Debtor, any subsidiary or affiliate of any Debtor (including, but not limited to, any non-Debtor subsidiary of the Debtors), the Reorganized Debtors and SC Management.

S.  "SC II" means SageCrest II LLC and its employees, agents, representatives, professionals, predecessors and all other persons acting or purporting to act for or on its behalf.

T.  "SC Dixon" means SageCrest Dixon Inc. and its employees, agents, representatives, professionals, predecessors and all other persons acting or purporting to act for or on its behalf.

U.  "SC Finance" means SageCrest Finance, LLC and its employees, agents, representatives, professionals, predecessors and all other persons acting or purporting to act for or on its behalf.

A/73499434.6

V.     "SC Holdings" means SageCrest Holdings Limited and its employees, agents, representatives, professionals, predecessors and all other persons acting or purporting to act for or on its behalf.

W.     "SC Management" has the meaning attributed to that term in the Debtors' Plan.

X.     The word "concerning" means directly or indirectly, in whole or in part, constituting, supporting, evidencing, recording, reflecting, substantiating, describing, summarizing, identifying, or referring or relating in any way to.

Y.     "Each" includes the word "every," and "every" includes the word "each."  "Any" includes the work "all," and "all" includes the word "any."

Z.     "And" or "or" shall be construed disjunctively or conjunctively as necessary to make the request inclusive rather than exclusive, and the plural of any word used herein includes the singular and the singular includes the plural.  The masculine gender of any word used herein includes the feminine and vice versa.  The past tense of a verb used herein includes the present tense and the present tense includes the past tense.

## REQUESTS FOR PRODUCTION

1.     All schedules referenced in the Debtors' Plan and the Debtors' Disclosure Statement.

2.     All Documents that are expected to be part of the "Plan Supplement" as referenced in the Debtors' Plan.

3.     All Documents or information relied upon by the Debtors in drafting the Debtors' Plan and the Debtors' Disclosure Statement.

4.     All Documents concerning or identifying the Assets that the Debtors propose to transfer to Deutsche Bank pursuant to the Debtors' Plan.

5.      All Documents concerning the terms of any note to be given to Deutsche Bank under the Debtors' Plan, including, but not limited to, any analyses or calculations concerning such terms.

6.      All cash flow projections concerning the SageCrest Entities relating to any period after September 1, 2010, including any projected cash flows relating to the operation and liquidation of the SageCrest Entities' portfolio following confirmation of the Debtors' Plan.

7.      All Documents concerning the cash flow projections referenced in Request for Production 6  including, but not limited to, (i) any Documents used by the Debtors in formulating the cash flow projections; (iii) any Documents provided to the Debtors concerning the cash flow projections; (iv) any drafts of the cash flow projections; and (v) income statements, balance sheets, and statements of cash flow, earnings, EBIT, and EBITDA used to create the cash flow projections.

8.      All budgets and/or forecasts of expenses concerning operation of the SageCrest Entities relating to any period after September 1, 2010, including any projected budgets and/or forecasts of expenses relating to the operation and liquidation of the SageCrest Entities' portfolio following confirmation of the Debtors' Plan.

9.      All Documents concerning the projected budgets and/or forecasts of expenses referenced in Request for Production 8 including, but not limited to, (i) any Documents used in formulating the budgets and/or forecasts of expenses; (iii) any Documents provided to the Debtors concerning the budgets and/or forecasts of expenses; (iv) any drafts of the budgets and/or forecasts of expenses; and (v) income statements, balance sheets, and statements of cash flow, earnings, EBIT, and EBITDA used to create the budgets and/or forecasts of expenses.

A/73499434.6

10.     Any business plan, financial statements, profit and loss statements or other projections created by the Debtors with respect to the Debtors and the operation and liquidation of the Assets, and all Documents concerning such business plan, financial statements, profit and loss statements or other projections including, but not limited to (i) any Documents used in formulating these items; (iii) any Documents provided to the Debtors concerning the these items; (iv) any drafts of these items; and (v) income statements, balance sheets, and statements of cash flow, earnings, EBIT, and EBITDA used to create these items.

11.     All Documents concerning the feasibility of the Debtors' Plan.

12.     All Documents concerning any projected future distributions to creditors, including the amount and timing of any such distributions.

13.     All Documents concerning projections of future administrative and operating costs of the SageCrest Entities, including the Reorganized Debtors, and SC Management (as those terms are defined in the Debtors' Plan), including, but not limited to, any anticipated future costs with respect to the maintenance or improvement of any Asset.

14.     All Documents concerning any one-time or non-recurring charges included in the projected financial data requested in Requests for Production 6-10 and 13.

15.     All Documents concerning employment agreements for all employees and directors of the SageCrest Entities, including benefit, management incentive, severance and bonus plans.

16.     All Documents concerning the Debtors' proposed employment agreements (or the proposed terms of any such agreement) for all employees and directors of SC Management or the Reorganized Debtors, including benefit, management incentive, severance and bonus plans for the period following the effective date of the Debtors' Plan if it is confirmed.

