**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| SAGECREST II LLC | ) | Case No. 08-50754 (AHWS) |
| SAGECREST FINANCE, LLC | ) | Case No. 08-50755 (AHWS) |
| SAGECREST HOLDINGS, LTD. | ) | Case No. 08-50763 (AHWS) |
| SAGECREST DIXON, INC. | ) | Case No. 08-50844 (AHWS) |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |

**(1) OBJECTION OF DEBTORS AND EQUITY COMMITTEE TO MOTION OF
DEUTSCHE BANK TO ADJOURN DISCLOSURE STATEMENT HEARING AND
(2) RESPONSE IN SUPPORT OF ADEQUACY OF DISCLOSURE STATEMENT**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") and the equity committee to SageCrest II, LLC (the "Onshore Committee", and, with the Debtors, the "Plan Proponents"), by and through their undersigned counsel, hereby: (1) object to the motion [Docket No. 1159] (the "DB Motion"[1]) of Deutsche Bank AG ("DB") to adjourn the hearing to approve the Debtors' Disclosure Statement; and (2) respond to the objections of DB [Docket No. 1156] (the "DB Objection") and ACG Credit Company II, LLC ("Art Capital") [Docket No. 1170] (the "Art Capital Objection") to the adequacy of the Debtors' Disclosure Statement.

**I.  Introduction and Summary of Objections by DB and Art Capital**

1.     The focus of these cases has always been returning value to investors in the SageCrest funds because, by its own admission, DB has been and remains significantly oversecured.[2]  To that end, the Debtors have painstakingly resolved actual and meaningful

---

[1] Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the DB Motion.

[2]  See DB Disclosure Statement at pp. 10, 44 (estimating DB's secured claims at $107 million plus costs, fees and interests and stating that an appraisal commissioned by DB determined the range of fair market value of the collateral securing DB's claims to be $118 million to $136 million).  The Plan Proponents believe that DB's appraisal significantly understates the value of DB's collateral and reserve all rights with respect thereto.  In addition, DB has stated that under the plan of the Plan Proponents, its post confirmation collateral could be worth as much as $155 million, a number which the Plan Proponents also believe is materially understated.

46365/0001-7028874v2

disputes with each other (resolving approximately $30 million of disputed intercompany claims), their entrenched management, and their investors.[3] Now that the Debtors are on the cusp of emerging from bankruptcy, DB is attempting to leverage its position as the only significant stakeholder not to support the Debtors' Plan in order to extract additional concessions on account of its oversecured claims.

2.      The Debtors' Plan provides payment in full of <u>all</u> creditor claims over a four year period from the proceeds of selective sales of assets of the Debtors and their affiliates. The Debtors' Disclosure Statement informs creditors that they will be paid in full with interest and describes the process by which liquidation and distribution decisions will be made. The information provided in the Debtors' Disclosure Statement is sufficient for creditors to choose to accept or reject the Debtors' Plan. DB's objection to the Debtors' Disclosure Statement is a premature objection to confirmation of the Debtors' Plan and without merit.[4] Moreover, it is clear from the DB Motion, the filing of the DB Plan and the DB Disclosure Statement, DB's extensive history with the Debtors, and the massive amount of information that DB already possesses regarding SageCrest and its assets that DB: (a) has adequate information to determine whether to vote for or against the Debtors' Plan, and (b) has decided not to do so. The Art Capital[5] Objection is similarly without merit and, in addition, demonstrates a fundamental misunderstanding of the Debtors' Plan.

---

[3] The Plan Proponents recently agreed in principle to resolve longstanding redemption disputes with Topwater Exclusive Fund III, LLC ("<u>Topwater</u>") and other onshore investors.

[4] The genuineness of the DB Objection is perhaps best considered in light of the fact that DB used substantially the same form of disclosure statement to disclose information about the competing DB Plan.

