**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

| | |
|---|---|
| In re:<br><br>SageCrest II LLC,<br>SageCrest Finance LLC, and<br>SageCrest Holdings Ltd.,<br><br>                    Debtors. | Chapter 11<br><br>Case No. 08-50754 |
| SageCrest II LLC,<br>SageCrest Finance LLC, and<br>SageCrest Holdings Ltd.,<br><br>                    Movants,<br><br>                  v.<br><br>Equal Overseas Consulting Ltd.,<br><br>                  Respondent. | Contested Matter<br><br>Related Docket Nos. 1909, 2023, 2029, 2133, 2136, 2137, 2167, 2168, 2169, 2221, 2225, 2226, 2254, 2255, 2284, 2298, 2299, 2300<br><br><br>**SUBMISSION PURSUANT TO<br>FED. R. CIV. P. 44.1 REGARDING<br>CANADIAN LAW ISSUES** |

      This memorandum is submitted on behalf of the SageCrest Liquidating Trust (the "**Trust**") by Borden Ladner Gervais LLP, Canadian counsel to the Trust, in connection with the objection by the Trust to a claim filed by Equal Overseas Consulting Ltd. ("**Equal**") in the chapter 11 proceeding of, inter alia, SageCrest II, LLC ("**SageCrest**").  The memorandum is submitted consistent with Rule 44.1 of the Federal Rules of Civil Procedure which we have been advised by the Trust's United States counsel, provides that should there be an issue before a United States federal court of a foreign country's law, the court may consider any relevant material or source, whether or not admissible as a matter of the applicable rules of evidence.

      The specific purpose of this memorandum is to set forth our view as to how a Canadian Court would view the claim filed by Equal should it have been filed in an insolvency proceeding under the Companies Creditors Arrangement Act (the "**CCAA**") or the Bankruptcy and Insolvency Act (the "**BIA**"), the two Canadian insolvency statutes which are imperfect analogies to chapter 11 and chapter 7 of the United States Bankruptcy Code.  As explained hereafter, our views are informed by the facts and assumptions set forth in this memorandum.

**Borden Ladner Gervais LLP**

      Borden Ladner Gervais LLP (BLG) is Canada's largest national law firm, with more than 750 lawyers, intellectual property agents and other professionals in Vancouver, Calgary, Toronto, Waterloo Region, Ottawa and Montreal. The BLG Insolvency and Restructuring (I&R) Group carries on one of Canada's leading restructuring, workout, bankruptcy and insolvency practices. The core of the I&R Group comprises leaders in the field with decades of restructuring

experience. Members of the I&R Group have received national and international recognition for their expertise by *Chambers Global – The World's Leading Lawyers*, *IFLR*, and *Lexpert©*. The 2014 edition of *The Best Lawyers in Canada©* ranks the Firm number one in Canada in Insolvency and Financial Restructuring, with 10 lawyers listed. Eight members of the I&R Group are members of the Insolvency Institute of Canada, a by-invitation national association of insolvency and restructuring professionals. Members of the I&R Group regularly appear before superior and appellate courts (including the Supreme Court of Canada) in insolvency, bankruptcy and restructuring proceedings, including contested bankruptcy, receivership, liquidation and realization proceedings; sales process hearings; sale approval motions; classification hearings; priority issues; plan sanction and approval motions as well as preference, fraudulent conveyance, undervalue, reviewable transaction, oppression, alter ego, subordination and related litigation.

**Summary**

In our view, if the facts and circumstances noted herein were presented to a Canadian judge, the conduct of the parties would be found to be inconsistent with the goals and principles underlying a Canadian court's supervised sales process in insolvency proceedings and would be a basis for a finding that there was a lack of good faith dealings in the sales process. Combined with the lack of disclosure to the Court of these parties' activities, the conduct would, in our view, lead the Court to conclude that the activity was contrary to the administration of justice.

We are also of the view that the defences of *ex turpi causa* (and/or its companion in *pari delicto*) are applicable with respect to the claim of Equal and that a Canadian Court would likely accept those defences in connection with a finding that the Consulting Agreement and the Settlement Agreement (as hereafter defined) are illegal contracts and unenforceable in a Canadian insolvency proceeding. The result of this would be that any claims arising under the Consulting Agreement or the Settlement Agreement would not be provable (i.e. "allowed") for the purposes of the CCAA or the BIA.

