UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

-----------------------------------------------------------x
In re:                                              :          Chapter 11
                                                    :
SAGECREST II LLC,[1]                                :          Case No. 08-50754 (AHWS)[2]
SAGECREST FINANCE LLC,                              :          Case No. 08-50755 (AHWS)
SAGECREST DIXON INC.,                               :          Case No. 08-50844 (AHWS)[3]
                                                    :
                    Debtors.                        :          Jointly Administered
-----------------------------------------------------------x

*Appearances:*

Laurence May, Esq.                          :          For the Liquidating Trustee
Cole, Schotz, Meisel, Forman                :          of the SageCrest Liquidating Trust
900 Third Ave., 16th Fl.                    :
New York, NY                                :

Kevin Nash, Esq.                            :          For Claimant, Equal Overseas
Goldberg, Weprin Finkel Goldstein           :          Consulting, Ltd.
1501 Broadway, 22nd Fl.                     :
New York, NY                                :

MEMORANDUM OF DECISION
ON DEBTOR'S OBJECTION TO CLAIM
OF EQUAL OVERSEAS CONSULTING, LTD.

Debtor SageCrest II, LLC ("SCII")[4] objects to the claim of Equal Oversea Consulting,

Ltd. ("Equal"). For the reasons that follow, the objection is sustained.

---

[1] Consistent with SageCrest II, LLC's December 13, 2011 Confirmed Plan ("Plan"), the SageCrest Liquidating Trust ("Trust") was established, all of the assets of the debtors were transferred to the Trust, and a liquidating trustee was appointed ("Trustee") to administer the Trust. As a result, the Trustee has replaced SCII as the party objecting to Equal Overseas Consulting, Ltd.'s claim. For convenience, the Court will continue to refer to SCII as the objecting party.

[2] For convenience, Case No. 08-50754 will be referred to as the "Main Case".

[3] For convenience, Case No. 08-50844 will be referred to as the "Dixon Case".

[4] *See supra* note 1.

## I. Background[5]

The Court assumes the parties' familiarity with the history of these cases.[6]  For convenience of the parties, the following limited background is provided to give context to this memorandum of decision.

*Generally*

SageCrest Dixon Inc. ("Dixon") was a Delaware corporation, which was a wholly owned subsidiary of SageCrest Canada Holdings Inc., which, in turn, was a wholly owned subsidiary of SCII.  Dixon was established to hold title to real property in Toronto, Canada, upon which the Constellation Hotel ("Hotel") was located ("Property").[7]  (*See* Bomhof Dep., at 89, Trustee's Tr. Exh. CC.)  The Property was Dixon's sole asset.

The manner in which Dixon came to own the Property prompted the instant controversy.  As more specifically detailed, *infra* at 7, the Property was acquired through a Canadian bankruptcy proceeding, known as an arrangement.

*SCII's Initial Interest in the Property and the Canadian Arrangement*

In March 2004, SCII made a loan to Orenstein Investments, Inc, which was secured by shares in a Canadian company known as 1587930 Ontario Inc. ("158

---

[5]  This Background section is derived from evidence adduced at the claims objection trial conducted on July 15-16, 2014.

[6]  *See, e.g., In re SageCrest II, LLC*, 414 B.R. 9 (Bankr. D. Conn. 2009); *In re SageCrest II, LLC*, 2011 WL 134893 (D. Conn. Jan. 14, 2011).  For purposes of this memorandum of decision the Court notes that "because of the complexity, illiquidity, and interconnectedness of the [SCII's and Dixon's] assets" this Court determined that a joint reorganization "would prove more fruitful than two separate reorganization plans." *In re SageCrest II, LLC*, 2011 WL 134893, at *1.

[7]  Since the claim which is the subject of this contested matter is made against SCII and given SCII's overarching involvement in the events which gave rise to the claim, notwithstanding Dixon's subsequent involvement as the entity created to hold title of the Property, for convenience and unless otherwise noted for clarity, the Court's reference to SCII encompasses Dixon.

Ontario"[8] ).  158 Ontario and its subsidiary, 2031939 Ontario Inc. ("203 Ontario"[9])
(collectively, the "Numbered Entities"), used that financing for the purchase of the
Property.  The Numbered Entities also borrowed approximately CDN $2 million from
Jean-Daniel Cohen ("Cohen") to acquire the Property.[10]  In addition, Cohen arranged a
CDN $20 million loan for the Numbered Entities, for which he was owed commissions.
(*See* July 15, 2014 Trial Tr. at 60; SCII's Tr. Exh. A (Cohen Aff. 5, ¶20).)