17.     All Documents concerning the retention of employees, managers, consultants and other professionals that the Debtors have selected or are considering in connection with implementing the Debtors' Plan, including but not limited to all communications with any such persons.

18.     All Documents concerning any valuation or appraisal of the Assets (including, without limitation, any valuation performed by Houlihan Smith & Company, Inc. or Risk Capital Partners), whether such Document was prepared by the Debtors, their affiliates, management, board members, directors, employees, professionals, retained experts or any other person or entity.

19.     With respect to any valuation or appraisal referenced in Request for Production No. 18, all drafts of any such valuation or appraisal, all workpapers created in connection with the preparation of such valuation or appraisal and all communications involving the person who created such valuation or appraisal.

20.     Documents sufficient to identify all Assets.

21.     With respect to each Asset, including, but not limited to, any real property, any loans issued by the SageCrest Entities, and any investments in life insurance policies owned by the SageCrest Entities, all Documents dated after the Petition Date concerning:

> (a)     any effort to sell any of the Assets;
>
> (b)     offers, letters of intent or expressions of interest by third parties to purchase the Asset;
>
> (c)     the marketing of the Asset and solicitations of any third party to purchase the Asset;
>
> (d)     the quality, desirability or collectability (or lack thereof) of the Asset;
>
> (e)     the saleability of the Asset, including any analysis of the holding period; and

(f)     loan status, defaults or litigation concerning the Assets.

22.     With respect to any loan that is either made by a SageCrest Entity, owned by any SageCrest Entity, or serves as collateral for an obligation of any SageCrest Entity:     (a) all communications concerning the loan, (b) the most recent monthly servicer report showing history of loan payments, current outstanding principal and interest balance, interest rate history (showing interest rate modifications/non-accrual) and history of principal and interest movements, (c) the most current year-to-date income statement and balance sheet for the underlying borrower(s), and (d) the most current monthly reporting package provided by the borrower.

23.     With respect to the WMD Bonds, (a) all Documents evidencing the obligations associated with the WMD Bonds, (b) all agreements concerning the WMD Bonds, (c) the most recent monthly servicer report showing history of loan payments, current outstanding principal and interest balance, interest rate history (showing interest rate modifications/non-accrual) and history of principal and interest movements, (d) the most current year-to-date income statement and balance sheet for the underlying borrower(s) and (e) the most current monthly reporting package provided by the borrower.

24.     All original loan documents, and any amendments thereto, for loans relating to the following entities:  (a) Atlas Capital Funding. (b) Champion Leasing Group, Inc., (c) Miller Coach & Limousine Sales, Inc., (d) TransCon Capital, LLC, (e) TransCon Financial, LLC, (f) TransCon Financial II, LLC, (g) AA Auto Brokers, (h) American Residential Equities, and (h) Health Capital, Inc.

25.     Documents sufficient to evidence all collateral supporting the Mongoose Capital, Inc. loan.

26.     All Documents listed below with respect to the following real property Assets --Sodus Bay – Sodus Point, NY; Stafford – Leicester, MA; Westborough – Westborough, MA; Viewstone – Greenwich, CT; Walden Woods – Schaumburg, IL:

    a.    Documents sufficient to show historical carrying costs for these properties, including, but not limited to, property taxes, insurance and other payments.

    b.    All Documents relating to the environmental status of these properties, including any environmental reports.

    c.    All Documents showing any future costs associated with these properties, including, but not limited to, environmental, title or other property related issues.

27.     With respect to the property known as Springmill, Eastland (in connection with the MetroCap loan): (a) all leases currently in place or recently signed and all lease amendments or modifications, and (b) Documents sufficient to show the terms of all leases that currently are being negotiated, historical vacancies and credit losses, and CAM reconciliations.

28.     With respect to the Life Insurance Assets:  (a) Documents sufficient to evidence premiums paid for each life insurance policy that is part of the Life Insurance Assets; (b) any cash flow report or schedule with respect to the Life Insurance Assets sufficient to evidence cash outflows by category, including premium payments, operating costs, servicing and tracking fees, exit fees, profit sharing fees, legal fees, consulting fees and any other costs related to the Life Insurance Assets;  (c) any cash flow report or schedule with respect to the Life Insurance Assets sufficient to show all cash inflows from the Life Insurance Assets, including gross and net death benefits, sale proceeds and premium finance repayments received; (d) all Documents concerning any agreement with any servicer of the Life Insurance Assets.

29.     With respect to each life insurance policy that is associated with the Life Insurance Assets:  (a) the most recent policy illustrations, (b) the insurance policies and any related agreements or documentation, and (c) any life expectancy estimates.

30. All Documents sufficient to show loan balances and accrued interest balances related to loans from any SageCrest Entity to Antietam Funding LLC and National Consolidated Funding, LLC.

31. All Documents concerning any audit of the Life Insurance Assets, including, but not limited to, any audit performed by Risk Capital Partners.

32. All Documents concerning any proposed or contemplated resolution of the bankruptcy cases of Il Lugano and HC Walden Woods.