[5] As this Court is aware, Art Capital is a net debtor to the Debtors' estates and a serial objector in these chapter 11 cases. Because the Debtors hold valid and enforceable rights of offset against Art Capital in amounts far in excess of the amount of any claim that Art Capital will ever have against the Debtors, Art Capital will never receive a distribution under the Debtors' Plan (or any other plan), and its objection must be considered in that light.

3. DB's objections to the feasibility or other alleged inadequacies of the Debtors' Plan should be argued at a confirmation hearing, not a disclosure statement hearing. This Court should establish a discovery and hearing schedule for confirmation of the Debtors' Plan that includes time for DB to conduct reasonable discovery, giving due regard to the vast amount of information about the Debtors' that it already has and keeps these cases on a timely path to exit. The focus of this bankruptcy should remain on the investors who will ultimately bear the costs of further delay, and not a significantly oversecured bank that seeks to hasten its repayment at their expense.

## II.  The Plan Proponents' Responses to Objections

### A.  The Debtors' Plan Should Be Confirmed Without Delay

4. After two years of hotly contested proceedings, the Plan Proponents are prepared to seek confirmation of a joint chapter 11 plan with the support of the Debtors' investors. To reach this point, the Debtors and their onshore and offshore investors engaged in extensive discovery, mediation and negotiation with each other over a period of several months and resolved millions of dollars worth of disputed intercompany claims. The Debtors also displaced their previously entrenched management Windmill Management, LLC ("Windmill"), which was viewed by many investors (and DB) as prerequisite to any consensual exit. Moreover, since the filing of the Debtors' Plan: (a) the Debtors have selected a permanent asset manager (the retention of which will be submitted for the Court's approval); (b) the Debtors have selected a broker to market their significant life portfolio assets, the value of which will accrue to the Debtors' estates; (c) the Debtors have reached agreement in principle with Topwater and other onshore investors regarding disputed, prepetition redemption requests; (d) the Debtors have selected an expert who will provide updated appraisals of the Debtors' assets, and, if necessary,

testify in support of confirmation of the Debtors' Plan; and (e) the Debtors' settlement with Windmill became effective. These developments ensure the Debtors' ability to successfully emerge from bankruptcy under the Debtors' Plan. The Plan Proponents should be permitted to prosecute confirmation of their plan without further delay.

**B. The Debtors' Disclosure Statement Provides Adequate Information**

5. The Debtors' Disclosure Statement provides adequate information for DB and other creditors of the Debtors to make an informed decision to vote for or against the Debtors' Plan. It is axiomatic that "what constitutes adequate information is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D. NY 1988); see *Kirk v. Texaco, Inc.,* 82 B.R. 678, 682 (S.D.N.Y. 1988) (quoting H.R. Rep. No. 595, at 224, 408-409 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News, 5963, 6183-6184, 6365); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985); *First Am. Bank of NY v. Century Glove Inc.*, 81 B.R. 274, 278 (D. Del. 1988); see also, *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988); *In re Monroe Well Service, Inc.*, 80 B.R. 324, 330-331 (Bankr. E.D. Pa. 1987). Since DB has obviously decided it is unhappy with the substance of the Debtors' Plan, it cannot now claim that the disclosure statement provides insufficient information upon which to make that very decision. See *In re Broad Assocs. Ltd. P'Ship*, 1989 Bankr. LEXIS 2248 *5 (Bankr. D. Conn. Dec. 29, 1989) ("Thus, it is parenthetically observed that the purpose of Pacific's objection to the adequacy of the amended disclosure statement is obscure, since Pacific has already decided to reject the amended plan, as evidenced by its December 6 objection, and therefore has no need for a disclosure statement to guide its decision.") The Court should also evaluate the credibility of

DB's argument that it lacks adequate information upon which to make an informed judgment about the Plan in light of the unique position it occupies relative to the Debtors.  Both before and after these proceedings began, among other disclosures made to DB the Debtors have provided most of their material business records to a "back-up servicer" selected by DB and, upon information and belief , affiliated with DB .. In short, DB's claim of inadequate disclosure is contrived and its real issue is with the  Debtors' Plan itself.