**Background**

In connection with our review of the issues noted above, we reviewed the following documents (the "**Documents**").

1. The endorsement of Justice Campbell, dated October 6, 2006 (the "**October 6 Endorsement**") in the CCAA proceedings relating to 1587930 Ontario Limited and 2031903 Ontario Limited (together, the "**Canadian Debtors**") before the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") having Court File No. 05-CL-5864 (the "**CCAA Case**") with respect to a sale approval motion heard by the Court on September 26, 2006 and October 3, 2006;

2. The Fourteenth Report of RSM Richter in its capacity as court appointed monitor in the CCAA Case (the "**Monitor**") dated October 18, 2006 together with the appendices to that report (the "**14th Report**");

3. An unsigned commitment letter dated August 27, 2006 (the "**August 27 Letter**") from Hermes Partners Mezzanine Capital S.A. as loan advisor to and on behalf of MP0906HP addressed to "MM Soorty/Cocov/Equal Overseas Investment S.A." ("**Cocov/Soorty**")

2

        together with an attached term sheet for a first senior secured term loan in the amount of C$30 million (the "**Commitment Letter**" and "**Term Sheet**" respectively). The borrower named in the Term Sheet is a special purpose company to be controlled by Soorty, Cocov and Equal Overseas Investments S.A.;

4. A letter dated September 26, 2006 from Societe Centrale Des Bois et Scieries de la Manche S.A. addressed to Zoran Cocov and Al Soorty, stating that "we have decided to support your offer to purchase the property known as the Constellation Hotel, and are agreeing to assign our unconditional financing offer of C$ 30mlns to your group for a closing on or about October 25th 2006" (the "**September 26 Letter**"). (While it is not clear from the September 26 Letter, we understand that it refers to the Commitment Letter and the Term Sheet.)

5. A "Motion Record" dated September 19, 2006 submitted in the CCAA Case on behalf of Equal's affiliates, Sofon Investissements SARL, Sofon Immobilier SAS and Hermes Partners SCS, pursuant to which they petitioned the CCAA Court for an order to require the Canadian Debtors to accept their offer to purchase the Constellation Hotel.

6. A settlement agreement dated October 17, 2006 (the "**Settlement Agreement**") between Jean-Daniel Cohen ("**Cohen**"), Hermes Partners SCS, Sofon Investissements SARL and Sofon Immobilier SAS, Sagecrest II, LLC, by its manager Windmill Management LLC ("**SageCrest**"), and Sagecrest Dixon Inc. ("**Dixon**").

7. A consulting agreement dated November 2006 (the "**Consulting Agreement**") between SageCrest, Dixon, and Equal.

8. A Proof of Claim dated September 22, 2008 filed by Equal in the chapter 11 proceedings of SageCrest, *et. al.* in respect of a claim under the Consulting Agreement and/or the Settlement Agreement.

9. Equal's Opposition to the Debtor's Claim Objection dated February 7, 2012, filed in the chapter 11 proceedings of SageCrest, *et. al.*, and the exhibits thereto.

Based on our review of the Documents and the information provided to us by the Trust and its agents, we understand the following:

On April 22, 2005, the Canadian Debtors commenced proceedings under the CCAA. One of the Canadian Debtors owned the Constellation Hotel (the "**Hotel**" or the **Constellation Hotel**"). A sales process was approved by the CCAA Court for the sale of the Hotel.

According to the October 6 Endorsement, the Canadian Debtors had filed a plan of arrangement (the "**CCAA Plan**") which involved the sale of the Hotel to SageCrest (or, more particularly, the affiliated entity, Dixon). We understand that SageCrest was the Canadian Debtors' only secured creditor and was owed approximately $36 million.

Based on, *inter alia,* the August 27 Letter and the September 26 Letter, Messrs. Cocov and Soorty represented to the Court that they had obtained a financing commitment for approximately $30 million from an affiliate of Equal. The funds were to be used to finance the

3

purchase of the Hotel which was being sold in the Canadian Debtors' court-supervised sales process.

The October 6 Endorsement indicates that SageCrest submitted an offer to purchase the Hotel and that SageCrest's offer appears to have been made by way of credit bid and cash. A portion of the cash was to fund the CCAA Plan for the benefit of the Debtors' unsecured creditors.