On April 22, 2005, the Numbered Entities filed petitions for arrangement under
Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 ("CCAA")[11] in
the Superior Court of Justice, Province of Ontario, Canada ("Ontario Court").  In
accordance with the CCAA, a monitor was appointed to oversee the Numbered Entities'
ongoing operations and assist with the filing and voting on a restructuring plan.  (*See*
July 16, 2014 Trial Tr. at 79-80 (Tayar Direct Exam) (ECF No. 2436).)  After the CCAA
filing date, SCII's subsidiary, SageCrest Regal, Inc., acquired the first and second
mortgages on the Property.  As a result, SCII was the Numbered Entities senior
secured creditor.  (*See* Equal's Tr. Exh. 5 at 6, ¶4(b) (Supp. to 12th Report of Monitor).)
Cohen was the Numbered Entities largest unsecured creditor.

On July 13, 2006, two former principals of 158 Ontario and 203 Ontario, Al
Soorty and Zoran Cocov (hereafter, "S&C"), submitted an initial offer to the monitor to
purchase the Property.  That offer was not approved by the Ontario Court because S&C
could not provide adequate assurance of financing to fund their offer.

---

[8]  For purposes of clarity, the Court notes that 158 Ontario was also known as
"Holdco" in the Canadian arrangement.

[9]  203 Ontario was also known as "Ownco" in the Canadian arrangement.

[10]  The Property was acquired out of a Canadian receivership in 2004 for CDN
$24 million.

[11]  In broad terms, the CCAA is similar to a Chapter 11 restructuring for a large
company.  *See generally In re Metcalfe & Mansfield Alt. Invs., et al.*, 421 B.R. 685
(Bankr. S.D.N.Y. 2010); *see also generally Elan Corp. v. Comiskey* (C.A.), 1990 CanLII
6979 (ON CA Nov. 2, 1990)(Doherty, J.A., dissenting) (discussing purpose of the
CCAA).

During September 2006, offers were made to the monitor for the Property by S&C (an amended offer); by Cohen, on behalf of various entities he controlled, including Mercury Hospitality Partners, LLC ("Mercury"),[12] and by SCII.  On September 25, 2006, the Ontario Court considered those offers.  After the September 25th hearing, S&C's financial advisor had a conversation with Cohen in which the advisor asked Cohen to support S&C's amended offer by making his (Cohen's) financing available to S&C.  (*See* SCII's Tr. Exh. I; *see also* SCII's Tr. Exh. BB at ¶¶7-11; SCII's Tr. Exh. DD at 39.)  S&C and Cohen reached an understanding that if the Ontario Court rejected S&C's amended offer, Cohen would pursue his own offer.  (*See id.*; *see also* SCII's Tr. Exh. DD at 41.)

The monitor and the Ontario Court did not learn about S&C's new, Cohen-related financing until September 26th or 27th, *i.e.*, after the September 25th hearing. (*See* SCII's Tr. Exh. BB. at ¶¶9, 11.)  On the basis of their enhanced financing capability to support their amended offer, S&C sought another court hearing on their offer to purchase the Property.  The Ontario Court agreed and conducted a hearing on October 3, 2006 to determine whether evidence of S&C's alleged financial status should be considered.  (*See id.* at ¶13.)

On October 6, 2006, the Ontario Court issued an endorsement that "with some reluctance" it would "re-open the opportunity to any party to put in a further offer" on the Property.  (*See* SCII's Tr. Exh. J.)  Its stated basis for doing so was that a Canadian bankruptcy proceeding "is different from an ordinary civil action and trial . . . [since it] anticipates dynamic and 'real time' process that should only be stifled when to do otherwise would operate as a significant prejudice to a creditor or group of creditors."

---

[12]  In addition to Mercury, these entities include: Hermes Partners SCS ("Hermes"), Sofon Investissements SARL, Sofon Immobilier SAS (collectively, "Sofon"), Equal Overseas Investments SA (Luxemburg), Equal Inc. (Japan), Mercury Hospitality Partners LLC Hospitality Investors Group, LLC, Glencoy Overseas Investments SA, Societe Centrale Des Bois er Scieries de la Manche, and Pacrim Hospitality Group (Canada) Inc.  Cohen identified himself, "Hermes and Sofon and their respective affiliates, associates and related entities" collectively as the "Equal Group".  (SCII's Tr. Exh. O at p.1.)  Unless noted otherwise, the Court's reference to Cohen in the singular will encompass him and the Equal Group.

Thus, the Ontario Court concluded that "the unsecured creditors should not be deprived of the possibility of Court consideration" of an improved offer by SCII or an offer from S&C or others.  (*See* SCII's Tr. Exh. J.)  A corresponding order entered on October 11, 2006 instructing, *inter alia*, that "[o]ffers are to be received by the monitor no later than Oct.18[, 20]06" and that "all parties bidding are to do so on a best foot forward basis." (*See* SCII's Tr. Exh. K.)  A hearing on the monitor's recommendation as to the best offer was scheduled for October 19 or 20, 2006.  (*See id.*)  Thus, when the bidding period was re-opened, Cohen was a bidder in two distinct capacities:  as a financial backer of S&C, and as a principal pursuing his own bid.