33. All Documents, including, but not limited to, communications, negotiations and analysis, concerning the amount of and the Debtors' Plan's treatment of all classes of Claims and Interests set forth in the Debtors' Plan.

34. All Documents concerning any analysis of the likely recovery under the Debtors' Plan of holders of claims and interests in all classes of Claims and Interests set forth in the Debtors' Plan and all Documents reviewed in connection with such investigation or analysis.

35. All Documents concerning any attempt by or on behalf of the Debtors or their affiliates to procure debtor-in-possession financing or exit financing; including, but not limited to, any communications with potential sources of financing

36. All Documents concerning any communications, negotiations or agreements between the Debtors and the Equity Committee regarding the Debtors' Plan, the Debtors' Disclosure Statement and/or Deutsche Bank's Claim.

37. All Documents prepared, produced or generated by or on behalf of any expert or consultant that Debtors have retained or consulted with in connection with or in anticipation of the hearing on either the Debtors' Disclosure Statement and/or confirmation of the Debtors'

Plan, including, but not limited to, reports, analyses, appraisals, valuations, workpapers and any amendments or supplements thereto.

38.     All Documents provided by the Debtors to any expert and/or consultant in connection with or in anticipation of the hearing on the Debtors' Disclosure Statement and/or confirmation of the Debtors' Plan.

39.     Documents sufficient to evidence the identity of all creditors of Debtors, the address of such creditor where a ballot on the Debtors' Plan will be sent, the amount such creditor was owed on the Petition Date, and whether the claims of such creditor are secured.

40.     Documents sufficient to evidence the identity of all equity holders in each of the Debtors, the address of such equity holder where a ballot on the Debtors' Plan will be sent, the current amount of their holdings, whether such equity holder holds a claim in Class 8 (Redemption Claims) of the Debtors' Plan and, if so, the amount of such Class 8 claim.

41.     All Documents concerning any effort to sell equity interests in any of the SageCrest Entities.

42.     The most recent tax returns for the SageCrest Entities and Documents sufficient to show all taxes currently owing or accrued and the status of any *ad valorem* taxes concerning the SageCrest Entities and the Assets.

43.     Documents sufficient to identify all executory contracts the Debtors propose to assume in connection with the Debtors' Plan.

44.     All exhibits that the Debtors plan to offer at the hearing on their motion for approval of the Debtors' Disclosure Statement.

45.     All exhibits that the Debtors plan to offer at the Confirmation Hearing.

BINGHAM MCCUTCHEN LLP

By: /s/Kate K. Simon
    Robert M. Dombroff (ct05363)
    Kate K. Simon (ct23489)
    One State Street
    Hartford, Connecticut 06103
    Telephone: (860) 240-2700
    Facsimile: (860) 240-2800
    E-mail:    robert.dombroff@bingham.com
              kate.simon@bingham.com

    Julia Frost-Davies (*pro hac vice* application to be submitted)
    Andrew Gallo (*pro hac vice* application to be submitted)
    One Federal Street
    Boston, Massachusetts 02110
    Telephone: (617) 951-8000
    Facsimile: (617) 951-8736
    E-mail:    julia.frost-davies@bingham.com
              andrew.gallo@bingham.com

    *Attorneys for Deutsche Bank AG, New York Branch, as Agent for DB Structured Products, Inc.*

Dated: September 21, 2010

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **SAGECREST II LLC,** | ) | **CASE NO. 08-50754 (AHWS)** |
| **SAGECREST FINANCE LLC,** | ) | **CASE NO. 08-50755 (AHWS)** |
| **SAGECREST HOLDINGS LIMITED, and** | ) | **CASE NO. 08-50763 (AHWS)** |
| **SAGECREST DIXON INC.,** | ) | **CASE NO. 08-50844 (AHWS)** |
| | ) | |
| **DEBTORS.** | ) | **JOINTLY ADMINISTERED UNDER** |
| | ) | **CASE NO. 08-50754 (AHWS)** |

**ORDER GRANTING EMERGENCY MOTION TO ADJOURN**
**DISCLOSURE STATEMENT HEARING AND EXPEDITE DISCOVERY**

Upon consideration of the Emergency Motion of Deutsche Bank AG, New York Branch, as Agent for DB Structured Products, Inc. ("DB") to Adjourn Disclosure Statement Hearing and Expedite Discovery dated September 21, 2010 [Docket No. \_\_\_] (the "<u>Motion</u>"),[1] it is hereby

**ORDERED** that the Motion is GRANTED; and it is further

**ORDERED** that the hearing to determine the adequacy of the Debtors' Disclosure Statement is hereby adjourned to _____, 2010, at which date the Court shall consider the adequacy of both the Debtors' Disclosure Statement and the DB Disclosure Statement; and it is further

**ORDERED** that the Debtors shall respond to DB's Document Requests on or before October 15, 2010 and shall produce a 30(b)(6) witness on a date convenient for the parties shortly thereafter, prior to the hearing on the disclosure statement.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.