      6.      The Debtors are a group of hedge funds that hold assets with a value far in excess of the claims against their estates.  The basis of the Debtors' Plan is that the Debtors' assets will be pooled and transferred to a new entity, SC Management (see Debtors' Plan § 6.01), which will selectively and prudently liquidate such assets (plus some assets of non-debtor affiliates) over time in a manner that will maximize the value for the benefit of all parties while satisfying in full all payment obligations to secured and unsecured creditors under the Debtors' Plan. Although payments to creditors will be made over time, the Debtors' Plan does so to afford SC Management the opportunity to liquidate the Debtors' assets for their fair market value and avoid liquidating assets in a down market solely to expedite payment of DB's oversecured claims, to the detriment of other creditors and investors in the funds.  The four-year plan horizon is not dependent on operations that may generate negative returns and jeopardize the payments to be made under the Plan.

      7.      The Debtors' Disclosure Statement identifies: (a) the assets that will be administered and liquidated to satisfy claims, (b) the classification of claims and interests under the Debtors' Plan, and (c) the manner in which distributions of such property and proceeds will be made.  The information provided is sufficient to allow any creditor to determine whether to vote for or against the Debtors' Plan (essentially to determine whether payment in full in four

years, or earlier if market conditions improve, is acceptable). The Debtors' Disclosure Statement is adequate because, as previously stated by this Court, it "states the treatment each class of claims will receive under the [Debtors' Plan], which is the critical information they need to decide whether or not to accept it." *Broad Assocs.* at 7.

8. The alleged deficiencies in the Debtors' Disclosure Statement raised in the DB Objection and the Art Capital Objection can be dismissed summarily.

9. First, DB's objections that the Debtors' Plan is not feasible (DB Objection at ¶ 19) are premature and properly heard at the hearing to confirm the Debtors' Plan. *See In re Broad Assocs.* at 6-7. As this Court has observed, "[A] disclosure statement is not intended to be the primary focus of litigation in a contested chapter 11 proceeding, and care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing." *Id.* (internal citations omitted).

10. Second, DB's objection to lack of a detailed "liquidation analysis" (DB Objection at ¶ 31) misses the point. The purpose of a liquidation analysis is to demonstrate that no creditor will receive less under a proposed plan than it would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7); *In re EBP, Inc.,* 172 B.R. 241, 246 (N.D. Ohio 1994) (stating that the "liquidation analysis enables creditors to test the proposed plan to see if it meets the requirements of § 1129"). The premise of the Debtors' Plan is payment to all creditors in full with interest, a result which cannot be bettered by a chapter 7 liquidation.[6] The DB Objection suggests that the Debtors' Disclosure Statement must provide comprehensive and detailed information and analysis that supports the Debtors' Plan's promise to pay all claims in full. (See DB Objection at ¶ 7.) This information may be relevant to feasibility and confirmation of the

---

[6] Because all creditors will receive payment in full with interest under the Debtors' Plan, the Debtors' Plan does not violate the absolute priority rule (as alleged in the Art Capital Objection).

Debtors' Plan, but is not relevant to determining the adequacy of the Debtors' Disclosure Statement.

11. Third, DB's objections based on the Debtors' Disclosure Statement's alleged failure to provide financial projections regarding specific assets "owned"[7] by the Debtors is misleading and irrelevant. (See DB Objection at ¶ 17.) Because SC Management will hold or control assets with a value much greater than the payment obligations under the Debtors' Plan and will selectively liquidate its assets to satisfy such obligations, it is irrelevant for purposes of the Debtors' Disclosure Statement which of the Debtors' assets, or assets of their non-debtor affiliates, generate revenue or free cash flow, in what amounts, or when. DB clearly desires this information to prosecute its anticipated objection to the feasibility of the Debtors' Plan and confirmation of its own plan. To the extent that it does not already possess this information, DB can request such information in connection with discovery related to the confirmation hearing.