The October 6 Endorsement further indicates the CCAA Plan was opposed by the Debtors' unsecured creditors who apparently requested that the Court approve the proposed offer by Cocov/Soorty to purchase the Hotel. The Cocov/Soorty offer appears to have been in excess of SageCrest's offer.

The October 6 Endorsement further indicates that the SageCrest offer was supported by the Monitor appointed in the CCAA Case. However, in light of the possibility that the Cocov/Soorty offer might provide better recoveries for unsecured creditors, Justice Campbell decided not to approve the SageCrest offer at that time, but to keep the sales process alive for a short time to allow SageCrest, Cocov/Soorty and one other prospective purchaser (Hermes an affiliate of Equal) to submit final offers for the Hotel. The October 6 Endorsement also provided:

> [5] When this matter was argued on September 26, the Court expressed concern with respect to the certainty of terms and firmness of the Soorty/Cocov offer, as counsel on their behalf requested up to 30 days to do due diligence, citing lack of cooperation on the part of Sagecrest and the Monitor to information considered vital to firming up their offer.
>
> [19] It is with some reluctance that I have concluded that in the circumstances, option 3 is the most appropriate at this time. I am mindful that this is a CCAA proceeding, not an auction process. Both sides have pointed to the decision of the Court of Appeal in Soundair as setting out the guiding principles. The factual distinction between this case and the facts in Soundair is that here there is at least the potential for a much-improved return for unsecured creditors.
>
> [22] A CCAA proceeding is different from an ordinary civil action and trial. The process itself anticipates dynamic and "real time" process that should only be stifled when to do otherwise would operate as a significant prejudice to a creditor or group of creditors.
>
> [23] What is of greater significance is whether the offer process should be allowed to continue. I have concluded that in these somewhat unique circumstances that it should.
>
> [24] In addition, Sagecrest has become in effect a "stalking horse" with its firm offer and should not be prejudiced by what is both a last minute and still somewhat uncertain position.
>
> [25] In addition, the unsecured creditors should not be deprived of the possibility of Court consideration of an improved Sagecrest offer.
>
> [26] For the above reasons, I am satisfied that the process should be re-opened for a very short timeframe. As a result, I do not think it appropriate to comment on the present offers, except to say that the Soorty/Cocov offer does appear on the surface to offer the potential for greater recovery for unsecured creditors – a matter that should receive further airing as against which Sagecrest may or may not do.

In summary, Campbell J. commented that, in re-opening the sales process:

49856/0001-9975213v2

(a) The process would not be conducted in a way that would prejudice creditors;

(b) The creditors should not be deprived of an improved offer from Sagecrest; and

(c) The Cocov/Soorty offer appeared on its face to be a superior offer.

We have been advised that Cohen has testified under oath that while the process set by Justice Campbell was extant, he was contacted by a representative of Sagecrest, Mr. Jeffrey Gwin of Creative Management LLC, and asked the circumstances needed for Hermes to withdraw its own bid and its financing support for the Cocov/Sorty bid so as not to be in competition with the SageCrest bid. The next day the Settlement Agreement was entered into between Equal, SageCrest and Dixon, and dated as of October 17, 2006. Thereafter (in November 2006), the Consulting Agreement was executed by SageCrest, Dixon and Equal, as contemplated by the Settlement Agreement.  The terms of the Settlement Agreement and the Consulting Agreement were negotiated as a result of the arrangements struck by Gwin, on behalf of Sagecrest, and Cohen to ensure that no competing bid would materialize in the re-opened sales process.

According to the 14th Report of the Monitor, following the reopening of the sales process by Justice Campbell no offers were made for the purchase of the Hotel save for the previous offers made by Dixon and Cocov/Soorty.  The 14th Report recommended the Dixon offer for a variety of reasons, noting that Cocov/Soorty's principal financier "has advised that it has withdrawn its term sheet/support" and is "no longer will to finance" the Cocov/Soorty offer.  No further explanation for Hermes/Cohen's decision appears to have been provided.

The communications between Sagecrest and Cohen and the existence of the terms of the Settlement Agreement (and the Consulting Agreement) were not disclosed to the Court (in particular, Justice Campbell). Campbell J. subsequently approved the sale of the Hotel to Dixon.