*Agreement Between SCII and Cohen*

On October 16, 2006, an SCII agent[13], Jeffrey Gwin of Creative Realty, LLC, telephoned Cohen to ask about his plans to bid on the Property.  (*See* SCII's Tr. Exh. DD at 63-64.)  Cohen told Gwin he was planning to re-submit his $42 million offer.  (*Id.* at 65.)  Gwin inquired whether Cohen was interested in "joining forces" and not competing with SCII.  (*Id.* at 67-70.)  Cohen agreed in principle.  That is, he would withdraw his financial support of the S&C offer, but he had not yet decided to forego his right to make an independent, competing bid through his Mercury affiliate.  That decision was made the next day, October 17, 2006, when Cohen received "the final terms of an agreement" with SCII, which were acceptable to him.  (*Id.* at 72-73.)

Despite having no claims against SCII (*see id.* at 75-76),[14] the agreement

---

[13]  Prior to SCII's bankruptcy, it was managed by Windmill Management, LLC ("Windmill"), the principals of which were brothers Alan and Phillip Milton ("Milton Brothers").  *See In re SageCrest II, LLC*, 2011 WL 134893, at *1. Because of the dissatisfaction of various of the bankruptcy constituents, *see id.* at *2, the Milton Brothers were eventually replaced by an interim manager.  *See id.* at *3.

[14]  Based on his earlier loan to the Numbered Entities and his having arranged for their CDN $20 million mortgage when they originally acquired the Property in 2004, Cohen had an approximate CDN$3.1 million claim against the Numbered Entities.  (*See* Equal's Pre-Trial Memo at 5 (ECF No. 2349).)  At the time of the Settlement Agreement, that claim had been denied in the Canadian bankruptcy case, but was under appeal.  (*See* SCII's Tr. Exh. W; *see also* Equal's Opp'n to Debtors' Claim Obj. at

between SCII and Cohen was fashioned as a "settlement agreement", which was subject to a confidentiality provision ("Settlement Agreement").  Under its terms, Cohen would withdraw his financial support of the S&C offer, would not make his own offer, and would support SCII's offer.  The Settlement Agreement also provided that the parties exchange mutual releases "with respect to any and all claims, liabilities and actions related to their investment in or involvement with the Property . . .".  (SCII's Tr. Exh. O at 3, ¶5.)  Further, SCII agreed that once it (through Dixon) became the registered title holder of the Property, it would retain Cohen as a redevelopment consultant, paying a fixed retainer in two installments:  an initial payment of CDN $1.369 million and a subsequent payment of CDN $1.379 million.  (*See* SCII's Tr. Exh. O at 2.)  Cohen was to receive a third payment, a commission of CDN $ 850,000 ("Commission"), upon the further sale of the Property, which "shall be a claim solely against the owner of the Property (*i.e.,* Dixon) . . ." (*Id.*)  It is of paramount significance in this controversy to note that those amounts were "*payable regardless of the quantum of the services actually requested by Dixon."*  (*See id.* at 3 (emphasis added).)  The Settlement Agreement also contemplated that once Dixon became the owner of the Property, a subsequent consulting agreement, as well as other related documents, would be executed between SCII and Cohen.  (*See id.*)  Notwithstanding the fact that Cohen received a letter from his Canadian counsel which raised concerns about whether the Settlement Agreement could expose Cohen to "criminal and civil charges and/or claims for bid-rigging or conspiracy . . ." under Canadian law (SCII's Tr. Exh. Y.[15]), Cohen testified that, on October 17, 2006, he nonetheless agreed to the terms of the Settlement Agreement, and then decided not to pursue his own offer for the Property.  (S*ee* SCII's Tr. Exh. DD at 72-73.)

On October 18, 2006, S&C re-submitted their amended offer and SCII submitted

---

2 (ECF No. 2023).)

[15]  Cohen's counsel identified two Canadian statutes he believed might apply: Section 47(1) of the Canadian Competition Act and Section 45(1) of that act, titled "Conspiracy".

its offer to the monitor.  (*See* SCII's Tr. Exh. Q at p.4.)  Cohen informed the monitor that his financial backing of the S&C financing had been withdrawn.  (*See* SCII's Tr. Exh. Q at p.5).  Neither he nor any of his affiliates made an offer by the October 18th deadline. It is noteworthy that the monitor was not informed about SCII's agreement with Cohen. (*See, e.g.*, SCII's Tr. Exh. CC at 85-86 (Bomhof Dep); *see also* July 16, 2014 Trial Tr. at 96-97.)  After comparing the two offers, the monitor recommended SCII's offer.  (*See* SCII's Tr. Exh. Q at 5.)  At an October 20, 2006 hearing to consider the monitor's recommendations, once again neither SCII nor Cohen disclosed to the monitor or the Ontario Court the existence of the Settlement Agreement.  (*See* July 16, 2014 Trial Tr. at 100-101; *see also* SCII's Trial Memo at 6 (ECF No. 2346).)  The Ontario Court approved SCII's bid and ordered that title to the property vest in SCII's designee (*i.e.*, Dixon).  (*See* SCII's Tr. Exh. BB at 116 (Bomhof Dep.).)