12. Fourth, DB provides no support for its assertions that the Debtors' Disclosure Statement must: (a) identify post-effective date management, or (b) include projected budgets and cash flows for the reorganized debtors. Moreover, while DB alleges that these defects are fatal to the Debtors' Disclosure Statement, it uses substantially the same mechanisms under the DB Plan and, yet, fails to disclose any such "required" information in the DB Disclosure Statement. For example, although DB objects to the failure of the Debtors' Disclosure Statement to identify a permanent asset manager (DB Objection at ¶ 15), the DB Disclosure Statement does not disclose the identity of the Plan Administrator (as defined in the DB Plan). Similarly, although DB complains that the Debtors' Disclosure Statement does not specifically identify the amount of initial funding or the future cash flows of SC Management (DB Objection at ¶ 13), the

---

[7] As DB well knows due to its extensive diligence and information on the Debtors and their affiliates, the Debtors chiefly own equity interests in affiliated, non-debtor entities and very few hard assets. It is the Debtors' non-debtor affiliates that hold loans, property and other assets that will generate cash.

DB Plan implements essentially the exact same restructuring and funding mechanism and, under the terms of the DB Plan and Disclosure Statement, neither the initial budget for SC Management nor the Marketing Plan must be made available prior to approval of the DB Disclosure Statement. (See DB Plan at §§ 6.04 and 8.02(b).) Finally, although the DB Plan relies upon a budgeting mechanism identical in concept to the budgeting mechanism under the Debtors' Plan (compare, DB Plan at §§ 1.15 and 1.16 to Debtors' Plan at §§ 1.15 and 1.16), the DB Disclosure Statement does not include a Budget or identify Budgeted Expenses (each as defined in the DB Plan), which are precisely the same supposed "omissions" for which DB criticizes the Debtors' Disclosure Statement. (See DB Objection at ¶ 14.)

13. Fifth, DB's objections that the Debtors' Disclosure Statement does not specifically identify the timing and amount of distributions to be made to creditors are also without merit. There is no requirement that a chapter 11 plan (much less a disclosure statement) specifically identify the amount and timing of payments to creditors. Moreover, the Debtors' Plan purposefully gives SC Management flexibility to liquidate assets when market conditions make such a sale prudent (as opposed to sooner at distressed value prices). This strategy allows SC Management to maximize returns to investors and renders it impossible for the Debtors or any other party to determine exactly how, when and at what value future sales will be made and cash realized. Even attempting to project this information may be misleading and would be damaging, because previewing to the market when SC Management may sell assets would artificially depress their value and thus undermine the primary goal of maximizing their value. For these reasons, and because the value of the Debtors' assets so greatly exceeds the amount of claims against the Debtors, DB's objections that that "the Debtors' Disclosure Statement contains no information as to what assets he Debtors intend to sell, when they intend to sell them

or the anticipated proceeds to be realized from these sales" (DB Objection at ¶ 16.) and "no information regarding the Debtors' ability to fund the liquidation throughout the Debtors' Plan's four-year term" (DB Objection at ¶ 18) are misleading and, under these circumstances, irrelevant.