**Sales Processes in Insolvency Proceedings in Canada**

As a preliminary matter, it is useful to provide some background on the guiding principles followed by the CCAA Court in the conduct of a sales process in an insolvency proceeding in Canada. The CCAA Court has indicated that its primary concern is protecting the interests of creditors, with an important secondary concern being the integrity of the process. The leading case concerning the conduct of a sales process and the tests that will be applied on a motion for approval of a sale of assets by a Court Officer is the Ontario Court of Appeal decision in *Royal Bank of Canada v. Soundair Corp.* (1991) 7 C.B.R. (3d) 1 (Ont. C.A.) ("*Soundair*").  In that case, Galligan, J.A., confirmed that the factors to be considered by the Court on a motion for approval are as follows:

"1.    It should consider whether the receiver has made a sufficient effort to get the best price and has not acted improvidently.

2.    It should consider the interests of all parties.

3.    It should consider the efficacy and integrity of the process by which offers are obtained.

5

    4.    It should consider whether there has been unfairness in the working out of the process."

*Soundair* involved a sale by a court-appointed receiver. Subsequent decisions have made it clear that the principles described in *Soundair* apply to sales processes undertaken in CCAA proceedings. This is exemplified by Justice Campbell's reference to *Soundair* in the October 6 Endorsement.

Subsequent to the *Soundair* decision and the October 6 Endorsement, the BIA and the CCAA were amended to incorporate the *Soundair* principles. For example, the CCAA now provides that a debtor may not sell property out of the ordinary course of business without court authorization. On an application for approval, subsection 36(3) of the CCAA requires the CCAA Court to consider certain specified factors, among other things:

    (3)    In deciding whether to grant the authorization, the court is to consider, among other things,

        (*a*)    whether the process leading to the proposed sale or disposition was reasonable in the circumstances;

        (*b*)    whether the monitor approved the process leading to the proposed sale or disposition;

        (*c*)    whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;

        (*d*)    the extent to which the creditors were consulted;

        (*e*)    the effects of the proposed sale or disposition on the creditors and other interested parties; and

        (*f*)    whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

Canadian Courts have said that the *Soundair* principles continue to apply and, in many respects, overlap with the factors listed in section 36 of the CCAA (see *Re White Birch Paper Holding Co.,* (2010) 72 C.B.R. (5th) 49 (Que.S.C.) and *Re Canwest Publishing Inc./Publications Canwest Inc.,* (2010) 68 C.B.R. (5th) 233 (Ont. S.C.J.).

The focus of most reported decisions about the approval of sales processes, stalking horses bids and sales is upon the efficacy of the process, the effect on stakeholders and value maximization. There is little commentary from the Canadian Courts with respect to analyzing the circumstances that would be called into question in connection with concerns regarding the "integrity of the process" or any "unfairness in the working out of the process".

6

In *Re PCAS Patient Care Automation Services Inc.* (2012), 91 C.B.R. (5th) 285 (Ont. S.C.J), the Court described the factors to be taken into account in considering whether to approve a sales process. The Court concluded that the factors to be considered were essentially the same as those set out in *Soundair* and, summarized them as follows:

> "(i)    the fairness, transparency and integrity of the proposed process;
>
> (ii)   the commercial efficacy of the proposed process in light of the specific circumstances facing the receiver; and,
>
> (iii)  whether the sales process will optimize the chances, in the particular circumstances, of securing the best possible price for the assets up for sale."

**Integrity of the Sales Process**

There are two important aspects to the consideration of Sagecrest's communication with Cohen, Equal's representative, regarding (a) the suggestion to withdraw its competing bid and join Sagecrest in a collaborative effort; and (b) the request to withdraw its financial support of the Cocov/Soorty bid. We are not aware of any Canadian decision where the court has been faced with evidence of undisclosed collusion in the midst of a court supervised sales process between prospective purchasers or bidders or between persons aligned with them in proceedings in a bankruptcy, receivership or reorganization. There is no provision in the BIA or the CCAA that is similar to section 363(n) of the United States Bankruptcy Code or that addresses those issues. There are, however, Canadian cases where competing bidders have subsequently joined forces to bid collaboratively on assets that are for sale in a restructuring process, the most significant (and recent) of which is the sale of the intellectual property in the Nortel CCAA proceedings. Here, however, there does not appear to be any disclosed joint or collaborative bid; rather one bidder withdrew from the process in return for receiving considerations from a competing bidder.