*Consulting and Other Agreements*

On December 15, 2006, as contemplated in the Settlement Agreement, after the sale of the Property, SCII and Cohen entered into a consulting agreement (the "Consulting Agreement").  (*See* SCII's Tr. Exh. BB at 124-27 (Bomhof Dep.); *see also* SCII's Tr. Exh. R; SCII's Tr. Exh. AA (re: date of Consulting Agreement).)  Cohen designated Equal as his nominee to be the consultant to SCII.  (*See* SCII's Tr. Exh. R at 1.)  The same relevant terms that were stated Settlement Agreement were repeated in the Consulting Agreement, specifically, the provision:  "The fees shall be payable *regardless of the quantum of services actually requested* by [Dixon, the title holder] or performed by [Equal],"and "[SCII] agrees to guarantee [Dixon's] obligations under this [Consulting] Agreement to pay to [Equal] the Fees for services rendered."  (*Id.* at 2, ¶4, ¶5 (emphasis added).)  Notwithstanding that none of the signatories where Canadian citizens or companies, and the Consulting Agreement was not signed in Canada, it specifically stated that it was to "be governed by and interpreted, construed and enforced in accordance with the laws of the Province of Ontario and the law of Canada applicable therein".  (*Id.* at ¶12; *see also* July 15, 2014 Trial Tr. at 34, 38-39.)

On December 15, 2006, in addition to the Consulting Agreement, two other

agreements were executed: an escrow agreement regarding CDN $250,000 of the first

fixed retainer fee due under the Consulting Agreement (*see* Equal's Tr. Exh. 23

(Escrow Agreement)), and a release agreement, which provided greater detail of the

releases referred to in October 17, 2006 Settlement Agreement.  (*See* Equal's Tr. Exh

24 (Release Agreement).)  The Settlement, Consulting, Escrow, and Release

Agreements were to "constitute the entire agreement between the parties pertaining to

the subject matter" of the Escrow agreement.  (*See* Equal's Tr. Exh. 23 at ¶18.)

It is undisputed the first fixed retainer payment was made.  (*See* July 16, 2014

Trial Tr. at 10-11.)  However, despite Cohen's demands made on December 21, 2007,

and January 14, 2008, the second fixed retained payment was not made.  (*See* SCII's

Tr. Exh. AA (re: demand); *see also* July 16, 2014 Trial Tr. at 11, 92.)  Nor was the

Commission ever paid.  On March 10, 2008, Equal commenced a collection action in

the Ontario Court, and motion practice ensued.  The collection action was stayed when

the Ontario Court was advised that bankruptcy petitions for SCII and Dixon had been

filed in this Court.   (*See* July 16, 2014 Trial Tr. at 93.)

*SCII's & Dixon's U.S. Bankruptcies*

On August 17, 2008 , SCII filed this chapter 11 case.[16]  On September 11, 2008,

Dixon also commenced a chapter 11 case in this Court.  SCII's and Dixon's cases have

been jointly administered.[17]  At the time of its filing, Dixon was in the process of

demolishing the Hotel in order to build a new one on the Property.  As a result of

Dixon's bankruptcy filing, all development of the Property stopped.  The Property was

eventually sold "as is, where is" on March 25, 2011, after a March 2, 1011 court-

---

[16]  SCII was a specialty lending hedge fund and one of a group of 27 related
entities of which eight filed Chapter 11 cases in this Court.  Dixon is one of those eight
entities.

[17]  *See* Dixon Case, Consolidation Order dated Oct. 30, 2008, ECF No. 35.

approved auction.[18]  By early 2012, the Dixon Case was fully administered,[19] and its application for a final decree was approved.  Thereafter, the case was closed.[20], [21]

*Equal's Proof of Claim and SCII's Objection*

On September 23, 2008, Equal filed a proof of claim ("POC") in SCII's case, based on SCII's guarantee of payments under the Consulting Agreement.  (*See* Main Case, Claims Register, Claim No. 3-1, Exh. A.)  Equal seeks CDN $1,379,000 for the second fixed retainer consulting fee and the CDN $850,000 Commission due after the sale of the Property.  On November 29, 2011, SCII filed an objection to Equal's claim.  (*See* ECF No. 1909.)