14. The Debtors' Disclosure Statement informs creditors that they will receive payment in full plus interest no later than four years after the effective date of the Debtors' Plan. The Debtors' Plan also provides, under certain circumstances described in the Debtors' Disclosure Statement, (a) for quarterly payments to unsecured creditors and (b) that on the effective date of the Debtors' Plan, DB will receive (i) property in lieu of cash and/or (ii) a secured note that matures four years from the effective date of the plan with a stream of payments tied to SC Management's excess cash flow.[8]

15. Sixth, Art Capital's objection that the Debtors' Plan violates the absolute priority rule because the Debtors' equity holders maintain their equity interests is without merit. As set forth in the Debtors' Disclosure Statement and above, the Debtors' Plan provides for payment in full of all unsecured claims with interest. Art Capital is incorrect when it alleges that unsecured creditors will not be paid in full. (See Art Capital Objection at ¶ 6.) Art Capital seems to confuse the proposed quarterly *pro rata* distributions of $300,000 under the Debtors' Plan, which amount would be distributed *pro rata* to all general unsecured creditors until their claims were satisfied in full with interest (see Debtors' Plan at § 5.06(b)), with a one time payment of $300,000 that would only partially satisfy such claims.

16. Seventh, Art Capital also objects to a provision of the Debtors' Plan that encourages unsecured creditors to vote in favor of the plan in exchange for quarterly *pro rata*

---

[8] The excess cash flow concept is substantially identical to the concept that DB uses to pay claims under the DB Plan. (Compare Debtors' Plan at §5.03(c)(iv) to DB Plan, Exhibit C ¶e.

payments to be made prior to satisfaction of DB's secured claims. While Art Capital perhaps fails to appreciate that this provision of the Debtors' Plan can only inure to its benefit (to the extent it may be an unsecured creditor), it certainly fails to provide any legal basis for this objection, which is without merit. Alternative plan treatments that encourage creditor acceptance of a plan are permissible so long as rejection does not nullify all distributions to the rejecting class, particularly where, as here, claims in the rejecting class are still paid in full before any distribution is made to junior classes. *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 716-17 (Bankr. S.D.N.Y. 1992); *see also* Debtors' Plan, §§ 5.08(d)(ii), 5.10(b), & 5.10(c) (mandating full payment of unsecured claims in Class 6 before any distributions may be made to Redemption Claimants and interest holders in Classes 8 and 10).

C. **There is no Need or Benefit to Adjourning the Hearing on the Debtors' Disclosure Statement**

17. The DB Objection articulates no valid basis to adjourn the hearing on the Debtors' Disclosure Statement, and none exists.

18. Neither additional time nor additional disclosure would remedy the purported "defects" alleged in the DB Objection because the objection is not based on a true lack of information. DB: (a) has had extensive knowledge of the SageCrest assets since it provided the Debtors with secured financing, (b) receives the Debtors' monthly operating reports, (c) receives and approves monthly budgets, (d) has received voluminous documents responsive to previous document requests (including documents recently delivered to facilitate DB's own valuation of assets of the Debtors and their affiliates), and (e) holds or controls many of the Debtors' documents as custodian under its prepetition credit agreements with the Debtors. DB clearly possesses more than enough information to evaluate the Debtors' Plan and determine whether or not to vote for the plan. *See In re Copy Crafters Quickprint, Inc.*, at 979 (noting that "in

ascertaining the adequacy of information in a disclosure statement, the bankruptcy court must consider each creditor's access to outside sources of information").

19. Although couched in terms of inadequate disclosure, DB's asserted objections to the Debtors' Disclosure Statement are, in fact, objections to confirmation of the plan that should be considered at the hearing to confirm the Debtors' Plan, not before. The obvious purpose of the DB Objection is to delay consideration of the Debtors' Plan (which DB opposes) in order to give DB time to pursue confirmation of the DB Plan (which it prefers). (See Motion to Adjourn at ¶ 18.) The Plan Proponents should not be penalized by delay because DB waited more than five months after expiration of exclusivity in these cases, elected to file a competing plan on the eve of the Plan Proponents' confirmation process, and now seeks a dual-track confirmation process. DB's decision to file its plan now, as opposed to any time in the last five months, strongly suggests that it is motivated by a desire to delay these proceedings in an attempt to leverage superior treatment under the Debtors' Plan. The Court should not reward such tactics.