In our view, Canadian Courts will look to the motives behind the parties' conduct and will consider what disclosures have been made to assess whether the integrity of the sales process has been compromised. The fact that previously competing parties have come to work on a collaborative basis in the sales process is not, in and of itself, fatal to the integrity of the sales process. Courts have not clearly articulated what would constitute a permissible collaborative effort, but the agreement between SageCrest and Equal does not seem to constitute a collaboration.

There is considerable case authority demonstrating that the Canadian courts will carefully guard and maintain the integrity of a court supervised sales process. On many occasions Canadian Courts have sacrificed the possibility of a better recovery for creditors through an increased price (typically through a late bid) in order to preserve the reliability and integrity of a sales process both for itself and for future cases. As noted above, *Soundair* was such a situation. In that case, the Ontario Court of Appeal confirmed that a fundamental aspect of the integrity of the process is that the prospective purchaser must be acting in good faith in its dealings within the process. Good faith has not been defined with any meaningful precision but Day J. used these words to clarify the term in *Viereit Inc. v. Panthanky* (1996), 42 C.B.R. (3d) 211, (Ont. S.C.J.):

7

> 30 The words "in "good faith" are often used in statutes but rarely defined. An act is made in good faith "when it is made honestly and with no ulterior motive" *Central Estates (Belgravia) Ltd. v. Woolgar*, [1971] 3 All E.R. 647 at 649 , C.A. per Lord Denning MR.

In the case of the sale of the Hotel in the CCAA proceeding, the Court was informed that Hermes and MP had made a commitment to provide financing to Cocov/Soorty in connection with an offer that was viewed by Justice Campbell in the October 6 Endorsement to be a superior offer for the creditors. The Court also knew that Equal affiliates had presented their own independent offer to acquire the Hotel and Mr. Cohen has testified that his desire was to keep that offer open should the offer of Cocov and Soorty prove unfeasible.  Subsequently, Hermes withdrew from the agreement – and chose to abandon the independent proposal to acquire the Constellation Hotel – in return for payments from SageCrest. This is a causal factor in Cocov/Soorty losing the opportunity to participate in a substantive way in the sales process (with the consequent potential prejudice to the Debtors' unsecured creditors). The parties, we have been advised, failed to disclose the events that lead to the withdrawal of the Cocov/Soorty and the Hermes bids. Those failures can be interpreted to be, or at least create, a fundamental deficiency in the integrity of the sales process for the Hotel.  It is our view that, if the facts noted above were disclosed to Justice Campbell at the time that the motion for approval of the Sagecrest offer came back before the Court, it is doubtful that the Court would approve the Seacrest offer. It is also likely in our view that the disclosure of Sagecrest's participation in the events that lead to the Settlement Agreement and the Consulting Agreement, and the consequent withdrawal of competing offer(s) would be considered by the Court to have been an interference with the administration of justice and to have created a serious question regarding the good faith dealings of the parties in the sales process.  That is particularly so when one considers the October 6 Endorsement and the concerns expressed by Justice Campbell with respect to the integrity of the sales process.

In our view, a Canadian judge presiding over a CCAA sales process would not wish to reward (and certainly was capable of sanctioning) any person who participated in activities that were intended to eliminate any competition for the purchase of the Hotel and to prevent the submission of an offer that the Court had commented (albeit in a preliminary manner) might be better for the unsecured creditors than the only other existing offer. To put the matter differently, the conduct of both Hermes and Sagecrest is entirely inconsistent with the goals and principles underlying a Canadian court supervised sales process in insolvency proceedings and would be a foundation for a serious question about whether there were good faith dealings in the sales process.

**Claims Provable**

We have also considered the impact of the parties' conduct on the provability of a claim based on the Settlement and Consulting Agreements in an insolvency proceeding in Canada.

Pursuant to section 121(1) of the BIA, the following claims are provable:

> **121.** (1) All debts and liabilities, present or future, to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the bankrupt's discharge by reason of any

8

49856/0001-9975213v2

obligation incurred before the day on which the bankrupt becomes bankrupt shall be deemed to be claims provable in proceedings under this Act.