SCII supplemented its objection, arguing the unenforceable nature of the intertwined agreements upon which Equal's claim is based.   (*See* SCII's Supplement at 2 (ECF No. 2344).)  In essence, SCII argues that Cohen was "offered a bribe" by Creative's Gwin (who was appointed by Windmill to act on SCII's behalf[22]) to induce Cohen to withdraw his support of S&C's competing bid for the Property in the Canadian bankruptcy case.  SCII argues that had such an arrangement been made in a U.S.

---

[18]  *See* Main Case, Bidding Procedures Order dated Feb. 16, 2011, ECF No. 1404; *see also* Main Case, Sale Order dated Mar. 10, 2011, ECF No. 1443.

[19]  *See* Main Case, ECF Nos. 1581, 1704, & 1859 (orders authorizing the distribution of proceeds from sale of Property).

[20]  *See* Dixon Case, Order Approving Application for Final Decree dated Apr. 24, 2012 (ECF No. 95).

[21]  On December 13, 2011 SCII's joint plan was confirmed.  (*See* ECF No. 1979.) Under the plan, the assets of SCII and other related affiliates are being liquidated through a trust.  (*See* ECF No. 1952 (1st Amended Plan).)  Since the Property, which was Dixon's sole asset, was sold prior to the plan confirmation, the 1st Amended Plan did not address the Property.  All other assets have been liquidated.  The remaining matter that needs to be resolved by the Trustee is this claim objection.

[22]  *See supra* note 13.

bankruptcy case, it would be a crime, citing 18 U.S.C. § 152(6).[23]  (*See* SCII's Trial
Memo. at 2 (ECF No. 2346).)  SCII acknowledges that the first fixed retainer fee was
paid, but as to the balance claimed in Equal's POC, "[t]his Court should not lend its
imprimatur to the enforcement of agreements so plainly contrary to United States law."
(*Id.*)

Equal countered that Cohen "had a significant interest to protect as a major
creditor of the [Property]," and that the "settlement was pursued to garner additional
support for" SCII's purchase of the Property.  (Equal's Pre-Trial Memo at 2 (ECF No.
2349).)  It further asserted that "the consulting agreement was effectively a funding
device" which SCII requested.  (*Id.* at 4.)  It characterized the parties' agreement
(initially documented in the Settlement Agreement, and subsequently augmented with
the December 15, 2006 Consulting Agreement and other integrated agreements) as
"the product of a duly negotiated settlement undertaken by experienced businessmen
and represented by seasoned counsel," which "remains an enforceable obligation . . ."
(*Id.*)

## II.  Discussion

### *Proof of Claim*

"A claim . . . , proof of which is filed under section 501 of this title, is deemed
allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a); *see also* Fed. R.
Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules
shall constitute prima facie evidence of the validity and amount of the claim.").

---

[23]  Section 152(6) of title 18 of the United States Code provides:

A person who—
\* \* \*

(6) knowingly and fraudulently gives, offers, receives, or
attempts to obtain any money or property, remuneration,
compensation, reward, advantage, or promise thereof for
acting or forbearing to act in any case under title 11 [i.e., the
Bankruptcy Code];

\* \* \*

shall be fined under this title, imprisoned not more than 5 years, or both.

> [T]he burden of persuasion under the bankruptcy claims
> procedure always lies with the claimant, who must comply
> with Fed. R. Bankr. P. 3001 by alleging facts in the proof of
> claim that are sufficient to support the claim.  If the claimant
> satisfies these requirements, the burden of going forward
> with the evidence then shifts to the objecting party to
> produce evidence at least equal in probative force to that
> offered by the proof of claim and which, if believed, would
> refute at least one of the allegations *that is essential to the*
> *claim's legal sufficiency.  See Lundell v. Anchor Cosnt.*
> *Specialist, Inc. (In re Lundell)*, 223 F.3d 1035, 1041 (9th Cir.
> 2000); *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773
> (2d Cir. B.A..P. 2000). . . .  If the objecting party meets these
> evidentiary requirements, then the burden of going forward
> with the evidence shifts back to the claimant to sustain its
> ultimate burden of persuasion to establish the validity and
> amount of the claim by a preponderance of the evidence.
> *See In re Consumers Realty & Dev'l Co.*, 238 B.R. 418 (8th
> Cir. B.A.P. 1999); *In re Allegheny Int'l, Inc.*, 954 F.2d 167,
> 173-74 (3d Cir. 1992).

*In re Driscoll*, 379 B.R. 415, 420 (Bankr. D. Conn. 2008) (block quoting *In re Jorczak*,

314 B.R. 474, 481 (Bankr. D. Conn) (further quoting *In re Rally Partners, L.P.*, 306 B.R.

165, 168-69 (Bankr. E.D. Tex. 2003) (footnote omitted)) (emphasis added); *see also In*

*re Central Rubber Products, Inc.*, 31 B.R. 865, 867 (Bankr. D. Conn. 1983) (instructing

that the "ultimate burden of persuasion . . . is upon the creditor").