20. This Court also should not delay the Debtors' confirmation process to allow DB to play catch up because the DB Plan is unconfirmable on its face. The DB Plan impermissibly expands the pool of assets that secure DB's secured claims to include assets of the Debtors that currently do not secure its claims. (See DB Plan at §1.31.) Moreover, the DB Plan requires the Debtors' non-debtor offshore affiliates to contribute and pledge assets to the restructuring. *Id*. These entities have indicated that they will not agree to contribute their assets under the terms of the DB Plan.[9] Finally, the DB Plan imposes an impermissible and non-consensual *de facto* merger of the SageCrest onshore and offshore entities, which are separate and distinct entities with separate and distinct creditors and investors. Absent the consent of the Debtors and their

---

[9] Under the Debtors' Plan, however, certain of the Debtors' non-debtor affiliates have agreed to: (1) contribute to SC Management for liquidation and distribution under the Debtors' Plan assets with a fair market value estimated to be $20 million, and (2) pledge these assets to further secure DB's already oversecured claims.

equity holders (which DB will not obtain) or substantive consolidation of the Debtors' estates (which DB has not proposed), there is no basis for the consolidation of the Debtors' estates required to confirm the DB Plan. The DB Plan is patently unconfirmable and not a viable alternative to the Debtors' Plan, thus there is no benefit to delaying confirmation of the Debtors' Plan to allow DB to pursue its confirmation.

21. Accordingly, and for the reasons set forth herein, it is appropriate for this Court to approve the Debtors' Disclosure Statement and enter an order scheduling a hearing to consider confirmation of the Debtors' Plan and governing related discovery.

## II.  Conclusion

22. The Plan Proponents respectfully request that the Court enter an order (a) overruling the DB Objection and the Art Capital Objection, (b) denying the DB Motion, (c) approving the Debtors' Disclosure Statement, and (d) granting the other relief requested in the Debtors' Motion to (I) Approve Proposed Disclosure Statement, (II) Approve Procedures to Solicit Acceptances of Proposed Joint Plan, and (III) Schedule a Hearing and Establish Notice and Objection Procedures for Confirmation of Proposed Joint Plan [Docket No. 1141].

Respectfully submitted this 24th day of September, 2010,

**SAGECREST II, LLC**
**SAGECREST FINANCE, LLC**
**SAGECREST DIXON, INC.**

By: /s/ *Douglas J. Buncher* (PHV 02880)
    One of its attorneys
NELIGAN FOLEY LLP
Patrick J. Neligan, Jr. (TX Bar No. 14866000)
Douglas J. Buncher (TX Bar No. 03342700)
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
(214) 840-5300
(214) 840-5301 (fax)

ZEISLER & ZEISLER, P.C.

**SAGECREST HOLDINGS LIMITED**

By: /s/ *Neil Y. Siegel*
    One of its attorneys

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Laurence May (LM-9714)
Neil Y. Siegel (NS-3216)
900 Third Avenue, 16th Floor
New York, NY  10022
(212) 752-8000
(212) 752-8393 (fax)

James Berman
558 Clinton Avenue
Bridgeport, CT 06605
(203) 368-4234 x 233
(203) 367-9678 (fax)

NEUBERT, PEPE & MONTEITH, P.C.
Douglas Skalka, Esq.
195 Church Street, 13th Floor
New Haven, CT 06510-2009
(203) 821-2000
(203) 821-2009 (fax)

**OFFICIAL COMMITTEE OF**
**EQUITY SECURITY HOLDERS OF**
**SAGECREST II, LLC**

By: /s/ *Dennis S. Meir*
       One of its attorneys

KILPATRICK STOCKTON LLP
Dennis S. Meir (GA Bar No. 501100)
Paul M. Rosenblatt (GA Bar No. 614522)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500
(404) 815-6555 (fax)


Reid and Riege, P.C.
Eric Henzy
195 Church Street, 15th Floor
New Haven, CT 06510
(860) 240-1081
(860) 240-1002 (fax)