In order to be provable, a claim must be recoverable by legal process. (Houlden & Morawetz, *Houlden and Morawetz Bankruptcy and Insolvency Analysis*, §G36.) Hence, if a claim could not be maintained in the ordinary courts, the claim will not be provable. The proof of claim provisions of the CCAA incorporate the BIA provisions.

Accordingly, the main issue to consider is whether the Settlement Agreement and the follow-on Consulting Agreement are contracts that are unenforceable such that a claim of Equal would not be recoverable by legal process in Canada.

**Unenforceable Contracts under Canadian Law[1]**

There are several applicable bases for a contract under Canadian law to be rendered unenforceable. A contract may be, or become, invalid for a variety of reasons including uncertainty, mistake, incapacity, fraud, duress, undue influence or unconscionability. A contract for an illegal purpose or against public policy, or for a purpose regarded by the law as improper, though it conforms to all other requirements of a valid transaction, will also be void.

A contract may be illegal by virtue of statute or by operation of the common law. When a contract is tainted with illegality in one form or another, it may not be possible to enforce some or all rights which would otherwise be available.

A contract may be illegal by operation of statute if:

1. the statute forbids the making of such a contract; or

2. the statute makes it unlawful to perform a contract in particular ways or to perform it without meeting specific conditions.

At common law, contracts may be illegal if:

1. The purpose of the contract is against the law (e.g. contracts to commit a crime and contracts involving the deliberate commission of a tort).

2. The purpose of the contract is to promote immorality.

3. The purpose of the contract is to interfere with the administration of justice.

4. The purpose of the contract is to interfere with marriage.

---

[1] See generally 6th ed.: G.H.L. Fridman, The Law of Contract in Canada (Toronto: Thomson Reuters;, 2011), at 337-419.

9

49856/0001-9975213v2

5. The contract involves corruption and bribery (to the extent that these are not regulated by statute).

6. The contract is in restraint of trade.

A contract which is illegal either at common law or under statute is void and unenforceable by either party. The consequence of such a contract is often expressed in one of two ways. The first is *ex trupi causa non oritur actio*, which means that a claim cannot be founded upon a base cause, namely the breach of a statute or a contract that is against public policy. The second is in *pari delicto potior est condition defendentis*, which means that, where the parties are equally at fault in their participation in an illegality, the position of the defendant is the superior.

### *Ex Turpi Causa*

The leading Canadian case on *ex turpi causa* is the Supreme Court of Canada decision in *Hall v. Hebert,* [1993] 2 S.C.R. 159. In that case, McLachlin J., (as she then was) for the majority said the following:

> The power expressed in the maxim *ex turpi causa non oritur actio* finds its roots in the insistence of the courts that the judicial process not be used for abusive, illegal purposes. Thus Professor Gibson, in "Comment: Illegality of Plaintiff's Conduct as a Defence" (1969), 47 *Can. Bar Rev.* 89, at p. 89, writes:
>
>> Few would quarrel with the proposition that a man who murders his wealthy aunt should not be allowed to receive the proceeds of her life insurance as beneficiary, or that two robbers who disagree over the division of the spoils would not be allowed to settle their dispute in a court of law. <u>It was to deal with flagrant abuses like these that English courts developed the principle expressed in the maxim: *ex turpi causa non oritur actio* -- no right of action arises from a base cause.</u> [Emphasis added.]
>
> The use of the doctrine of *ex turpi causa* to prevent abuse and misuse of the judicial process is well established in contract law and insurance law, where it provokes little controversy.

In his concurring reasons, Gonthier, J. provided the following useful summary:

> I have had the benefit of the reasons of Justices Cory and McLachlin. I concur in their disposition of the case and agree for the reasons which they give that on the facts of this case the respondent had a duty of care and a defence of *ex turpi causa* was not open to him, be it viewed as such or as a matter of public policy. I also share their reasons inasmuch as they support a restricted and more carefully circumscribed application of the defence of *ex turpi causa* in tort cases. Even though it has given rise to some confusion in the past, its principle, properly understood in the light of the examples of its proper application given by my colleagues, and their comments, is in my view valid and has an important role to play in the limited circumstances to which it applies. It reflects one facet of public policy which is best captured in the statement of its purpose adopted by Justice Sopinka in his reasons in *Norberg v. Wynrib*, [1992] 2 S.C.R. 226, at p. 316, from those of Taylor J. in *Mack v. Enns* (1981), 30 B.C.L.R. 337 (S.C.), at p. 345:

10

> The purpose of the rule today must be to defend the integrity of the legal system, and the repute in which the courts ought to be held by law-abiding members of the community.