*Applicable Law*

    SCII argues that the laws of the United States must be applied, but even if

Canadian law applies, the Agreement is not enforceable.  Equal challenges that

assertion, taking the position that the claim objection should be determined under

Canadian law, pursuit to which its claim should be allowed.  For the reasons that follow,

the Court need not dwell on which law applies because the same result follows with the

application of either.[24]

---

    [24] Assuming there is a conflict, the choice of law rule which would govern is
federal common law since jurisdiction in this case is based on federal law, *i.e.*, the

---

Bankruptcy Code.  *See Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (2d Cir. 1991); *see also In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995).  Federal conflict of laws principles incorporate the Restatement (Second) of Conflict of Laws ("Restatement").  *See Schoenberg*, 930 F.2d at 782.  Under § 187(2) of the Restatement, a court may disregard the parties' choice of law if its application would lead to a result contrary to a "fundamental policy" of the forum court when the forum court has a materially greater interest in the outcome than does the jurisdiction whose laws were chosen by the parties.  *See Restatement § 187(2).*  Specifically, § 187(2) provides:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, *unless either*
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1971) (emphasis added).

      Here, the particular issue is SCII's objection to Equal's POC, which is based on an alleged breach of contract.  This Court has a materially greater interest in the determination of that claim objection than does the Ontario Court.  None of the parties involved in this claim objection have any current presence in Ontario.  Nor were they ever entities or citizens of Canada.  As stated, *supra* at 7, no party executed the consulting Agreement in Canada, and there was never any intention that services be rendered in Canada.  Further, the underlying Property, which is located in Toronto, has long been sold, under the auspices of this Court, and neither SCII nor Equal have any remaining interest in it.

      Conversely, SCII chose to become a Chapter 11 debtor in this Court.  By filing its POC in SCII's bankruptcy case, Equal has voluntarily submitted itself to this Court's jurisdiction for the determination and administration of the claim.  *See In re Winimo Realty Corp.*, 270 B.R. 108, 120 (S.D.N.Y. 2001) (collecting cases).  Moreover, if there had been an absence of a choice-of-law provision in the agreement, it is likely that the

1.  Under Canadian Law, the Consulting Agreement Would Not Be Enforceable[25]

There are two independent reasons why the Agreement is not enforceable under Canadian law.  The cumulative effect of those reasons strengthens this conclusion.

(a) Lack of Consideration

Under Canadian law, "Adequacy of consideration is not the test of a valid contract but sufficiency of consideration is.  There must be something which is being given in exchange for the act or promise that is alleged for there to be contractual obligation. . . ."  Fridman, *The Law of Contract in Canada*, at 91 (6th ed. 2011).  In this instance, the Court finds Cohen did not provide any consideration for the payments to be received under the Consulting Agreement.

Despite Equal having claims against the Property's prior owners, it failed to persuasively explain how those claims became claims against SCII, such that SCII would need to consider them.  Indeed, Cohen's testimony on this matter is inconsistent.  While Cohen previously testified at his deposition that he had no claims against SCII (*see* Joint Tr. Exh. 3 at 75-76 (Cohen Dep.)), he equivocally testified at trial that he may have a claim against SCII (*see* July 15, 2014 Trial Tr. at 88-89 (ECF No. 2435); July 16, 2014 Trial Tr. at 10).  Despite it being his burden to do so, Cohen has failed to

---

relative importance of the various contact factors of Restatement § 188(2) would favor the laws of the United States, in particular federal bankruptcy law.


[25] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1, made applicable in bankruptcy by Fed. R. Bankr. P. 9017.  In support of their positions and to assist the Court in its determination whether the Consulting Agreement is enforceable under Canadian law, the parties submitted reports from Canadian counsel on that issue.  SCII's Rule 44.1 Report was prepared by counsel of the Canadian firm Borden Ladner Gervais, LLP. (*See* Main Case, ECF No. 2347, dated Nov. 1, 2013 ("Borden Rule 44.1 Report").) Cohen's Rule 44.1 Reports were prepared by the Canadian firm Blake, Cassels & Graydon LLP.  (Submitted to Chambers, dated June 26, 2014 "Blakes Rule 44.1 Report").)

adequately explain the claim or claims he had against SCII, such that his waiving them would serve as his consideration in entering into the initial Settlement Agreement or the subsequent Consulting Agreement.

Rather, on the basis of the evidence adduced at trial, including the text of the Consulting Agreement, together with the other agreements, the Court concludes that the Agreements, collectively, were a mechanism to implement a side-deal whereby SCII would pay Cohen roughly the amount of his unsecured claims against the Numbered Entities to ensure his support of its bid for the Property.  (*See, e.g.,* Equal's Tr. Exh. I at 11, ¶3.)  This appears to be tacitly acknowledged in Blakes Rule 44.1 Report at ¶15 (the assumed fact Equal provided to Blakes that Cohen would "explore the possibility of a 'partnership' with SageCrest, based upon a settlement that would pay Sofon/Cohen a minimum of $4.0 million").)