> While this statement is broad in potential scope, it is so by reason of the nature of the concept which it expresses. I view my colleagues' comments as helpful guidelines for the application of the principle but, in my opinion, it is not appropriate to define exhaustively a priori the circumstances or particular grounds for its application.

We note that there are some limited exceptions to the ideas of *ex turpi causa* and *in pari delicto*, resulting in certain situations in which an illegal contract may not stand in the way of some kind of remedy or recovery – yielding the result that a party may not be deprived of rights or claims because that party has participated in something which is illegal at common law or by statute. These exceptions are: (1) where the party claiming is less at fault; (2) where the party claiming repents before the contract is performed; and (3) where the party claiming has an independent right to recover (the "**Voiding Exceptions**"). There do not appear to be any facts that provide a basis for the consideration of any of the Voiding Exceptions here.

## In *pari delicto potior est condition defendentis*

*In pari delicto (potior/melior est conditio defendentis)*, Latin for "in equal fault - better is the condition of the defendant" is a legal term used to indicate that two persons or entities are equally at fault, whether the malfeasance in question is a crime or tort.

The phrase is most commonly used by courts when relief is being denied to both parties in a civil action because of wrongdoing by both parties. The phrase means, in essence, that since both parties are equally at fault, the court will not involve itself in resolving one side's claim over the other, and the defendant's position is essentially favored, in the absence of an alternative cause of action that is independent from the tainted claim.

While Canadian Courts have carved out a limited exception to this rule when it is apparent that one party will be unjustly enriched, the application of the exception is to be considered on a case by case basis in light of the "extent of the illegality and the unjust enrichment" In *Tsoi v. Lai* (2012), 34 B.C.L.R. (5th) 207 (B.C.S.C), citing Fridman at 414. When the illegality is central to the claims being advanced, the Canadian Courts will apply the *ex turpi* doctrine - see *Daemore v. Von Windheim* (2011), 200 A.C.W.S. (3d) 627 (B.C.S.C.)

In *Major v. Canadian Pacific Railway* (1922), 64 S.C.R. 367, the Supreme Court of Canada held:

> No action [says *Halsbury's Laws of England*, vol. 7, p. 408], can be brought for the purpose of enforcing an illegal contract either directly or indirectly, or of recovering a share of the proceeds of an illegal transaction, by any of the parties to it. Where the object of a contract is illegal the whole transaction is tainted with illegality, and no right of action exists in respect of anything arising out of the transaction. *In such a case the maxim In pari delicto, potior est conditio defendentis* applies, and the test for determining whether an action lies is to see whether the plaintiff can make out his claim without relying on the illegal transaction to

    which he was a party.

In our view, based on the facts as we understand them, a Canadian Court would apply the principles of *ex turpi causa* and *in pari delicto* to deny enforcement of the Settlement and Consulting Agreements. Both agreements are at the core of the illegal conduct. Equal would stand to profit directly from its own wrongdoing. This is precisely what the *ex turpi causa* doctrine seeks to prevent. Given that the key policy objective underlying the doctrine is that courts are loath to reward people for their own wrongdoing as this would tarnish the integrity of the legal system and introduce inconsistency in the law, from a policy standpoint, the *ex turpi causa* as well as *in pari delicto* defences would be available under the facts as we have outlined them.

Based on the foregoing, we are of the view that the defences of *ex turpi causa* (or its companion in *pari delicto*) would be applicable with respect to the claim of Equal and that a Canadian Court would accept those defences in connection with a finding that the Settlement Agreement and the Consulting Agreement are illegal contracts and, as such, are unenforceable against a debtor in a Canadian insolvency proceeding and would not be provable for the purposes of the CCAA or the BIA.

                                            Respectfully submitted,

                                            Borden Ladner Gervais LLP
                                            Scotia Plaza, 40 King St W
                                            Toronto, ON, Canada  M5H 3Y4

                                            Craig J. Hill
                                            Tel.: 416.367.6156
                                            Fax: 416.361.7301

49856/0001-9975213v2