Accordingly, there was nothing to settle; so, there was no bases for a settlement. It follows, therefore, that there was nothing to serve as consideration for the payments to be made to Equal.  Thus, without consideration, the Consulting Agreement, upon which Equal bases its POC, is unenforceable.

### (b)  *In Pari Delicto* and/or *Ex Turpi Causa Non Oritur Actio*

Canada recognizes the common law principle of *in pari delicto*, which holds that when parties enter an agreement that offends public policy or is plainly illegal, *i.e.*, where the parties are equally at fault, a court will not lend its stature and good offices to enforce the agreement.  Instead, it will leave the equally culpable parties to their own devices.  "They cannot come to the courts to enforce any unfulfilled promises, recover any money or property which has been transferred thereunder, or obtain damages." *See* Fridman, *The Law of Contract in Canada* at 408 (6th ed. 2011); *see also Major v. Canadian Pacific Railway* [1992], 64 S.C.R. 367 ("No action . . . can be brought for the purpose of enforcing an illegal contract either directly or indirectly, or for recovering a share of the proceeds of an illegal transaction, by any of the parties to it.  Where the object of a contract is illegal the whole transaction is tainted with illegality and no right of action exists in respect of anything arising out of the transaction.").

Like the United States, Canada, recognizes that contracts which offend public policy are not enforceable.  Where a matter is presented to a court, such as Equal's claim, which is based on such a contract, the imposition of the doctrine of *ex turpi causa non oritur actio* is appropriate.  As one Canadian jurist wrote over a century ago:

> *Ex turpi causa non oritur actio.*  This old and well known legal maxim is founded on good sense, and expresses a clear and well recognized legal principle which is not confined to indictable offences.  No court ought to enforce an illegal contract or allow itself to be made the instrument of enforcing obligations alleged to arise out of a contract or transaction which is illegal, if the illegality is duly brought to the notice of the court, and if the person invoking the aid of the court is himself implicated in the illegality.  It matters not whether the defendant has pleaded the illegality or whether he has not.  If the evidence adduced by the plaintiff proves the illegality the court ought not to assist him.

*Scott v. Brown*, [1892] 2 Q.B. 724 (Lord Justice Lindley).  Furthermore, in his concurrence in *Hall v. Herbert*, [1993] 2. S.C.R. 159, Canadian Justice Gonthur stated that the purpose of this maxim is "to defend the integrity of the legal system and the repute in which the courts ought to be held . . . ."  *See also generally* Fridman, *The Law of Contract in Canada* at 406-410 (6th ed. 2011).

The evidence supports a finding that the Settlement Agreement, with the subsequent Consulting Agreement, was a side-deal between SCII and Cohen under which, for a pay-off, Cohen agreed to cease competing with SCII for the Property.  This collusive thwarting of a rival bid is contradictory to what the Ontario Court sought to accomplish by ordering the bidding period re-opened.  The stated reason Justice Campbell reluctantly agreed to re-open the bidding was to provide the opportunity for other, better bids to be presented for the benefit of the unsecured creditors.  (*See* SCII's Tr. Exhs. J, K.)  By SCII's entering into a side-deal with Cohen, the purpose of Justice Campbell's orders was subverted – indeed, eviscerated – because the potential of another, real and better offer for the Property, *i.e.*, an offer from Cohen, was eliminated.  It also meant Cohen, an unsecured creditor, would receive more than his *pro rata* share of funds available for unsecured creditors.  (*See, e.g.*, Equal's Tr. Exh. at

10.) The Court concludes that if the Ontario Court had been made aware of these facts, it also would have found them to be offensive to the integrity of the Canadian legal system and/or a manifest interference with the administration of justice. *See* Fridman, *The Law of Contract in Canada* at 361-363, 407 & n.420[26] (6th ed. 2011). Presented with such an affront, it is likely that the Ontario Court would invoke either of two doctrines (if not both): *in pari delicto* and/or *ex turpi causa non oritur actio*.

### 2.  Under U.S. Law, the Consulting Agreement is Not Enforceable

The Agreement is not enforceable under U.S. law.

(a)  *Lack of Consideration*.

Like Canada, for a contract to be enforceable in the United States, there must be consideration. *See Citizens Commc'ns Co. v. Trustmark Ins.*, 303 F. Supp.2d 197, 209 (D. Conn. 2004). The Court has already found Cohen did not meet his burden of establishing the requisite consideration to establish an enforceable contract under Canadian law. (*See supra* at 13-14.) That also supports a finding that the Consulting Agreement is unenforceable under U.S. law.

(b)  *In Pari Delicto*

As with Canadian law, the laws of the United States recognize the doctrine of *in pari dellicto*. *See Pinter v. Dahl*, 486 U.S. 622, 634 (1988); *see also Titan Real Estate Ventures, LLC v. MJCC (In re Flanagan)*, 415 B.R. 29, 34, 36 (D. Conn. 2009). The imposition of that doctrine "prohibits wrongdoers from evading responsibility for their own corrupt bargains by leaving the parties where it finds them . . ." *Titan Real Estate*,

---

[26] Note 420 of Fridman's treatise states, in relevant part:

> (i) courts will not enforce a contract expressly or impliedly forbidden by statue or entered into with the intention of committing an illegal act; (ii) courts will not assist a party to recover a benefit from his own wrongdoing. . . .

415 B.R. at 36.  Indeed, it has long been the law of the United States that "illegal promises will not be enforced in cases controlled by federal law." *Kaiser Steel Corp. v. Mullins et al.*, 455 U.S. 72, 77 (1982).  Further, when federal courts are acting as courts of equity, they should be even more reluctant to recognize agreements which are tainted with illegality.  *See, e.g., Morris-Griffen Corp. v. C&L Serv. Corp.*, 731 F. Supp.2d 488, 496 & 502 (E.D. Va. 2010).

Contrary to Equal's attempt to characterize it otherwise, this is not the instance where two parties agreed to act together to combine their bids to raise their offer, which courts have found to be non-collusive.  *Cf., In re GCC, Inc.,* 453 B.R. 132, 154 (Bankr. S.D.N.Y. 2001) (finding the existence of a joint bid does not itself amount to collusive bidding).  Rather, here, one party agreed to not submit a bid in exchange for a payment, so that the other party could present its own bid, unchallenged.  That is antithetical to the Bankruptcy Code, and this Court will not countenance such conduct.  *See*, *e.g.*, 11 U.S.C. § 363(n).  Thus, for the same reasons that this Court concluded the Ontario Court would not enforce the Settlement and Consulting Agreements under the *in pari delicto* doctrine, *see supra* at 14-16, this Court finds the doctrine is applicable under U.S. law warranting the conclusion that the Consulting Agreement is unenforceable under U.S. law.

### 3.  Under U.S. Bankruptcy Law, There Is No Basis for Awarding the Commission

As a threshold matter, Equal was never retained as a professional by SCII to assist it in selling the Property.  *See* 11 U.S.C. § 327(a); *see also* Fed. R. Bankr. P. 2014(a).  "[W]ithout an order of the court . . . not only may [the professional] not be retained, but he can recover nothing, no matter how beneficial, or how arduous, his services." *In re Eureka Upholstering Co., Inc.*, 48 F.2d 95, 95 (2d Cir. 1931)(J. Hand). *See also In re Crafts Retail Holding Corp.*, 378 B.R. 44, 48-49 (Bankr. E.D.N.Y. 2007) (collecting cases).

Through its claim, Equal is, in essence, attempting to circumvent one of the safeguards of court-approval of a debtor-in-possession's retention of professionals, *i.e.*, control over administrative costs.  *See Crafts Retail*, 378 B.R. at 49 (citing *Eureka*

*Upholstering*, 48 F.2d 95).  That is contrary to the

> strong policy reasons underlying the requirement for prior
> court approval of the employment of . . . other professionals
> who will ultimately seek to be paid from estate resources.
> Judicial approval of employment entails a court's
> independent, detached determination that the applicant
> satisfied the statutory requirements under § 327(a) that he is
> disinterested and does not have an adverse interest, *and
> also that*, among other things, *the nature and extent of the
> proposed services are necessary under the circumstances*.

*Id.*  (emphasis added).  As noted, *supra* at 7, the Property was sold via a court-ordered
auction under the auspices of this Court.  It is undisputed that Equal did not provide any
services in that auction.  Even assuming, *arguendo*, Equal had been retained, its lack of
providing any services would warrant the denial of the CDN $850,000 Commission
sought.


                                        * * *

     It is noteworthy that SCII's management, Windmill, which authorized SCII to
enter into the side-deal, was removed.  *See In re SageCrest II, LLC*, 2011 WL 134893,
at *2-3.  Neither Windmill nor its principals, the Milton Brothers, will benefit from this
ruling.  Rather, the monies claimed by Equal will be available for distribution in
accordance with SCII's Plan.

### III.  Conclusion

Accordingly, **IT IS ORDERED** that SCII's objection to Equal Oversea's claim is sustained.

This memorandum of decision constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052.

Dated this 23 day of December 2015 at Bridgeport, Connecticut.

By the court

*Alan H. w. Shiff*
Alan H. W. Shiff
United States Bankruptcy Judge